1

**WANGER JONES HELSLEY PC**
265 E. River Park Circle, Suite 310
2
Fresno, California  93720
Telephone:      (559) 233-4800
3
Facsimile:      (559) 233-9330

4
Jay A. Christofferson #203878
Christopher A. Lisieski #321862
5

6
Attorneys for:   PLAINTIFFS D.M. and L.M., minors, by and through their Guardian ad litem Jose
Martinez, on their own behalf and on the behalf of the Estate of Rene Snider, decedent; DENISE
7
SAWYER, on her own behalf; and DOUG SNIDER, on his own behalf

8

9
**UNITED STATES DISTRICT COURT**

10
**EASTERN DISTRICT OF CALIFORNIA**

11

12
D.M. and L.M., minors, by and through their
Guardian ad litem Jose Martinez, on their own
13
behalf and on the behalf of the Estate of Rene
Snider, decedent; DENISE SAWYER, on her
14
own behalf; and DOUG SNIDER, on his own
behalf,
15

16
                    Plaintiffs,

17
          v.

18
COUNTY OF MERCED, WELLPATH, LLC,
19
CALIFORNIA FORENSIC MEDICAL
GROUP, INC., AMANPREET ATWAL, C.O.
20
CASTANEDA, ALICIA DUNWOODY,
GIANFRANCO BURDI, KERIANN QUINN-
21
FITZPATRICK, DYLAN FULCHER, SHAWN
AUTREY, PAO CHANG, JESSICA RAMIREZ-
22
AGUILAR, JAMIE BURNS, THANYA
23
RYLAND, and DOES 1–10, inclusive,

24
                    Defendants.

Case No. 1:20-CV00409-NONE-SAB

**FIRST AMENDED COMPLAINT FOR
VIOLATIONS OF THE FOURTEENTH
AMENDMENT PURSUANT TO 42 U.S.C.
§ 1983, CALIFORNIA CIVIL CODE
§ 52.1, AND WRONGFUL DEATH**

**Jury Trial Demanded**

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTEENTH AMENDMENT PURSUANT TO
42 U.S.C. § 1983, CALIFORNIA CIVIL CODE § 52.1, AND WRONGFUL DEATH

Plaintiffs D.M. and L.M. by and through their guardian ad litem Jose Martinez, and DENISE SAWYER and DOUG SNIDER (hereafter referred to collectively as "Plaintiffs"), by and through their counsel of record, file this complaint against Defendants COUNTY OF MERCED, WELLPATH, LLC, CALIFORNIA FORENSIC MEDICAL GROUP, INC., AMANPREET ATWAL, C.O. CASTANEDA, ALICIA DUNWOODY, GIANFRANCO BURDI, KERIANN QUINN-FITZPATRICK, DYLAN FULCHER, SHAWN AUTREY, PAO CHANG, JESSICA RAMIREZ-AGUILAR, JAMIE BURNS, THANYA RYLAND, and DOES 1–10, inclusive (hereafter referred to collectively as "Defendants"), and allege as follows:

## INTRODUCTION

1.      Plaintiffs in this case are the mother, father, and minor children of Rene Snider (hereafter "Ms. Snider" or the "Decedent").  Ms. Snider died by suicide due to hanging in a jail cell at the Merced County Jail on March 23, 2019, after she had been held incompetent to stand trial and ordered into custody for restoration of competency.  Upon being ordered into custody, Ms. Snider was inadequately screened for the risk of suicide, with a nurse incorrectly entering information into the jail's computer system indicating she was not a suicide risk, when in fact Decedent disclosed she had previously attempted suicide and had serious mental health disorders.  Additionally, Ms. Snider's mental health medications were abruptly stopped by jail staff, and never restarted.  Ms. Snider was not placed into a safety cell, or given safety garments or bedding appropriate for someone at risk of suicide.  Finally, Ms. Snider was not appropriately monitored by jail staff, who failed to notice physical evidence that Ms. Snider had, in fact, attempted suicide earlier on the same day.

2.      This suicide highlights a policy of deliberate indifference to the mental health needs of Merced County inmates, including Ms. Snider.  Merced County outsources its medical and mental healthcare services to a for-profit entity known as California Forensic Medical Group (and/or various affiliated corporate entities, known as Wellpath, Correctional Medical Group Companies, and Correct Care Solutions).  Merced County has contracted and continues to contract with CFMG and its affiliates, despite the fact that these entities have a long track record of providing inadequate mental health care and higher-than-average suicide rates in facilities under their control.  Merced County's decision to continue utilizing third-party service providers with a demonstrated track record of

insufficiently providing for mental healthcare is a policy that shows Merced County's deliberate indifference to Ms. Snider's mental health needs.

## JURISDICTION AND VENUE

3.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, as it arises under 42 U.S.C. § 1983.

4.     This court has personal jurisdiction over all Defendants as Plaintiffs are informed and believe and thereon allege that each is either a resident of California, or conducts significant business within the State of California.

5.     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claim occurred in Merced County, which is within this judicial district.

6.     On or about August 29, 2019, within six months of the conduct of the Defendants that gives rise to this lawsuit and which caused Plaintiffs' injuries, Plaintiffs timely complied with the Government Tort Claims Act under Government Code § 910 by filing a claim for damages form with Defendant County of Merced which presented all facts and injuries known or reasonably known to the Plaintiff regarding his claims.  This claim form is attached to this complaint as **Exhibit A**.

7.     Pursuant to Government Code §§ 913 and 915.4, Defendant County of Merced rejected Plaintiffs' claims on or about October 1, 2019.  Accordingly, Plaintiffs have standing to bring suit for monetary damages against this government entity.  Plaintiffs have timely filed their original complaint within six months from the date of Defendant's Notice of Rejection.   The rejection letter from Defendant County of Merced is attached to this complaint as **Exhibit B**.

## PARTIES

8.     At all times relevant herein, Plaintiff D.M. was and is a minor child of the Decedent, Ms. Snider.  D.M. is represented in this litigation by and through her guardian ad litem Jose Martinez.

9.     At all times relevant herein, Plaintiff L.M. was and is a minor child of the Decedent, Ms. Snider.  L.M. is represented in this litigation by and through her guardian ad litem Jose Martinez.

10.    At all times relevant herein, Plaintiff Denise Sawyer was and is the mother of the Decedent, Ms. Snider.

11.    At all times relevant herein, Plaintiff Doug Snider was and is the father of the Decedent, Ms. Snider.

12.    Plaintiffs are informed and believe and thereon allege that Defendant County of Merced ("County") is a county organized under the laws of the State of California.

13.    Plaintiffs are informed and believe and thereon allege that Wellpath LLC ("Wellpath") is a limited liability company formed in the State of Delaware, with its principal place of business located in Davidson County, Tennessee.  Wellpath is an entity formed from the merger of Correct Care Solutions and Correctional Medical Group Companies ("CMGC").

14.    Plaintiffs are informed and believe and thereon allege that California Forensic Medical Group, Inc. ("CFMG") is a California corporation with a principal place of business in Monterey, California.  Plaintiffs are informed and believe and thereon allege that CFMG is the former name of a subsidiary or constituent member company of CMGC, which has since merged with Wellpath. However, since California Secretary of State records show that CFMG remains a currently active corporation, CFMG is also named as a defendant herein.  On information and belief, Plaintiffs allege that the County of Merced has contracted and continues to contract with CFMG and/or its subsidiaries and affiliates for the provision of medical services, including mental health care, at all of its detention facilities.  Because the exact corporate relationship of Wellpath, Correct Care Solutions, CMGC, and CFMG is unknown to Plaintiffs, all of these entities will be collectively referred to as "CFMG" below, unless a more specific designation is noted.  The County of Merced, Wellpath, and CFMG are also collectively referred to as the "Entity Defendants."

15.    Plaintiffs are informed and believe and thereon allege that Defendant AMANPREET ATWAL ("Atwal") is a citizen of California, and is a nurse employed by or an agent of CFMG and/or the County who conducted an initial intake screening of Ms. Snider and failed to accurately reflect that Ms. Snider had a prior history of suicide.

16.    Plaintiffs are informed and believe and thereon allege that Defendant C.O. CASTANEDA ("Castaneda") is a citizen of California, and is a correctional officer who is employed at the Merced County Jail who was on duty and responsible for monitoring the inmates in Ms. Snider's section of the jail during the period in which she killed herself.

17.     Plaintiffs are informed and believe and thereon allege that Defendant ALICIA DUNWOODY ("Dunwoody") is a citizen of California, and is the director of nursing for Wellpath/CFMG, and that in this position, Dunwoody is an agent or employee of CFMG and/or the County of Merced, and refused to provide Ms. Snider with the Dilaudid which had been prescribed to her, despite acknowledging the court's direction to do so.

18.     Plaintiffs are informed and believe and thereon allege that Defendant GIANFRANCO BURDI ("Burdi") is a citizen of California, a medical doctor who works at the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who ordered Ms. Snider's Prozac prescription to be restarted on March 20, 2019, but failed to provide Ms. Snider with her prescription for Dilaudid.

19.     Plaintiffs are informed and believe and thereon allege that Defendant KERIANN QUINN-FITZPATRICK ("Quinn-Fitzpatrick") is a citizen of California, a nurse practitioner who works at the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who failed to provide Ms. Snider with her prescription for either Prozac or Dilaudid.

20.     Plaintiffs are informed and believe and thereon allege that Defendant DYLAN FULCHER ("Fulcher") is a citizen of California, a registered nurse who works at the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who failed to adequately screen Ms. Snider for a risk of suicide.

21.     Plaintiffs are informed and believe and thereon allege that Defendant SHAWN AUTREY ("Autrey") is a citizen of California, is a medical provider who works at the Merced County Jail, is an agent or employee of CFMG and/or the County of Merced, and failed to adequately screen Ms. Snider for a risk of suicide.

22.     Plaintiffs are informed and believe and thereon allege that Defendant PAO CHANG ("Chang") is a citizen of California, a medical provider who works at the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who failed to adequately screen Ms. Snider for a risk of suicide.

23.     Plaintiffs are informed and believe and thereon allege that Defendant JESSICA RAMIREZ-AGUILAR ("Ramirez-Aguilar") is a citizen of California, a registered nurse who works at

the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who failed to adequately screen Ms. Snider for a risk of suicide.

24.     Plaintiffs are informed and believe and thereon allege that Defendant JAMIE BURNS ("Burns") is a citizen of California, a licensed vocational nurse who works at the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who failed to adequately screen Ms. Snider for a risk of suicide.

25.     Plaintiffs are informed and believe and thereon allege that Defendant THANYA RYLAND ("Ryland") is a citizen of California, a registered nurse who works at the Merced County Jail, and an agent or employee of CFMG and/or the County of Merced, who failed to adequately screen Ms. Snider for a risk of suicide.

26.     Defendants Atwal, Castaneda, Dunwoody, Burdi, Quinn-Fitzpatrick, Fulcher, Autrey, Chang, Ramirez-Aguilar, Burns, and Ryland are collectively referred to as the "Individual Defendants" below.

27.     The true names and capacities of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiffs who therefore sue said Defendants by such fictitious names.  Plaintiffs will seek leave of this Court to amend this Complaint when the true names and capacities of these defendants have been ascertained.

## **FACTUAL ALLEGATIONS**

28.     Ms. Snider was born in 1979 in Merced, California.  She is the mother of D.M. and L.M., of whom Jose Martinez is the father.

29.     Ms. Snider has a long-standing and well-established history of mental illness.  While Ms. Snider's mental illness was initially experienced as simply depression and anxiety, her mental status degraded into delusions and psychosis over the years.  Eventually, she was held incompetent to stand trial on charges related to the kidnapping of her children, D.M. and L.M. and—because she was considered by the court to be a danger to her children and a danger to flee—was remanded to custody in the Merced County Jail on March 18, 2019.

30.     The Individual Defendants knew, or recklessly disregarded the knowledge, that Ms. Snider had been found incompetent to stand trial and had been ordered detained because of the

risk her mental health disorders posed.   The Individual Defendants also knew, or recklessly disregarded the knowledge, that Ms. Snider was prescribed fluoxetine (Prozac) and hydromorphone (Dilaudid) to treat her mental health disorders by her long-term psychiatrist, Dr. Bruce Milin, who had overseen her mental health treatment for most of the prior decade.   Similarly, the Individual Defendants knew, or recklessly disregarded the knowledge, that Ms. Snider had a prior history of suicide attempts and was a danger to herself.

31.   At the hearing at which Ms. Snider was ordered into custody, Ms. Snider voiced her concerns that she would be unable to receive her mental health medication while she was in custody. The Court specifically ordered Ms. Snider continue to receive this medication while she was in custody.   Nevertheless, both drugs were abruptly stopped when she entered custody.   Medical records indicate that Ms. Snider was again prescribed Prozac by jail personnel on March 21, 2019, though they do not indicate that she ever received the drug.   Ms. Snider's prescription for Dilaudid was never restarted.

32.   As a result of the deliberate indifference of Defendants, including inadequate screening, inadequate housing, inadequate monitoring, and the deprivation of her mental health medications, Ms. Snider killed herself on March 23, 2019, at approximately 6:00 p.m., by hanging herself from a bed sheet tied to a bunk bed ladder.   She was in a cell by herself, and had not been checked on for the better part of an hour, despite the fact that Ms. Snider's mental health disorders were readily apparent to even a casual observer.

### Ms. Snider's Personal History

33.   Ms. Snider had a long history of mental illness.   She was in the care of multiple psychiatrists and therapists from at least 2010 onward.   While her diagnoses varied over time, they included post-traumatic stress disorder ("PTSD"), attention-deficit hyperactivity disorder ("ADHD"), unspecified nonorganic psychosis, and psychotic disorder (not otherwise specified).

34.   In particular, Ms. Snider was under the care of a psychiatrist, Dr. Bruce Milin, from December 2010 through the incarceration that led to her death.   Dr. Milin prescribed her numerous psychiatric medications throughout his care of her, including Zyprexa, Ritalin, Klonopin, Abilify, Inderal, and Xanax.   Most of these did little, if anything, to assist Ms. Snider's symptoms.   For the

1  final years of his treatment of Ms. Snider, Dr. Milin prescribed her Prozac and Dilaudid, which did

2  help alleviate her depression and anxiety.

3       35.   Many of Ms. Snider's more severe mental health problems fixated on a delusional

4  belief that the father of her children had abused and molested their children, D.M. and L.M.  This

5  belief manifested itself in multiple complaints over the years, and involved accusations to and

6  investigations by both law enforcement and child protective services.  However, despite multiple

7  investigations, including forensic interviewing of the children, none of the various law enforcement

8  and child protective agencies investigating Ms. Snider's claims discovered any evidence that Mr.

9  Martinez had ever engaged in any type of abusive or inappropriate contact with either D.M. or L.M.

10  Indeed, Ms. Snider's beliefs were completely unfounded.

11      36.   Despite the large and growing amount of evidence that Mr. Martinez had not abused

12  their children, Ms. Snider grew increasingly paranoid and convinced that Mr. Martinez was an abuser.

13  She also became fixated on a belief that the government was out to get her and would not assist her in

14  protecting her children.

15      37.   As issues related to Ms. Snider's mental health continued to surface during the course

16  of family law disputes related to the custody of D.M. and L.M., Mr. Martinez was eventually awarded

17  full custody of the couple's children.  Ms. Snider's custodial rights were reduced over time, though

18  she retained the right to have visitation with the children.

19      38.   In October 2016, Ms. Snider kidnapped her children from outside of Mr. Martinez's

20  home during a scheduled visitation.  Upon realizing the children were missing, Mr. Martinez and his

21  wife contacted the police, who began a search for Ms. Snider and the children.

22      39.   Ms. Snider was apprehended along with D.M. and L.M. several days later attempting to

23  cross the U.S.-Canada border from North Dakota into Canada.  D.M. and L.M. were returned home to

24  Mr. Martinez and his wife, while Ms. Snider was arrested and arraigned in Merced County Superior

25  Court.  Ultimately, Ms. Snider was freed on bond pending trial on these charges.

26      40.   While free on bond, Ms. Snider successfully completed all aspects of her bail

27  conditions, and continued her psychiatric care.

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTEENTH AMENDMENT PURSUANT TO
42 U.S.C. § 1983, CALIFORNIA CIVIL CODE § 52.1, AND WRONGFUL DEATH

41.     Ms. Snider's defense attorney, Jeffrey Tenenbaum, requested that she submit to a competency evaluation, which the Court ordered.

42.     More than one competency evaluation was conducted as to Ms. Snider.  In October 2017, Dr. Andrew Neufeld evaluated Ms. Snider's competency.  Though he concluded that she could presently understand the nature of the proceeding against her and cooperate in a rational manner with her counsel, he concluded that she was "not presently able to prepare and conduct her own defense in a rational manner without counsel."

43.     In September 2018, another competency evaluation was conducted by Dr. Philip Hamm.  Dr. Hamm's report noted that Ms. Snider was particularly concerned about the informed consent document she was asked to sign, and advised she would not divulge "privileged" information that she knew because it was "classified" and involved issues of "national security."  Dr. Hamm noted that Ms. Snider "had a grandiose paranoid quality," and that there "was a distinctly paranoid quality to Ms. Snider's speech and responses throughout the interview."  Dr. Hamm performed IQ testing, which revealed scores that were "noticeably below average and reflect impairment of cognitive abilities."  Dr. Hamm's diagnosis was that Ms. Snider suffered from paranoid delusional disorder, and possibly suffered from schizophrenia spectrum disorder and/or medication/drug induced dementia.  Ultimately, Ms. Snider was "not presently able to understand the nature and scope of the proceedings taken against her," was "not presently about to cooperate in a rational manner with counsel in presenting a defense," and was "not presently able to prepare and conduct her own defense in a rational manner without counsel."  The court adopted Dr. Hamm's recommendation that Ms. Snider was not competent to stand trial in a minute order in November 2018.

44.     Pursuant to a February 4, 2019 court order, Ms. Snider was evaluated by the Central Valley Conditional Release Program ("CONREP") for the purpose of recommending treatment placement under Penal Code § 1370(a)(2)(A) following the determination that Ms. Snider lacked competence to stand trial.  The CONREP evaluation determined that "there was evidence of underlying paranoid and grandiose delusional ideations," and noted "[i]t was evident from reviewing Dr. Hamm's thorough and comprehensive forensic psychological competency evaluation report . . . that Ms. Snider was experiencing symptoms of a serious mental disorder, specifically, 'Paranoid

1  Delusional Disorder, Rule Out Schizophrenia Spectrum Disorder, [and] Rule out medication/drug

2  induced dementia.'"  The CONREP interview noted that "there is a significant concern that the Court

3  referring Ms. Snider to the Department of State Hospitals could be a trigger for her to act out or again

4  flee the country and *possibly endanger herself and her children*."  Other important comments from

5  the report relate:

6          a.  "Ms. Snider does not appear stable at this time."

7          b.  "[S]he lacks the capacity to make decisions about her treatment."

8          c.  "The presence of active symptomology, including her history of self-medication with

9              marijuana, her instability, and her deficiency in her responsiveness to community

10             treatment are significant risk factors that suggest the defendant's noncompliance with

11             community treatment and future dangerousness."

12         45.    The CONREP interview team recommended that Ms. Snider "be referred to the

13  California Department of State Hospitals in order to receive competency training in a locked forensic

14  setting."

15         46.    The CONREP interview team sent its report to the Merced County Superior Court,

16  which held a hearing on March 18, 2019, at the conclusion of which it remanded Ms. Snider into

17  custody.

18  *FAILURE TO ADEQUATELY SCREEN*

19         47.    The court hearing at which Ms. Snider was remanded to custody concluded at

20  3:46 p.m., according to court transcripts.  Immediately thereafter, a medical intake evaluation was

21  conducted by Defendant Atwal.  Medical records show this evaluation began at 3:51 p.m. and

22  concluded at 4:00 p.m.

23         48.    The notes from Defendant Atwal's initial intake evaluation reflect that Ms. Snider

24  advised of the following:

25         a.    She was under the care of a doctor for medical and psychiatric reasons;

26         b.    She was taking prescribed medicine;

27         c.    She was suffering muscle aches and pains;

28         d.    She had been experiencing weight loss, night sweats, or fatigue;

{9232/002/01090371.DOCX}                        9

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTEENTH AMENDMENT PURSUANT TO
42 U.S.C. § 1983, CALIFORNIA CIVIL CODE § 52.1, AND WRONGFUL DEATH**

     e.      She expected to withdraw from alcohol / drugs;

     f.      She had mental health problems;

     g.     She was a victim of sexual assault or abuse;

     h.    ***She had previously attempted suicide***;

     i.      She was under the care of a psychologist; and

     j.      She was under a conservatorship.

49.    Despite being advised by Ms. Snider that she had previously attempted suicide and had psychiatric issues, Defendant Atwal checked the box directing that Ms. Snider be "housed according to classification," rather than being placed in a safety cell or in medical isolation.

50.    Defendant Atwal then apparently filled out a second medical intake evaluation—more specifically, she entered the data from the handwritten form into a computer form—on March 18, 2019 at 5:10 p.m.  This computerized entry shows numerous errors and discrepancies when compared with the handwritten evaluation form from approximately one hour before.   In particular, on this second evaluation, Defendant Atwal:

     a.     Indicated Ms. Snider had no history of abuse;

     b.     Included nothing about Ms. Snider's behavior suggesting she might be a danger to self or others;

     c.     ***Indicated that Ms. Snider had not previously attempted suicide***;

     d.     Represented that Ms. Snider had suffered no recent rejection/loss; and

     e.     Advised there were no signs of depression or anxiety.

51.    The most notable error was that Defendant Atwal stated Ms. Snider had never previously attempted suicide.  The automated computer form that Defendant Atwal completed during this second screening specifically noted that if the question about prior suicide was answered "yes," a further screening tool would be required.  Another, separate note on the chart also indicates that a "Yes" answer to that question denotes a "High Risk for Potential Suicide," and requires further screening.

52.    Defendant Atwal was not the only medical services provider to fail to notice signs of concern.  Defendant Ryland noted Ms. Snider had made odd comments to her that should have

**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983, CALIFORNIA CIVIL CODE § 52.1, AND WRONGFUL DEATH**

1  indicated Ms. Snider was suffering from mental health issues.  Medical records reflect that on March
2  19, 2019, Ms. Snider was "obviously irritable/anxious" and advised Defendant Ryland she needed
3  medical treatment for her "active blood" and that she would go blind if she did not receive her eye
4  drops.  Later that same day, Ms. Snider again advised that her "blood was active."

5       53.    Further, a basic physical examination of Ms. Snider revealed evidence of prior suicide
6  attempts.  Ms. Snider's autopsy indicated she had old "hesitation marks" on her left forearm.
7  "Hesitation marks" are self-inflicted cuts or wounds that reflect initial attempts to cause death by
8  suicide, but are insufficient to actually cause death in a person.  They are common markers of suicide
9  attempts.

10       54.    Medical records reflect that nine different medical providers saw Ms. Snider during her
11  time at the Merced County Jail:  Defendants Atwal, Ryland, Burns, Ramirez-Aguilar, Chang, Quinn-
12  Fitzpatrick, Fulcher, and Autrey.  On information and belief, Plaintiffs allege that each of these
13  individuals conducted a physical examination of Ms. Snider, as each recorded her blood pressure, her
14  pulse, her respiration rate, her temperature, and her oxygen levels.  However, not one of these medical
15  providers noted Ms. Snider's hesitation marks, and not one of them referred her for further
16  psychological evaluation for risk of suicide.

17       55.    Plaintiffs are informed and believe and thereon allege that a history of prior suicide
18  attempts places an individual at increased risk of attempting suicide again in the future.  Plaintiffs are
19  informed and believe and thereon allege that the Defendants were each aware of, or recklessly
20  disregarded, the fact that Ms. Snider had a history of prior suicide attempts, which placed her at an
21  increased risk of attempting suicide again.  The Entity Defendants affirmatively recognized this risk
22  by utilizing screening tools that required additional screening in the event that an inmate had a history
23  of suicide.

24       56.    Plaintiffs are informed and believe and thereon allege that Defendants Atwal, Ryland,
25  Burns, Ramirez-Aguilar, Chang, Quinn-Fitzpatrick, Fulcher, and Autrey either knew and consciously
26  disregarded, or recklessly disregarded, the obvious physical signs and self-reported information that
27  indicated Ms. Snider was at increased risk of suicide.

28  /////

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTEENTH AMENDMENT PURSUANT TO
42 U.S.C. § 1983, CALIFORNIA CIVIL CODE § 52.1, AND WRONGFUL DEATH

*FAILURE TO PRESCRIBE MEDICATIONS*

57.   Before the close of the court hearing at which she was remanded into custody, Ms. Snider advised the Court that she was concerned she would not be given her medications in jail. In response, the Court twice noted, "They're to provide you whatever medication you're taking."

58.   Alicia Dunwoody, director of nursing for Wellpath, advised the Court on March 19, 2019 that jail staff had received the Court's instruction.  Despite acknowledging the Court's instructions, Defendant Dunwoody refused to continue Ms. Snider's Dilaudid prescription.

59.   Medical records show that Ms. Snider was seen by Defendants Burdi and Quinn-Fitzpatrick while at the Merced County Jail and that both Defendants Burdi and Quinn-Fitzpatrick prescribed and/or supplied Ms. Snider with medications and supplements, yet failed to restart or provide her the Dilaudid that had been prescribed to her.

60.   Records show that Ms. Snider was again prescribed Prozac by Defendant Burdi at the jail on March 20, 2019, two days after she was remanded into custody.  No medical records reflect that this medication was ever actually provided to Ms. Snider, despite this order.  Ms. Snider's prescription for Dilaudid was never restarted.

61.   Jail records reflect that the Individual Defendants, including Defendants Dunwoody, Burdi, Quinn-Fitzpatrick, Atwal, Ryland, Shepherd, Burns, Ramirez-Aguilar, Chang, Fulcher, and Autrey were aware of the medications Ms. Snider was prescribed, including both Prozac and Dilaudid. According to medical records, a member of Ms. Snider's family even brought her prescriptions to the jail.  Plaintiffs allege the Individual Defendants knew that Ms. Snider had been prescribed both Prozac and Dilaudid but failed, refused, and/or unreasonably delayed in providing these medications to her.

62.   The Individual Defendants knew of, or acted with reckless disregard to the risk that, Ms. Snider would be more prone to suicide if suddenly and abruptly removed from her psychiatric medication.

*FAILURE TO APPROPRIATELY HOUSE AND CLOTHE DECEDENT*

63.   On information and belief, Plaintiffs believe and thereon allege that Ms. Snider was not housed in a suicide cell, or a cell that was designed to prevent an inmate from harming themselves, Merced County Sheriff's Office records indicate that Ms. Snider was moved several times: she was

housed at one point with a cellmate, but was moved following a physical altercation; she was then placed into temporary holding; and ultimately, she was moved to the cell in which Ms. Snider killed herself.

64.     On information and belief, Plaintiffs believe and thereon allege that the cell in which Ms. Snider was ultimately housed was not suitable for a person at risk for suicide.  Merced County Sheriff's Office records note that the cell contained horizontal bars on the ladder between the bed bunks, which Ms. Snider ultimately used to hang herself.

65.     Information about which officers within the jail were responsible for Ms. Snider's housing decisions is not yet available.  Plaintiffs are informed and believe and thereon allege that one or more Doe Defendants transferred Ms. Snider to the cell in which she ultimately killed herself, and failed to house her in a safety cell or provide her with safety garments or bedding to reduce her risk of suicide, despite knowing or recklessly disregarding the risk of suicide.

### FAILURE TO APPROPRIATELY MONITOR DECEDENT

66.     Ms. Snider's successful attempt at suicide was not even her first while in the custody of the Defendants.  The autopsy report for Ms. Snider states that she had a "superficial abrasion-laceration of ventral left forearm consistent with recent hesitation mark."

67.     The autopsy report further states that there was a "panty liner . . . stuck to the medial left upper arm by a purple elastic band," which was bloodstained.  "This appears to be an amateur bandage that was meant to cover an injury . . . on the proximal ventral left forearm, but has slipped up to the biceps area such that at the time of the autopsy it is not covering any injury."

68.     Records from various agencies noted approximately an hour elapsed between the time Ms. Snider's body was located and the time she was last seen alive, indicating that no one visually examined her cell for at least an hour.

69.     Additionally, included in Ms. Snider's effects from the jail was a hand-written "last will and testament," which begins, "In case I don't survive, I love my children very much."  This three page document was apparently written by Ms. Snider during her time in the jail.  It demonstrates both the level of delusions from which she was suffering—she wrote, "In all truth, I am an American spy, a

1  US intelligence clandestine officer, an asset"—as well as the fact that Ms. Snider was suicidal for an

2  extended period of time and that her hanging was not a spur-of-the-moment decision.

3         70.    Records from the Jail indicate that Defendant Castaneda ultimately found Ms. Snider's

4  body, and Plaintiffs allege, on information and belief, that Defendant Castaneda was responsible for

5  monitoring and/or supervising the health and wellbeing of the inmates in Ms. Snider's section of the

6  jail at the time of her death.

7         71.    On information and belief, adequate monitoring of Ms. Snider by Defendant Castaneda

8  would have revealed that she had already attempted to injure herself that day, and would have allowed

9  jail personnel to intervene to save her life.  Defendant Castaneda was deliberately indifferent to the

10  evidence that Ms. Snider was at great risk of killing herself, and had already attempted as much earlier

11  the same day.

12  ***WELLPATH'S HISTORY OF PROVIDING INADEQUATE MENTAL HEALTH CARE***

13         72.    The County of Merced has contracted with CFMG to provide medical care at all of its

14  detention facilities, including mental health care, since at least July 22, 2008 (Contract No. 2008171).

15  That contract was extended in 2012.  A new contract between Merced County and CFMG was entered

16  into on May 21, 2013 (Contract No. 2013102).   The agreement was amended on May 24, 2016 to

17  extend the agreement through FY 2016/2017, and was amended on April 4, 2017 to extend the

18  agreement through June 2018.

19         73.    Based on Ms. Snider's medical records, it appears Wellpath is currently providing

20  medical and mental health care services to the County at its detention facilities.

21         74.    Wellpath and its two predecessor entities—CMGC (of which CFMG was a component)

22  and Correct Care Solutions—have a long history of providing inadequate mental health care to

23  inmates under their supervision, including numerous instances in which inmates or detainees have

24  killed or severely injured themselves while under the care of these companies.

25         75.    In May 2013, Joshua Claypole hanged himself in a Monterey County Jail, which

26  contracted its medical and mental healthcare to CFMG, after being removed from suicide watch by a

27  CFMG employee.  *See Estate of Claypole v. County of Monterey*, No. 14-cv-02730-BLF, 2016 WL

28  693282 (N.D. Cal. Feb. 22, 2016).

76.     In July 2013, Amanda Fox Sloan hanged herself in Santa Cruz County Jail, a facility at which CFMG provided medical and mental healthcare services, because of CFMG's failure to provide necessary mental healthcare.  *See L.S. v. County of Santa Cruz*, No. 5:15-cv-03032-EJD, 2016 WL 3017645 (N.D. Cal. May 26, 2016).

77.     In August 2013, Scott Meirs hanged himself at the Ottawa County Jail after he was abruptly taken off of his prescribed pain medications, placed into a regular cell rather than a safety cell, and not adequately monitored by employees of Correct Care Solutions.  *See Meirs v. Ottawa County*, No. 1:15-cv-866, 2018 WL 9815859 (W.D. Mich. Jan. 8, 2018).

78.     In March 2014, Barton Grubbs killed himself by taking an entire bottle of Percocet and an entire bottle of Valium at the Weld County Jail while under the care of Correct Care Solutions and its employees.  *See Estate of Grubbs v. Weld County Sheriff's Office*, No. 16-cv-00714-PAB-STV, 2017 WL 951149 (D. Colo. Mar. 8, 2017).

79.     In May 2014, Anthony Dasaro killed himself by hanging at the Monmouth County Correctional Institution, after not being given his mental health medications.  Correct Care Solutions provided the medical and mental healthcare services for that institution.  *See Estate of Dasaro v. County of Monmouth*, No. 14-7773(PGS), 2015 WL 5771606 (D.N.J. Sept. 30, 2015).

80.     In October 2014, Shane Allen Murphy hanged himself in the Mendocino County Adult Detention Facility, a jail for which CFMG provided medical and mental healthcare services.  *See Murphy v. County of Mendocino*, No. 15-cv-04624-NJV, 2016 WL 3539124 (N.D. Cal. June 29, 2016).

81.     In October 2014, Tylor Young hanged himself at the Peoria County Jail, a facility for which Correct Care Solutions was providing the medical and mental healthcare services, after he was withdrawn from methadone and was not appropriately monitored.  *Young v. Peoria County*, No. 1:16–cv–01367–JBM, 2017 WL 6418888 (C.D. Ill. Dec. 15, 2017).

82.     In December 2014, Richard Michael Ramirez killed himself ***at the very same jail*** as Ms. Snider, Merced County Jail, in the ***exact same manner*** as Ms. Snider, namely, by hanging himself from his bunk.  Mr. Ramirez had been found incompetent to stand trial, just like Ms. Snider, and Mr. Ramirez killed himself following prior suicide attempts at the same facility, just like Ms. Snider.

CFMG was responsible for the medical and mental healthcare of inmates at the Merced County Jail at that time.  *See Atayde v. Napa State Hosp.*, No. 1:16-cv-00398-DAD-SAB, 2016 WL 4943959 (E.D. Cal. Sept. 16, 2016).

83.    In March 2015, Sandra Vela hanged herself in the Monterey County Jail, after having been refused pain medication and been discharged from suicide watch by CFMG staff.  Just like Ms. Snider, Ms. Vela hanged herself from her bunk.  *See Estate of Sandra Vela v. County of Monterey*, No. 16-cv-02375-BLF, 2016 WL 4678300 (N.D. Cal. Sept. 7, 2016).

84.    In September 2015, Lawrence Spies killed himself in the Placerville Jail, after being inappropriately screened as not being a suicide risk by CFMG staff.  *See Spies v. El Dorado County*, No. 2:16-02232 WBS GGH, 2016 WL 7212788 (E.D. Cal. Dec. 12, 2016).

85.    In October 2015, Jeremy Lapachet suffered extensive injuries rendering him a quadriplegic, resulting from self-injury while at the Stanislaus County Jail.  CFMG was responsible for providing medical and mental healthcare at the jail.  Employees of CFMG witnessed Mr. Lapachet injuring himself repeatedly over the course of many hours, and failed to intervene until after he had severely injured himself.  *See Lapachet v. California Forensic Medical Group, Inc.*, 313 F.Supp.3d 1183 (E.D. Cal. 2018).

86.    In November 2015, Charles Troutman was arrested and taken to a facility managed by Correct Care Solutions.  Mr. Troutman was inadequately screened by a Correct Care Solutions' employee and was classified as not being a suicide risk, despite prior suicide attempts in that facility. He died by suicide while under Correct Care Solutions' care shortly thereafter.  *See Troutman v. Louisville Metro Dep't of Corr.*, No. 3:16-cv-742-DJH-CHL, 2018 WL 6413201, at *1 (W.D. Ky. Dec. 6, 2018).

87.    In January 2016, Dillon Blodgett hanged himself at the Montrose County Detention Center, which employed Correct Care Solutions to provide mental healthcare and medical treatment to its inmates and detainees.  Mr. Blodgett disclosed to numerous care providers that he had a history of suicide attempts, but nevertheless was not placed in a safety cell and was given a second towel, with which he hanged himself, just like Ms. Snider.  *See Estate of Blodgett v. Correct Care Solutions*, No. 17-cv-2690-WJM-NRN, 2018 WL 6528109 (D. Colo. Dec. 12, 2018).

88.     In September 2016, Joshua Bellamy hanged himself at the Marion County Jail while under the supervision of Correct Care Solutions and its employees, who provided the medical and mental healthcare for the jail.  Mr. Bellamy, who was suffering from withdrawal symptoms, was inadequately screened as a suicide risk by Correct Care Solutions employees, just like Ms. Snider.  *See Vale-Gugliuzzi v. Layton*, No. 1:17-cv-03432-JMS-DML, 2018 WL 3416637 (S.D. Ind. July 13, 2018).

89.     In July 2017, Tricia Cooper hanged herself in a cell at the Luzerne County Correctional Facility after being taken off of suicide watch by employees of Correct Care Solutions, LLC, despite a significant history of mental health disorders and opiate withdrawal.  *Cooper on behalf of Estate of Cooper v. Correct Care Solutions, LLC*, No. 18-4358, 2019 WL 1227713 (E.D. Pa. Mar. 15, 2019).

90.     The above cases are an illustrative list of suicides that have occurred under the supervision of the for-profit private correctional companies that are now part of Wellpath.  These cases do not reflect all of the suicides under CFMG/Wellpath's watch, but rather represent only cases that were actually filed and proceeded through the courts.  In fact, statistics from the California Department of Justice on in-custody deaths show at least six other suicides—on July 31, 2005; August 30, 2009; March 12, 2010; December 15, 2014; July 21, 2015; and August 22, 2016—which occurred ***by hanging in the Merced County Jail*** between 2005 and 2016.  A *Sacramento Bee* article from January 2015, attached as **Exhibit C** to this complaint, recounted that, "[i]n a 10-year period ending in May 2014, 92 people died of suicide or a drug overdose while in the custody of a jail served by CFMG," and "CFMG's population-adjusted rate for such deaths is about 50 percent higher than in other county jails."

91.     Nevertheless, despite the numerous suicides by inmates under the care of Wellpath, CFMG, or the company's affiliates, and the numerous suicides in the Merced County Jail itself, which Wellpath/CFMG was supervising, the County of Merced renewed contracts with these entities no less than five separate times, in 2008, 2012, 2013, 2016, and 2017.  The latest of these renewals occurred after all of these suicides had occurred, and after it was well known that CFMG and affiliated companies did not employ effective safeguards against the risk of suicides by detainees under their care, custody, and control.

**FIRST CAUSE OF ACTION – DELIBERATE INDIFFERENCE TO MEDICAL NEEDS IN VIOLATION OF THE FOURTEENTH AMENDMENT (D.M. and L.M., as successors in interest to Decedent against the Individual Defendants)**

92.     Plaintiffs re-assert and re-allege Paragraphs 1 to 89, as though fully set forth herein.

93.     Ms. Snider was a pretrial detainee being detained by the Defendants.  Accordingly, she had a right to receive adequate physical and mental health care from Defendants under the Fourteenth Amendment.

94.     The Defendants knew, or recklessly disregarded the risk, that Ms. Snider was at a high risk for suicide, given her reporting of prior suicide attempts, the fact that she had been found incompetent and a danger to herself and others, a prior suicide attempt while in Defendants' care, and the abrupt cessation of her prescribed psychiatric medications.

95.     Plaintiffs allege that Defendants were deliberately indifferent to Ms. Snider's mental health needs.  Specifically, Defendants (1) failed to adequately screen Ms. Snider for a risk of suicide; (2) failed to continue providing her prescribed medications; (3) failed to appropriately house Ms. Snider in a suicide cell or other facility that would prevent her from killing herself; (4) failed to provide her with appropriate safety bedding and garments; and (5) failed to appropriately monitor Ms. Snider, which would have revealed her earlier attempts to take her own life that same day.

96.     Policies for the Merced County Sheriffs' Office Corrections Bureau state that inmates may be placed in a safety cell if they "claim[ ] or display[ ] behavior of suicidal intentions."  Once in a safety cell, inmates are to be provided with a safety garment and will receive a safety check in the form of "direct visual observation at least twice in every 30-minute period."

97.     Plaintiffs are informed and believe and thereon allege that safety cells typically lack bars to which a rope, sheet, or other ligature could be tied, and that even where bars exist, they are typically vertical and not horizontal bars.  Either of these designs helps prevent inmates from asphyxiating themselves, as occurred with Ms. Snider.

98.     Plaintiffs are informed and believe and thereon allege that Ms. Snider was physically dependent on Dilaudid, which she was prescribed in increasing amounts for a period of years.

99.     Plaintiffs are informed and believe and thereon allege that sudden discontinuation of medicines such as Dilaudid or Prozac significantly increases the risk the individual will die by suicide.

100.    Had Defendants performed any of the above steps—adequately screening Ms. Snider for a risk of suicide; continuing Ms. Snider's prescriptions; appropriately housing Ms. Snider in a suicide or safety cell; or appropriately monitoring Ms. Snider—Ms. Snider would not have had the opportunity to kill herself prior to being transferred to an inpatient mental health setting where her competency could be monitored and restored.

101.    This failure to adequately provide Ms. Snider with mental health care and failure to adequately protect Ms. Snider from suicide violated Ms. Snider's Fourteenth Amendment rights. Defendants were deliberately indifferent to Ms. Snider's mental health needs, causing her death.

**SECOND CAUSE OF ACTION – DELIBERATE INDIFFERENCE TO MEDICAL NEEDS IN VIOLATION OF THE FOURTEENTH AMENDMENT (D.M. and L.M., as successors in interest to Decedent against the Entity Defendants)**

102.    Plaintiffs re-assert and re-allege Paragraphs 1 to 99, as though fully set forth herein.

103.    Plaintiffs are informed and believed and thereon allege that the County of Merced has made independent policy decisions in at least 2008, 2012, 2013, 2016, and 2017 to renew its contracts with Wellpath, CFMG, and/or their affiliates and continue to have these entities provide mental health care to inmates being housed at detention centers in Merced County.

104.    Merced County elected to renew its contracts with Wellpath, CFMG, and/or their affiliates despite the fact that numerous, preventable suicides had occurred in facilities for which CFMG and/or affiliates provided the mental health care and treatment.  Many of these suicides resulted from inmates hanging themselves after being denied psychiatric and other medications, being inappropriately housed and/or monitored, or being inappropriately screened for risk of suicide.  Prior suicides occurred under almost identical circumstances *within the same jail*.  Further, numerous, well-publicized suicides indicate Merced County either knew, or recklessly disregarded the risk, that continuing to contract with Wellpath, CFMG, and/or their affiliates would lead to continued deliberate indifference of the mental health needs of detainees and future suicides in Merced County Jail.

105.   Merced County's decision to renew its contracts with Wellpath, CFMG, and/or their affiliates, caused Ms. Snider to receive constitutionally deficient mental health care, including inadequate screening, housing, monitoring, and the abrupt removal of mental health medications, which lead directly to her death by suicide.

106.   Additionally, Wellpath, CFMG, and/or their affiliates are obviously familiar with the excessive number of suicides that have occurred in institutions under the care, custody, or control of their employees.  The failure of the CFMG Defendants to take remedial steps to ensure that inmates are adequately screened for suicide risk, adequately monitored, adequately housed and clothed, and prescribed all psychiatric medication is a policy, procedure, or practice that subjects these entities to liability under § 1983 based on a deprivation of rights protected by the United States Constitution.

**THIRD CAUSE OF ACTION – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIM FOR LOSS OF COMPANIONSHIP (D.M., L.M., Denise Sawyer, and Doug Snider, each on their own behalf, against the Individual Defendants)**

107.   Plaintiffs re-assert and re-allege Paragraphs 1 to 104, as though fully set forth herein.

108.   Defendants' actions in this case—including but not limited to: (1) the failure to adequately screen Ms. Snider for a risk of suicide; (2) the failure to continue providing her prescribed medications; (3) the failure to appropriately house Ms. Snider in a suicide cell or other facility that would prevent her from killing herself; (4) the failure to provide her with appropriate safety bedding and garments; and (5) the failure to appropriately monitor Ms. Snider, which would have revealed her earlier attempts to take her own life that same day—caused Plaintiffs to forever lose the care and companionship of their respective mother and daughter, Ms. Snider.

109.   These actions, both individually and collectively, shock the conscience, and evidence both deliberate indifference and reckless disregard to the mental health and medical needs of Ms. Snider.

**FOURTH CAUSE OF ACTION – FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS CLAIM FOR LOSS OF COMPANIONSHIP (D.M., L.M., Denise Sawyer, and Doug Snider, each on their own behalf, against the Entity Defendants)**

110.   Plaintiffs re-assert and re-allege Paragraphs 1 to 107, as though fully set forth herein.

111.     Plaintiffs are informed and believed and thereon allege that the County of Merced has made independent policy decisions in at least 2008, 2012, 2013, 2016, and 2017 to renew its contracts with Wellpath, CFMG, and/or their affiliates and continue to have these entities provide mental health care to inmates being housed at detention centers in Merced County.

112.     Merced County elected to renew its contracts with Wellpath, CFMG, and/or their affiliates despite the fact that numerous, preventable suicides had occurred in facilities for which CFMG and/or affiliates provided the mental health care and treatment.  Many of these suicides resulted from inmates hanging themselves after being denied psychiatric and other medications, being inappropriately housed and/or monitored, or being inappropriately screened for risk of suicide. Indeed, prior suicides occurring under almost identical circumstances had occurred *within the same jail*.  Further, numerous, well-publicized suicides indicate Merced County either knew, or recklessly disregarded the risk, that continuing to contract with Wellpath, CFMG, and/or their affiliates would lead to continued deliberate indifference of the mental health needs of detainees and future suicides in Merced County Jail.

113.     Merced County's decision to renew its contracts with Wellpath, CFMG, and/or their affiliates, caused Ms. Snider to receive constitutionally deficient mental health care, including inadequate screening, housing, monitoring, and the abrupt removal of mental health medications, which lead directly to her death by suicide.

114.     Additionally, Wellpath, CFMG, and/or their affiliates are obviously familiar with the excessive number of suicides that have occurred in institutions under the care, custody, or control of their employees.  The failure of the CFMG Defendants to take remedial steps to ensure that inmates are adequately screened for suicide risk, monitored, housed and clothed, and prescribed all psychiatric medication is a policy, procedure, or practice that subjects these entities to liability under § 1983.

115.     These actions, both individually and collectively, shock the conscience, and evidence both deliberate indifference and reckless disregard to the mental health and medical needs of Ms. Snider.

/////

/////

**FIFTH CAUSE OF ACTION – CIVIL CODE § 52.1 (D.M. and L.M., as successors in interest to Decedent against All Defendants)**

116.    Plaintiffs re-assert and re-allege Paragraphs 1 to 113, as though fully set forth herein.

117.    Plaintiffs allege that Defendants interfered with Ms. Snider's constitutional right to receive adequate mental health care while incarcerated through their deliberate indifference to Ms. Snider's mental health needs.  Specifically, Defendants (1) failed to adequately screen Ms. Snider for a risk of suicide; (2) failed to continue providing her prescribed medications; (3) failed to appropriately house Ms. Snider in a suicide cell or other facility that would prevent her from killing herself; (4) failed to provide her with appropriate safety bedding and garments; and (5) failed to appropriately monitor Ms. Snider, which would have revealed her earlier attempts to take her own life that same day.

**SIXTH CAUSE OF ACTION – WRONGFUL DEATH and SURVIVAL ACTION UNDER CCP §§ 377.30, 377.60 et seq. (D.M. and L.M., on behalf of themselves and as successors in interest to Decedent against All Defendants)**

118.    Plaintiffs re-assert and re-allege Paragraphs 1 to 115, as though fully set forth herein.

119.    Plaintiffs D.M. and L.M. bring this cause of action both on their own behalf under Code of Civil Procedure § 377.60 and as successors in interest to the Decedent, Ms. Snider, under Code of Civil Procedure § 377.30.

120.    As a direct and proximate result of the negligence, wrongful acts, conduct, and omissions of the Defendants, and each of them, D.M. and L.M. have been deprived of the decedent's love, companionship, comfort, care, assistance, protection, affection, society, support, training, and guidance.  D.M. and L.M. are the children of the decedent, and are therefore people entitled to recover wrongful death damages pursuant to California Code of Civil Procedure § 377.60 et seq.  D.M. and L.M. have suffered pecuniary and non-pecuniary losses in an amount to be determined at trial.

121.    As a direct and proximate result of the negligence, wrongful acts, conduct, and omissions of the Defendants, and each of them, Ms. Snider suffered severe and painful injuries, which resulted in recoverable legal damages prior to Ms. Snider's death.  D.M. and L.M. have the authority

1  to commence a survival action on decedent's behalf pursuant to California Code of Civil Procedure

2  § 377.30 et seq.

3                                    **PRAYER FOR RELIEF**

4       **WHEREFORE**, Plaintiffs pray for judgment and an order against each Defendant as follows:

5       1.       On each of the causes of action, for damages, including but not limited to damages for

6  economic harm, non-economic harm, pain, suffering, emotional distress, and punitive damages,

7  according to proof at trial;

8       2.       On each of the causes of action, for injunctive relief as may be shown to be proper;

9       3.       On each of the causes of action, for attorneys' fees, costs, and interest, as authorized by

10  law; and

11      4.       Any other relief that this Court deems just and proper.

12

13  Dated:  April 13, 2020.                    WANGER JONES HELSLEY PC

14

15                                    By: __/s/ Christopher A. Lisieski _____

16                                    Jay A. Christofferson
                                      Christopher A. Lisieski
17                                    Attorneys for Plaintiffs

18

19                                    **REQUEST FOR JURY TRIAL**

20       Plaintiffs request a trial by jury for all causes of action to which they are entitled to a jury.

21

22  Dated:  April 13, 2020.                    WANGER JONES HELSLEY PC

23

24                                    By:__/s/ Christopher A. Lisieski_____

25                                    Jay A. Christofferson
                                      Christopher A. Lisieski
26                                    Attorneys for Plaintiffs

27

28

FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FOURTEENTH AMENDMENT PURSUANT TO
42 U.S.C. § 1983, CALIFORNIA CIVIL CODE § 52.1, AND WRONGFUL DEATH