1  **WANGER JONES HELSLEY PC**
   265 East River Park Circle, Suite 310
2  Fresno, California 93720
   Telephone:     (559) 233-4800
3  Facsimile:     (559) 233-9330

4  Jay A. Christofferson #203878
    *jchristofferson@wjhattorneys.com*
5  Steven K. Vote #309152
    *svote@wjhattorneys.com*
6  Nathan J. Martin #339673
    *nmartin@wjhattorneys.com*
7

8  Attorneys for:  Plaintiffs D.M., L.M., and DENISE SAWYER

9

10              **UNITED STATES DISTRICT COURT**

11             **EASTERN DISTRICT OF CALIFORNIA**

12

13  D.M. and L.M., minors, by and through their      Case No. 1:20-cv-00409-JLT-SAB
14  Guardian ad litem Jose Martinez, on their own
    behalf and on the behalf of the Estate of Rene   **DECLARATION OF JAY A.**
15  Snider, decedent; DENISE SAWYER, on her          **CHRISTOFFERSON IN SUPPORT OF**
    own behalf; and DOUG SNIDER, on his own          **OPPOSITION TO MOTION FOR**
16  behalf,                                          **SUMMARY JUDGMENT**

17              Plaintiffs,                          Complaint filed:  March 19, 2020

18       v.
                                                     **[Accompanying Documents: Memorandum**
19  COUNTY OF MERCED; WELLPATH, LLC;                 **of Points and Authorities; Plaintiffs'**
    CALIFORNIA FORENSIC MEDICAL                      **Objections to Evidence; Plaintiffs'**
20  GROUP, INC.; AMANPREET ATWAL;                    **Statement of Disputed Facts;]**
    C.O. CASTANEDA; ALICIA DUNWOODY;
21  GIANFRANCO BURDI; KERIANN QUINN-
    FITZPATRICK; DYLAN FULCHER; SHAWN
22  AUTREY; PAO CHANG; JESSICA
    RAMIREZ-AGUILAR; JAMIE BURNS;
23  THANYA RYLAND; and DOES 1–10,
    inclusive,
24

25              Defendants.

26

27

28

{9232/002/01760134.DOCX}
             DECLARATION OF JAY A. CHRISTOFFERSON IN SUPPORT
              OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

I, Jay A. Christofferson, hereby declare as follows:

1.      I am an attorney with the law firm of Wanger Jones Helsley PC, counsel of record for Plaintiffs D.M., L.M., and DENISE SAWYER in this matter.  I am licensed to practice in all of the federal district courts in the State of California and the Ninth Circuit.  I know the information contained herein of my own personal knowledge and would competently testify thereto.

2.      This Declaration is made in support of the Opposition to Defendants' Motion for Summary Judgment.

3.      On or about June 23, 2023, my office served Plaintiffs' Expert Witness Designation, which included the name and qualifications of all of Plaintiffs' retained experts, as well as copies of the reports they prepared in this matter.  A true and correct copy of Plaintiffs' Expert Witness Designation is attached hereto as **Exhibit "A."**

4.      On or about March 3, 2022, my office took the deposition of Dr. Gianfranco Burdi, the on-call psychiatrist for the jail facility where Ms. Snider was housed during the time of her incarceration.  True and correct copies of excerpted portions of this deposition are attached hereto as **Exhibit "B."**

5.      On or about November 19, 2021, my office took the deposition of Amanpreet Atwal, R.N., the nurse that performed an intake examination of Ms. Snider at the jail facility.  True and correct copies of excerpted portions of this deposition are attached hereto as **Exhibit "C."**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this Declaration was executed on March 7, 2024, at Fresno, California.

_____
Jay A. Christofferson

DECLARATION OF JAY A. CHRISTOFFERSON IN SUPPORT
OF OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

# Exhibit A

1    **WANGER JONES HELSLEY PC**
      265 E. River Park Circle, Suite 310
2    Fresno, California 93720
      Telephone:    (559) 233-4800
3    Facsimile:    (559) 233-9330

4    Jay A. Christofferson #203878
       *jchristofferson@wjhattorneys.com*
5    Steven K. Vote  #309152
       *svote@wjhattorneys.com*
6    Nathan J. Martin #339673
       *nmartin@wjhattorneys.com*
7

8    Attorneys for:  Plaintiffs D.M., L.M., and DENISE SAWYER

9

10                   **UNITED STATES DISTRICT COURT**

11                   **EASTERN DISTRICT OF CALIFORNIA**

12

13   D.M. and L.M., minors, by and through their          Case No.  1:20-cv-00409-JLT-SAB
     Guardian ad litem Jose Martinez, on their own
14   behalf and on the behalf of the Estate of Rene       **PLAINTIFFS' EXPERT WITNESS**
     Snider, decedent; DENISE SAWYER, on her              **DESIGNATION; DECLARATION OF**
15   own behalf; and DOUG SNIDER, on his own              **JAY A. CHRISTOFFERSON**
     behalf,
16
                                                          Complaint filed:  March 19, 2020
17                Plaintiffs,

18          v.

19   COUNTY OF MERCED; WELLPATH, LLC;
     CALIFORNIA FORENSIC MEDICAL
20   GROUP, INC.; AMANPREET ATWAL;
     C.O. CASTANEDA; ALICIA DUNWOODY;
21   GIANFRANCO BURDI; KERIANN QUINN-
     FITZPATRICK; DYLAN FULCHER; SHAWN
22   AUTREY; PAO CHANG; JESSICA
     RAMIREZ-AGUILAR; JAMIE BURNS;
23   THANYA RYLAND; and DOES 1–10,
     inclusive,
24
25                Defendants.

26

27

28

{9232/002/01593149.DOCX}

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD HEREIN:**

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure Rule 26(a)(2), Plaintiffs, D.M., L.M., and Denise Sawyers ("Plaintiffs"), hereby provide the following information regarding expert witnesses that they may call/or use at trial to present evidence under Federal Rule of Evidence 702, 703, and/or 705:

**RETAINED EXPERTS**

1.      Philip Stanley.  5440 46th Ave. SW Seattle, Washington  98136.  Mr. Stanley can be contacted through counsel.

2.      Dr. Terry Kupers.  484 Lake Park Ave., #338 Oakland, California 94610.  Dr. Kupers can be contacted through counsel.

3.      Taylor Ehrlich.  Resolution Economics LLC, 1925 Century Park East, 15th Floor, Los Angeles, California 90067.  Mr. Ehrlich can be contacted through counsel.

Plaintiffs reserve the right to call any expert witness in their case in chief or in rebuttal evidence required to refute the testimony of expert witnesses who are called by Defendants, COUNTY OF MERCED (the "County") and/or WELLPATH, LLC ("Wellpath" and collectively with the County, "Defendants"), regardless of whether or not Defendants actually call the witness(es) to testify during the trial.  Pursuant to Federal Rule of Civil Procedure Rules (26(a)(2)(E) and 26(e), Plaintiffs also reserve all rights to submit a supplemental expert witness list containing the name(s) and address(es) of any expert(s) who will express opinions of any subject to be covered by an expert designated by Defendants in this litigation.  Plaintiffs further reserve the right to call such witness(es) as necessary for purposes of impeaching the testimony of any expert witness(es) called by Defendants.

Dated: June 23, 2023.                                     WANGER JONES HELSLEY PC

By: _____
Jay A. Christofferson
Steven K. Vote
Nathan J. Martin
Attorneys for Plaintiffs
D.M., L.M., and DENISE SAWYER

**EXPERT WITNESS DECLARATION**

I, Jay A. Christofferson, declare as follows:

1.      I am a shareholder with the law firm of Wanger Jones Helsley PC and counsel of record for Plaintiffs, D.M., L.M., and Denise Sawyers ("Plaintiffs"), in the above-entitled action.  I am an attorney at law duly licensed to practice before this Court, and all courts in the State of California.  Unless qualified, I have personal knowledge of the matters stated hereafter and, if called as a witness, could and would testify competently to the same.  As to those matters stated upon information and belief, I am informed and believe them to be true.

2.      The following individuals have been retained by Plaintiffs for purposes of this litigation:

*Philip Stanley*

   a.      Mr. Stanley received a Bachelor of Arts degree in Sociology from University of Washington, Seattle.  He holds a Master of Public Administration degree from Seattle University.

   b.      Mr. Stanley's experience includes acting as a Prison Superintendent and Regional Administrator within the Washington State Department of Corrections.  Mr. Stanley also served as the Commissioner for the Department of Corrections, New Hampshire.  Mr. Stanley has also been a Probation Officer in the State of Washington and the Director of Chelan County Regional Justice Center in the State of Washington.

   c.      Mr. Stanley is a Jail and Prison Consultant and has expertise in prison conditions and procedures.  His expert report, curriculum vitae, and list of cases retained as jail expert is attached hereto as **Exhibit "A."**

   d.      Mr. Stanley is expected to testify about the policies and procedures at the Merced County Jail and whether they were followed.

   e.      Mr. Stanley has agreed to testify at trial, and will be sufficiently familiar with this action to submit to a meaningful oral deposition concerning the specific testimony, including his opinions and the bases for them, that he is expected to give at trial.

   f.   Mr. Stanley's hourly rate is $300.00 for expert witness testimony.

///

*Dr. Terry Kupers*

g.      Dr. Kupers received a Bachelor of Arts degree, with distinction, in Psychology from Stanford University.  Dr. Kupers holds a Doctorate of Medicine from University of California, Los Angeles School of Medicine and a Masters in Social Psychiatry from University of California, Los Angeles.

h.      Dr. Kupers is a board-certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues.  His expert report, curriculum vitae, and past four years of deposition and court testimony is attached hereto as **Exhibit "B."**

i.      Dr. Kupers is expected to testify about the management and mental health treatment of Ms. Rene Snider at the Merced County Jail.

j.      Dr. Kupers has agreed to testify at trial, and will be sufficiently familiar with this action to submit to a meaningful oral deposition concerning the specific testimony, including his opinions and the bases for them, that he is expected to give at trial.

k.      Dr. Kupers' hourly rate is $500.00 for expert witness testimony.

*Taylor Ehrlich*

l.      Taylor Ehrlich, CPA, Resolution Economics LLC, is an economist and damage model expert with Resolution Economics LLC.  Attached hereto is a true and correct copy of Mr. Ehrlich's expert report, curriculum vitae, and testifying experience as **Exhibit "C."**

m.      Mr. Ehrlich is expected to testify regarding damages calculations for Plaintiffs based on the economic damages due to Ms. Snider's death.

n.      Mr. Ehrlich's hourly rate is $500.00 for expert witness testimony.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this 23 day of June, 2023 in Fresno, California.

_____
Jay A. Christofferson

PLAINTIFFS' EXPERT WITNESS DESIGNATION; DECLARATION OF JAY A. CHRISTOFFERSON

# EXHIBIT "A"

D.M. and L.M.; Denise Sawyer; Doug Snider v. County of Merced and Wellpath, et al.

United States District Court

Eastern District of California

Phil Stanley

Plaintiff Expert Report

June 16, 2023

INTRODUCTION

My experience in the field of corrections spans more than fifty years, starting in 1969. My current resume is attached as Exhibit A. I began my career by working with juveniles as a counselor at a juvenile correctional facility in Washington State for three years. Thereafter, I have worked with adult offenders at every stage of the criminal justice system, including probation, parole, work release, prisons and jails. My thirty year career with the Washington Department of Corrections included work at all levels of the organization, with progressively more responsibility at each level. I was Superintendent (Warden) of three prisons, including the primary prison for mentally ill inmates (Special Offender Center). The final three years of my Washington State career was as Regional Administrator, with overall responsibility for three prisons, including approximately one-third of the prison population of Washington State.

After retirement from Washington Department of Corrections in 2000, I was appointed as Commissioner of the New Hampshire Department of Corrections and served two governors over four years, responsible for leadership of all prisons and parole programs. During this time the New Hampshire Department of Corrections prisons and parole operations, including programs for the mentally ill, was fully accredited by the American Correctional Association. The accreditation process requires a jail or prison to follow national standards of care and custody for inmates.

From 2007 to 2012 I was the Director of the Chelan County Regional Justice Center, the primary jail (380 beds) for Chelan and Douglas Counties in central Washington State. While the Director, I participated in the revision of Jail Guidelines for Washington State jails, for the Washington Association of Sheriffs and Police Chiefs. These jail guidelines have since become the standards for jails in Washington State. During that time I was also a board member of the Regional Support Network (Mental Health) for that area of Washington State. My background in jails and prisons has provided me the expertise of managing the housing of persons with serious substance abuse problems, as well as those inmates with severe mental health issues.   My opinions are based on my experience and knowledge of contemporary national standards for jails, regarding how to prevent serious injuries and deaths for those in jail custody.

For the last eight years I have consulted as a jail expert related to court cases, for both plaintiff and defense, in Washington State, California, New Mexico, Mississippi, Texas, Wisconsin, New York, Oregon, Iowa and Illinois. In 2015, I was appointed federal monitor of a Settlement Agreement, regarding jail conditions, in Farris, et al. v. Franklin County, U.S. District Court, Eastern District of Washington, reporting to a Federal District Court

Judge. In December 2018 I began work as a federal monitor in Disability Rights Washington v. Yakima County, U.S. District Court, Eastern District of Washington, a case involving provision of services for mentally ill in the Yakima County jail. I have also provided analysis and recommendations to two Sheriffs and a Police Chief on their operation of jails, including the care of mentally ill inmates, inmates in alcohol withdrawal and inmates who indicate a risk for suicide.

Exhibit B contains a list of cases in which I have testified in the past six years and Exhibit C identifies my compensation fees for expert work. I have not published any articles in the last ten years.

MATERIALS RELIED UPON

In order to provide analysis and opinion in the case of D.M. and L.M.; Denise Sawyer; Doug Snider v. County of Merced and Wellpath, et al., I have reviewed a wide variety of materials. The primary documents I have reviewed include: the Complaint filed by plaintiff's attorney; depositions of Officer Swafford, Officer Castaneda, Nurse Atwal; Suicide Prevention training material from Merced County; Policies of Merced County Jail; Policies of Correctional Medical Group Companies; Letter of Reprimand for Officer Castaneda; Jail booking forms completed by jail staff and medical staff; Autopsy report; Doctor Report from Merced County Superior Court; Internal Affairs Investigation by Sergeant Gallagher; Death review by Dr. Bird.

I also reviewed the American Correctional Association Core Jail Standards, First Edition (2010), the American Correctional Association Standards for Adult Correctional

Institutions, 4th Edition (2003), the National Commission on Correctional Health Care Standards for Mental Health Services in Jails (2015).

## OVERVIEW

Rene Snider was remanded to custody at the Merced County Jail in Merced, California on March 18, 2019, following various competency evaluations regarding her serious mental health issues. At the Merced County Jail, a booking officer did an initial intake evaluation of Ms. Snider and noted that she was under the care of a physician for medical and psychiatric reasons, that she was taking prescribed medication, that she had previously attempted suicide, among other notable issues. Nurse Atwal then completed a medical assessment, entering information into the computer system at the jail describing that Ms. Snider had no signs of depression or anxiety, had not previously attempted suicide, had no history of abuse, and made no description that Ms. Snider's behavior might be a danger to herself and others, all of which were significant issues for Ms. Snider. Nurse Atwal next marked a box on jail forms  that she was to be "housed according to classification" rather than noting she should be placed in a safety cell or medical isolation, due to her prior suicide attempts and her serious mental health issues. There was physical evidence of Ms. Snider's prior suicide attempts in the form of "hesitation" marks on her left arm which are known indicators of the risk of suicide. Ms. Snider was seen by nine medical staff members at the Merced County Jail and none noted these "hesitation" marks.

At the hearing to remand her into jail custody Ms. Snider voiced her concern about her medications and twice the Court  on March 18, 2019, noted "They're to provide you whatever medications you are taking." This did not occur and Defendant Dunwoody failed to continue Ms. Snider's prescription for Dilaudid. Ms. Snider's family even brought her medications to the jail to be dispensed to her, but this failed to occur. Ms. Snider was also prescribed Prozac by Defendant Burdi at the jail but this medication was not provided to Ms. Snider. Rather than placing Ms. Snider in a safety cell at the Merced County Jail, she was placed in various cells with other inmates in the John Latoracca Corrections Center, and finally was placed alone in a cell  with horizontal bars on a ladder between two bunks. This was a significant jail classification error. On the day of her death, March 23, 2019, Ms. Snider was found by Officer Castaneda, who had previously failed to monitor the cell area occupied by Ms. Snider, by not conducting welfare checks in a timely manner. The autopsy report  (County 0093) noted she died from "asphyxia by hanging" and had "superficial abrasion-laceration of her left forearm" with a "panty liner stuck to her left upper arm" which was bloodstained, signs of a suicide attempt that was ignored by Officer Castaneda.

FAILURE TO NOTE MEDICAL AND MENTAL HEALTH ISSUES AT INTAKE

When an inmate is received into a jail, it is critical to gather all pertinent information, both from the inmate, but also from the committing paperwork. The paper documentation includes not only the charge information but also critical information regarding court status, medical and mental health issues. The documentation regarding Rene Snider's

troubled mental health was available to medical and correctional staff at the Merced County Jail, but it was ignored. There was ample detail about her medication needs as well as her history of suicide attempts. The initial booking process and the subsequent classification process should be designed to place an inmate in the safest location within the jail. It is important to remember that once a jail accepts an inmate, their full care and custody are the sole responsibility of the jail. An inmate has little choice about any significant matter in their life in a jail environment, those decisions and the manner of care are all up to jail personnel. Communication between jail officers and medical staff is key to both the initial placement of an inmate in the jail, but also for their ongoing care. The National Commission on Correctional Health Care  standard on Communication on Patients' Mental Health Needs (MH-A-08) states "Communication occurs between appropriate nonclinical staff and treating mental health professionals regarding inmates' significant mental health needs that must be considered in classification decisions in order to preserve the health and safety of that inmate, other inmates, or staff."

The booking officer at the Merced County Jail noted on the Medical Pre-Screen (County 0408-0409) form that Ms. Snider was under the care of a doctor, took medications, had muscle aches and pains, had been a victim of sexual assault, had mental health problems, had attempted suicide, had been treated by a Psychologist, was under a Conservatorship and had disabilities, impairments or medical issues that require special consideration. The Suicide Prevention policy of the Merced County Jail (Policy 09.03) states "Jail staff may be alert to possible indicators of potentially suicidal inmates, by such things as: past history of suicide attempts and recent crisis in personal events, such as extended or life sentencing." These criteria applied to Rene Snider. Yet, when

Nurse Atwal took this form from the booking officer and did her own assessment, making entries into the jail computer system on the Medical Intake Triage/Receiving Screening form (County 0303-0309), she marked that Ms. Snider had no history of sexual victimization, had no chronic symptoms, had no prior mental health hospitalizations, had no prior suicide attempts, had no outpatient treatment, and had no other signs of suicidality. Nurse Atwal also failed to note any signs of lacerations on Ms. Snider, yet the autopsy report clearly noted "hesitation" marks on her arm. The discrepancy between what the booking officer noted and the ultimate entry into the jail computer system is indicative of extreme errors made in assessing Ms. Snider, leading me to opine that Nurse Atwal was indifferent to the medical and mental health needs of Ms. Snider. There is no evidence in her deposition that Nurse Atwal conferred with the booking officer regarding apparent discrepancies in Ms. Sniders responses. Nurse Atwal furthered her errors of assessment by signing the Medical Pre-Screen form, which was sent on to Jail Classification, by marking "House per Classification." Jail Classification staff, having received this information, indicating no danger signs, assigned Ms. Snider to jail housing at the John Latoracca Correction Center. This jail was not designed to provide for her safety.

Another document that should have been closely reviewed by jail and medical staff was the Doctor Report, dated March 18, 2019, from the Merced Superior Court overseen by Judge Ash. Judge Ash was in receipt of a CONREP (Central Valley Conditional Release Program) Report, dated February 29, 2019, that said that Ms. Snider was "experiencing symptoms of a serious mental disorder," (p. 6) and that she "receive competency training in a locked forensic setting." (p. 9) The judge reviewed the CONREP

report which said that Ms. Snider receive "inpatient treatment." (p. 5) The Doctor Report clearly shows that Ms. Snider's competency was being assessed. The judge stated "...we"ll set a date for the competency issue."(p.4) When Ms. Snider told the court she had concerns that the jail could not deal with her medical issues, the judge responded "They're to provide you whatever medication you're taking, anything like that." (p. 5) After that the judge said "I'll ask the jail staff to conduct a medical evaluation and that you also have the required medications. They're to make sure you get those medications." (p. 6) This Doctor Report documents the judge's decision to remand her to the care of the Merced County Jail. This report was available to jail staff as well as medical staff. However, Nurse Atwal either did not review this report, crucial to the care of Rene Snider, or she ignored the report, deciding that these issues were not of importance in the care of Ms. Snider. The disconnect between the court, medical staff, and jail booking staff indicates to me that these entities were not working in concert, resulting in Nurse Atwal's faulty assessment.   Her decisions and her computer input at the time of booking disregarded important descriptions of severe mental health issues from the Superior Court, as well as danger signs noted by the booking officer. When booking an inmate, about whom little is immediately known, it is best to be cautious. Given the vital information available to Nurse Atwal, she should have paid heed to the intake concerns noted by the booking officer. Nurse Atwal should have used discretion in marking the jail computer entry forms, resulting in Ms. Sniders jail housing, but this did not occur and Rene Snider's mental health issues were ignored.

Following Rene Snider's death, Dr. Bird of the Merced County Department of Health conducted a review (COUNTYIA0331) on May 10, 2019. He said "She had a medical

history of PTSD, borderline personality, myelodysplastic disorder, post procedure pain, admitted to marijuana use for anxiety and had a history of prior suicide attempt." He also said "Accompanying the jail medical record were extensive private psychotherapy notes documenting treatment for unspecified non organic psychosis and chronic procedural pain." It is my opinion that the documentation, noted by Dr. Bird, describing these medical diagnoses was ignored at the Merced County Jail. Also, Dr. Bird, who has no knowledge about the operations and housing issues in a jail, failed to comment on the errors made at booking, the errors made in not providing required medications, and the errors made in housing and supervision of Ms. Snider by corrections staff.

## FAILURE TO PROVIDE PRESCRIBED MENTAL HEALTH MEDICATION

My years of experience in jails and prisons has taught me that these facilities often house inmates who are seriously mentally ill. And medication provision is key to keeping these inmates balanced enough to deal with the stress of jail life, as well as aid in their rehabilitation or preparation for release. Continuing medications that an inmate was taking in the community is important, even if medication substitution or replacement occurs at a later date. As a jail administrator, I regularly discussed medication issues with medical and mental health staff, to ensure inmates received the medication they needed for stabilization. At the Merced County Jail, Rene Snider did not receive all of the medications for her pain or for her mental illness issues.

As noted above, there was a Doctor Report from the Merced County Superior Court where the judge ordered that the jail continue her medications, stating "They're to make

sure you get those medications." But Rene Snider never received her prescription for Dilaudid or Prozac, which are medications to deal with her body pain and mental health stability. It is also tragic that Ms. Snider's family brought her prescriptions to the jail as noted by Nurse Atwal, "Patient's family member came in with the medication bottles." (County 0303) In my experience, when an inmate comes into a jail with their medications, they have those medications provided to them until a doctor reviews the medication, does an assessment, and then either continues, discontinues, or replaces those medications. This clearly did not occur with Rene Snider and her rapid path to suicide within five days of entering the jail was the result. The Correctional Medical Group,  had the medical contract at the Merced County Jail. Their policy on Continuation of Medications Begun Prior to Incarceration (D02.1) states "Continuation and bridging of all essential medications begun prior to incarceration is essential to the health and well-being of patients. It is the policy of CMGC that patients will not miss any essential medications whether verified or unverified, formulary or non-formulary."(CFMG-RS 000397) This policy also states "Prescription medications in the patient's possession or brought to the jail by family may be continued.." (CFMG-RS 000399) This policy was ignored leading me to believe that medical staff were indifferent to Ms. Snider's medical needs and mental health.

## FAILURE TO CORRECTLY CLASSIFY AND HOUSE MS. SNIDER

The procedure by which inmates are brought into a jail is critical to their care afterwards for however long they are incarcerated. The booking process is intended to be

comprehensive, to learn as much as possible about the inmate so that the inmate can be placed in the jail in the appropriate location. Failure to do so accurately can lead to a host of problems. There can be gang issues, drug issues, assault issues, medical and mental health issues, to name a few of the potential problem areas of a jail.  A breakdown in the booking process can expose the inmate to a great deal of danger, even in the best operated jail, up to and including death. With regard to Rene Snider it is my opinion that this process was botched from the start. Information from a corrections officer at the time of booking was ignored by medical staff, also at booking, resulting in improper placement of Ms. Snider within the jail.

Following the booking process, jail classification officers then determine where to house the inmate within the jail. Ms. Snider was booked into the Merced County jail, where there were safety cells and where suicidal inmates were housed, but instead of being kept there for her safety, she was transferred to the John Latoracca Correctional Center, where, when asked about safety cells, Officer Swafford said in his deposition, "We have one at JLCC." (p. 39. Ms. Snider was not placed in the safety cell at JLCC. Instead, Rene Snider was first placed in a cell with another inmate and, after an altercation, she was housed alone, in a cell with a bunk ladder, which she used to tie off a bed sheet and hang herself. The National Commission on Correctional Health Care standard on Suicide Prevention (MH-G-04) states "All cells or rooms housing suicidal inmates are as suicide resistant as possible, with no protrusions that would enable hanging." The design of this cell had a horizontal ladder on the bunk by which Ms. Snider hanged herself. This was not a safe cell for an inmate, with severe mental health issues, to be placed. To house

Ms. Snider in this cell was a distinct indication of the indifference shown for the care of her by staff at the Merced County Jail.

## FAILURE TO PROVIDE REQUIRED SUICIDE PREVENTION TRAINING

Jail officers spend the bulk of their time in monitoring the activities of jail inmates. They are in a position to observe inmate behavior in a tightly controlled setting. They are also in a position to significantly deter an inmate who might be prone to self-harm. Suicide Prevention training is an important piece of the required training for corrections officers. The National Commission on Correctional Mental Health Care standard on Suicide Prevention (MH-G-04) states "All Staff members who work with inmates are trained to recognize verbal and behavioral cues that indicate potential suicide and how to respond appropriately. Initial and at least biennial training are provided, although annual training is recommended." The Merced County Jail policy on Perishable Skills Training (13.07) states "Corrections Officers must acquire initial certification and maintain current/continual certification in these categories minimally: Suicide Prevention (among other topics)." This policy describes "Perishable skills are unique in that they require training to achieve proficiency and proficiency is tested or qualified in defined time periods such as, but not limited to annual or bi-annual intervals."

However, the Merced County Jail did not follow either the national standard nor their own policy. At deposition, neither Officer Swafford or Officer Castaneda could remember when they had last received suicide prevention training. Officer Swafford, was asked if there was on the job training related to suicide prevention and he responded "Not that I

recall." (p. 96) Asked if he was aware of a policy related to preventing suicide Officer Swafford said "Not that I'm aware of." (p. 97) When asked if he had seen any written material related to suicide prevention Officer Swafford said "Not that I recall." (p. 99) Officer Castaneda was asked similar questions in her deposition. When asked when she last attended suicide prevention training she said ""I don't remember." (p. 75) When Officer Castaneda was asked if she remembered attending a training on suicide prevention provided by a mental health nurse at the jail and she said "No." (p. 80) When she was asked if she could identify any of the training materials related to suicide prevention training Officer Castaneda said "No." (p. 82) The responses in these two depositions lead to my belief that the jail officers charged with responsibility for Rene Snider's health and well being at the John Latoracca Correction Center were ill trained to prevent her suicide. Their lack of training indicates that the jail administration of the Merced County Jail did not take the issue of suicide prevention seriously, resulting in an extremely dangerous environment for inmates in this jail.

FAILURE TO PROVIDE REQUIRED MONITORING OF A SUICIDE RISK INMATE

The Merced County Jail failed to monitor the cell assigned to Ms. Snider, where her death by hanging could have been averted. On the night of Rene Snider's death, Officer Castaneda was given the responsibility for making area checks of the cells at the JLCC, including the cell which housed Ms. Snider. Put simply, Officer Castaneda failed to make her area checks in a timely manner, leaving open a window of time where Ms. Snider's death could have been prevented. The Merced County Jail policy on Management of

Security Program  (03.01) states "A Health and Safety check is performed at least once every 60 minutes in all housing areas." The California Board of State and Community Corrections Title 15 Minimum Standards for Local Detention Facilities states "Safety checks shall be conducted at least hourly through direct visual observation of all inmates. There shall be no lapse between safety checks." (COUNTYIA 0683-0684) In her deposition, Officer Castaneda said an area check  was "to make sure all the inmates are inside and that they're safe." (P. 66) She was asked if the last time she saw Rene Snider was at 1643 hours on March 23, 2019 and she said "Yes." (p. 112) And, when asked about the next time she saw Ms. Snider at 1805 hours, Officer Castaneda  said "when I passed cell 237 I saw Inmate Snider hanging from the bunk." (p. 115) Officer Castaneda then entered the cell and cut Ms. Snider down from a hanging position, with Officer Swafford's help, and CPR was started. Officer Castaneda was asked if she remembered the last time she received CPR training and she replied "No." (p. 117)

Officer Castaneda was provided a Letter of Reprimand (COUNTYIA0001-0003) from Lieutenant Swiggart,  on September 23, 2019 for: Violation of any County Code or lawful departmental or county regulation or code; Neglect of duty; Unsatisfactory work performance; failure to perform a visual Health and Safety check at least every 60 minutes in all housing areas of the facility ; and failure to follow BSCC Title 15-1027.5, which also mandated visual observation be no more than 60 minutes between safety checks.. The Letter of Reprimand noted that one hour and twenty two minutes had passed between the time Officer Castaneda saw Rene Snider alive and the time where she saw her hanging. Officer Castaneda was not suspended from employment. Officer Castaneda was not demoted in her employment. Officer Castaneda was not terminated from

employment. Officer Castaneda was not ordered to take a Suicide Prevention course or to take any remedial classes of training. The abject failure of the jail administration to hold Officer Castaneda responsible for her actions indicates to me that indifference to the health and safety concerns of inmates reached all the way to the top.

## CONCLUSION

In the space of five days at the Merced County Jail, medical and correctional staff missed a multitude of opportunities to save Rene Snider's life. She went into the jail afraid that she would not be given the medications she had been taking to stabilize her mental illness. Her fears were realized. Vital information, important to the booking, classification and medical treatment of Rene Snider, from the Merced County Superior Court, and from Ms. Snider herself, was ignored which could have saved her life. Errors on the part of a jail nurse and other medical staff, left her health and mental health issues unaddressed. Outright failure, by a corrections officer, to do the bare minimum in providing safety checks provided Ms. Snider the needed time to complete her suicide by hanging in a cell where she should never have been placed.

Less than one month after a CONREP report recommending to a judge that Rene Snider "receive competency training in a locked forensic setting" and a Superior Court judge directing that the jail "make sure you get the medications you were taking" she was found dead by hanging from a bedsheet tied around her neck in a cell that was not suicide proof. The correctional system in Merced County failed in providing

care of for Ms. Snider. The Merced County Jail failed to keep her alive to receive the

mental health competency training she so badly needed to preserve her life for herself

and her family.

Date_____June 17, 2023_____

Signature_____

Printed
Name_____Philip Stanley_____

Curriculum Vitae

**Curriculum Vitae**
**Mr. Phil Stanley**
**5440 46th Ave. SW**
**Seattle, WA  98136**
**(206)403-8453 (cell)**
**E-mail:  ps2x@centurylink.net**

**EDUCATION:**

**MA, Public Administration**
SEATTLE UNIVERSITY, Seattle, Wa., 1977

**BA Sociology**
UNIVERSITY OF WASHINGTON, Seattle, WA., 1971

**CORRECTIONS BACKGROUND:**

**Director**, Chelan County Regional Justice Center-Wenatchee, WA   2007-2012
Provided leadership to ninety employees in operation of 380 bed co-ed jail in Central Washington. Managed $9 million annual budget, responsible for all hiring/disciplinary decisions, reporting to three County Commissioners.

**Probation Officer,** Lake Forest Park Municipal Court, Lake Forest Park, WA  2004-2020
Supervise caseload of misdemeanant probationers. Prepare reports to the court. Provide monitoring to determine compliance of probationers meeting court conditions. (part-time position)

**Commissioner**, Department of Corrections, New Hampshire, May 2000 - November 2003
Reporting to Governor and Executive Council, provide leadership for all staff and offenders under the authority of the Department of Corrections. Offender population consisted of 2,415 inmates and 6,100 offenders under probation or parole supervision.

**Regional Administrator,** Washington State Department of Corrections  1997-2000
Provide leadership for prison superintendents and management staff in Northwest Region, consisting of Clallam Bay Corrections Center, Monroe Corrections Complex, Olympic Corrections Center and all community corrections offices within the region.

**Prison Superintendent**, Washington State Department of Corrections   1992-1997
Coyote Ridge Corrections Center (1992-1994), Special Offender Center (1994-1995), and Washington Corrections Center (1995-1997), each position reflected increasing responsibility for staff and inmates.

**Associate Superintendent, Correctional Program Manager, Parole Officer,** Washington Department of Corrections  1973-1992

**Counselor,** Echo Glen Children's Center, State of Washington   1970-1973

**JAIL CONSULTANT EXPERIENCE:**

Jail Consultant-provide written report reviewing jail operations 2015
Provide update September 2017

{9232/002/01147119.DOCX}

Island County Jail, Coupeville, WA
Contact: Sheriff Mark Brown (360-679-7310

Jail Consultant-provide written report reviewing jail operations 2014
Snohomish County Jail, Snohomish, WA
Contact: Sheriff Ty Trenary (425-388-3393)

Jail Consultant-review jail operations, attend stakeholder meetings,
advise Police Chief and City Manager on operation of Fife, WA City Jail 2013

List of Cases Retained as Jail Expert          February 2023

Hedrick v. Grant
U.S. Eastern District Court of California
Expert Report (for plaintiff)December 9, 2014
Expert Report February 23, 2016
Contact: Michael Bien   (415) 433-683
Rosen, Bien, Galvan & Grunfeld, LLP        San Francisco, CA

Jayne v. Bosenko
U.S. Eastern District Court of California
Deposition  December 8, 2015
Expert Report (for plaintiff)  March 2015
Contact: Carter White   (530) 752-6942.  University of California at Davis Law School  Davis, CA

Abila v. Funk, Duckett, Jorgensen
U.S. District Court of New Mexico
Expert Report  (for plaintiff) April 22, 2016
Deposition  June 2016
Contact: Matthew Coyte (505) 244-1406.     Coyte Law, P.C.  Albuquerque, NM

Peggy Johnson v. Mason County
U.S. Western District Court of Washington
Expert Report (for defendant) May 9, 2016
Deposition  October 2016
Contact: Guy Bogdanovich  (360) 754-3480
Law, Lyman, Daniel, Kamerrer, & Bogdanovich, P.S.   Olympia, WA

Roddy Avery v. Cowlitz County
U.S. District Court of Western Washington
Expert Report  (for defendant)  September 2016
Contact: John Justice (360) 754-3480
Law, Lyman, Daniel, Kamerrer & Bogdanovich, P.S.     Olympia, WA

Bryan Schrotberger v. Grays Harbor County
Superior Court Grays Harbor County
Expert Report (for defendant) November 2016
Contact: John Justice (360) 754-3480
Law, Lyman, Daniel, Kammerrer, & Bogdanovich, P.S.    Olympia, WA

Farris v. Franklin County
U.S. District Court of Eastern Washington
Appointed Monitor of Settlement Agreement, September 2016
Completed Monitor's Report July 2017
Completed Monitor's Report February 2019
Contact: Nick Straley, Columbia Legal Services, (206) 287-8613 or
Steve Sultemeier, Commander Franklin County Jail (509) 545-3520

Corbier v. St. Clair County
U.S. District Court for Southern District of Illinois
Expert Report (for plaintiff) April 2017
Deposition June 2017
Contact: Sheila Bedi (708) 214-0844     Northwestern Pritzker School of Law     Chicago , IL

Priscilla Sanchez, as next friend of Roxanne Estrada v. Otero County
U.S. District Court for New Mexico
Expert Report (for plaintiff) June 2017
Contact: Matthew Coyte (505) 244-1406     Coyte Law, P.C.  Albuquerque, NM

Petrolino v. City and County of San Francisco
U.S. District Court of Northern District of California
Expert Report (for plaintiff) September 2017
Contact: Ben Bien-Kahn  (415) 433-6830
Rosen, Bien, Galvan & Grunfeld, LLP     San Francisco, CA

Scarpi v. St. Clair County
U.S. District Court for Southern District of Illinois
Expert report (for plaintiff) October 2017  Deposition December 2017
Testimony for Trial  December 2018
Contact: Sheila Bedi (708) 214-0844.     Northwestern Pritzker School of Law     Chicago, IL

Weber v. Mason County
Mason County Superior Court
Expert Report (for defendant)  January 2018  Deposition March 2018
Contact: Andrew Weinberg (206) 462-6764
Patterson Buchanan Fobes & Leitch, Inc. P.S.     Seattle, WA

Jimenez v. Sacramento County
U.S. District Court Eastern District of California
Retained as Jail Expert  April 2017
Expert Report (for plaintiff) June 2019
Deposition  September 2019
Contact: Douglas Gordon (559) 486-5200.     Miles, Sears & Eanni     Fresno, CA

Fuerstenberg v. Aruba
U.S. District Court Northern District of Illinois
Expert Report (for plaintiff) January 2019
Deposition April 2019
Contact: Shannon Gross (312) 902-5200)     Katten Muchin Rosenman LLP     Chicago, IL

Disability Rights Washington v. Yakima County
U.S. District Court  Eastern District of Washington
Appointed Federal Monitor of Settlement Agreement, December 2018
Completed Monitor's Report  March 2019   Completed Monitor's Report  February 2021
Completed Monitor's Report  August 2021   Completed Monitor's Report August 2022
Contact: Kim Mosolf, Disability Rights Washington (206) 324-1521 or
Jeremy Welch, Director Yakima Department off Corrections (509) 574-1758

Freiwald v. Fatoki
U.S. District Court Eastern District of Wisconsin
Expert Report (for plaintiff) May 2019
Deposition  November 2019
Contact: Nicole Auerbach, (312) 676-5469.        Valorem Law Group        Chicago, IL

Graham v. Bolivar County
U.S. District Court, Northern District of Mississippi, Greenville Division
Expert Report (for plaintiff)
Contact: Raphael Green  (769) 208-8122    Gilmer & Green Legal Group, PLLC    Jackson, MS

Rodriguez v. SCORE Jail, Des Moines, WA
Expert Report (for defendant) December 2019
Contact: John Justice (360) 754-3480
Law Lyman, Kammerer, & Bogdanovich, P.S.  Olympia, WA

Cordova v. Lea County
U.S. District Court, District of New Mexico
Expert Report (for plaintiff)  December 2019
Contact: Alexandra Freedman Smith  (505) 314-8884        Albuquerque, NM

Gienapp v. Milbrandt
U.S. District Court, District of South Dakota, Northern Division
Expert Report (for plaintiff) January 2020
Contact: Frances Crockett (505) 314-8883 Law Office of Frances Crockett Albuquerque, NM

Lucero v. Core-Civic
State of New Mexico, County of Cibola, Thirteenth Judicial District
Expert Report (for plaintiff) January 2020
Contact: Paul Dominguez  (505) 850-5854        Dominguez Law Firm    Albuquerque, NM

Andrews v. Sangamon County
U.S. District Court Central District of Illinois
Expert Report (for plaintiff)  January 2020
Contact: Elizabeth Mazur  (773) 769-1411    Uptown People's Law Center    Chicago, IL

Reed v. Nacogdoches County, Texas
U.S. District Court, Eastern District of Texas, Lufkin Division
Expert Report (for plaintiff)  July 2020
Contact: Scott Medlock. (512) 623-7727        Edwards Law.    Austin, TX

Bair v. Snohomish County
U.S. District Court
Expert Report (for plaintiff)   September 2020
Deposition: November 2020
Contact: Darryl Parker. (206) 557-7719.     Civil Rights Justice Center, PLLC    Seattle, WA

Nordenstam v. Corizon Health and Clackamas County
U.S. District Court for Oregon, Portland Division
Expert Report (for plaintiff)   October 2020
Contact: Chad Stavely     (503) 546-8812.   Law Office of Chad Stavely, P.C.   Portland, OR

Velez v. Connell
U.S District Court State of New York
Expert Report (for plaintiff)   February 2021
Contact: Jeffrey Rothman     (212) 227-2980   Attorney at Law     305 Broadway, New York, NY

Steel v. Alameda County
U. S District Court for Northern California
Expert Report (for plaintiff).   February 2021
Deposition: April 2021
Contact: Yolanda Huang  (510) 329-2140.              Attorney in Private Practice     Oakland , CA

Powless v. Whatcom County
U.S. District Court for Western District of Washington
Expert Report (for plaintiff)  March 2021
Deosition: August 2021
Contact: Ryan Dreveskracht  (206) 909-3842.     Galanda Broadman, PLLC.          Seattle, WA

Villagran v. County of El Paso
U.S. District Court, Western District of Texas, El Paso Division
Expert Report (for Plaintiff). May 2021
Contact: Chris Benoit   (915) 532-5544               Law Office of Lynn Cole        El Paso, TX

Maes/Smith v. New Mexico Corrections and GEO Group
U. S. District Court for District of New Mexico
Expert Report (for Plaintiff)   July 2021
Contact: Frances Crockett   (505) 314-8884  Law Office of Frances Crockett  Albuquerque, NM

LaToya Johnson on behalf of Robert Johnson Estate v. Kemper County, et al.
U.S. District Court, Southern District of Mississippi, Northern Division
Expert Report (for plaintiff) September 2021
Contact: Cliff Johnson, Professor (662) 915-6863 U. of Mississippi Law School   Jackson, MS

Emad v. Wong
U.S. District Court, Eastern District of Wisconsin, Milwaukee Division
Declaration Report (for plaintiff).  September 2021
Deposition: September 2021
Contact: Sheila Bedi (708) 214-0844   Northwestern Pritzker School of Law   Chicago, IL

Hernandez v. Alameda County; Well-path
U.S. District Court for Northern District of California
Expert Report (for plaintiff) October 2021
Deposition: November 2021
Contact: Fulvio Cajina, Attorney   (510) 543-1912     528 Grand Avenue,   Oakland, CA

Cooper v. Whatcom County
U.S. District Court for Western District of Washington
Expert Report (for plaintiff)   November 2021
Ryan Dreveskracht, Attorney    (206) 909-3842   Galanda Boardman, PLLC.      Seattle, WA

Barraza v. Contra Costa County
U.S. District Court for Northern California
Expert Report (for plaintiff) November 2021
Contact: Fulvio Cajina, Attorney  (510) 543-1912        528 Grand Avenue,  Oakland, CA

Norman v. Wellpath, et al.
U.S. District Court for District of Oregon, Portland Division
Expert Report (for plaintiff) November 2021
Contact: Patrick Angel,  Attorney   (509) 953-8224        Angel Law       Portland, OR

Denton v. Pierce County, et al.
U.S. District Court for Western Washington
Expert Report (for plaintiff)  April 2022
Contact: Darryl Parker, Attorney  (206) 557-7719 Civil Rights Justice Center, PLLC.  Seattle, WA

Conway v. County of Dubuque
U.S. District Court for the Northern District of Iowa, Dubuque Division
Expert Report (for plaintiff)   July 2022
Contact: Nathan Mundy, Attorney     (515) 288-1552        Des Moines, Iowa

Tyler Wheeler v. New Mexico Department of Corrections
U.S. District Court for District of New Mexico
Expert Report (for plaintiff)  July 2022
Contact: Samuel Walker, Attorney (505) 508-4640 Atkins & Walker Law, P.C. Albuquerque, NM

Ferrill v. Colfax County
U.S. District Court for New Mexico
Expert Report (for plaintiff) August 2022
Contact: Frances Crockett   (505) 314-8884  Law Office of Frances Crockett  Albuquerque, NM

Lara v. County of Monterey
U.S. District Court for Northern District of California, San Jose Division
Expert Report (for plaintiff)    August 2022
Contact: Lori Rifkin, Attorney  (510-414-4132)      Rifkin Law Office    San Francisco, CA

Jones v. Faulkner County, et al.
U.S. District Court for Eastern District of Arkansas, Central Division
Expert Report (for plaintiff)   September 2022
Contact:  Morris Thompson, Attorney   (501) 661-8100  Little Rock, AR

Forrest v. Multnomah County,et al.
U.S. District Court for District of Oregon, Portland Division
Expert Report (for plaintiff)    January 2023
Contact: Joe Piucci, Attorney   (503) 228-7385  Piucci Law   Portland, OR

Anderson v. County of Lea
U.S. District Court    District of New Mexico
Expert Report (for plaintiff)    February. 2023
Contact: Frances Crockett (505) 314-8884    Law Office of Frances Crockett  Albuquerque, NM

Brown v. Columbia County
U.S. District Court for District of Oregon, Portland Division
Expert Report (for plaintiff)    February 2023
Contact: Jacob Johnstun, Attorney  (503) 410-3572   St. Helens, OR

# EXHIBIT "B"

# Expert Report of Terry A. Kupers, M.D., M.S.P.

**Re: DM & LM v. County of Merced, Wellpath et al., Case No. 1:20-CV00409-NONE-SAB**

## I. Background and Qualifications

I am a board-certified psychiatrist, Institute Professor at the Wright Institute, Distinguished Life Fellow of the American Psychiatric Association, and an expert on correctional mental health issues. I have testified more than thirty times in state and federal courts about the psychiatric effects of jail and prison conditions, the quality of correctional management and mental health treatment, and prison sexual assaults. I have served as a consultant to the U.S. Department of Justice, Human Rights Watch and Disability Rights. I am the author of Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It (Jossey-Bass/Wiley, 1998) and Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It (University of California Press, 2017), co-editor of Prison Masculinities (Temple University Press, 2001), and a Contributing Editor of Correctional Mental Health Report. I have authored and co-authored dozens of professional articles and book chapters, including "A Community Mental Health Model in Corrections" in Stanford Law & Policy Review, 26, 119-158, Spring, 2015; and "The Asylum, The Prison and the Future of Community Mental Health," a chapter in *Community Mental Health: Challenges for the 21st Century*, Editors Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017. I served as consultant to the Connections Program in San Francisco, California, a collaboration between San Francisco Court Case Managers, San Francisco Jail Mental Health Services and Community Mental Health agencies designed to provide alternatives to jail for mentally ill and substance-abusing offenders. I have served as an expert witness in multiple class action lawsuits concerning the conditions of confinement in solitary confinement units, including *Jones 'El v. Litscher, Dockery v. Hall and Ashker v. Governor of California* (see *curriculum vitae*, Exhibit A). I served as monitor of the *Presley v. Epps* consent decree (federal court) in Mississippi, involving inmates with mental illness in isolated confinement at Mississippi State Penitentiary.[1] I was the recipient of the Exemplary Psychiatrist Award presented by the National Alliance on Mental Illness (NAMI) at the 2005 annual meeting of the

---

[1] No. 4:05CV148-JAD (N.D. Mississippi, 2005 & 2007).

2

American Psychiatric Association, and the William Rossiter Award for "global contributions made to the field of forensic mental health" at the 2009 Annual Meeting of the Forensic Mental Health Association of California.

I have been asked by Plaintiff's Counsel to review records and provide opinions about the management and mental health treatment of Ms. Rene Snider at the Merced County Jail between her admission on March 18, 2019 and her death by suicide on March 23, 2019.  My fee is $350 per hour for all work except testimony, and $500 per hour for testimony at deposition and/or trial. My C.V., which includes a list of publications in the past ten years, and a list of cases where I have testified in the last four years are attached to this report as Exhibits A & B.

## II. Preparation

I have reviewed the Complaint in this matter as well as attached Exhibits; Depositions and attached Exhibits of Amanpreet Atwal, Adriana Kifan, Jessica Ramirez-Aguilar, Debbie Mandujano, Keriann Quinn-Fit, Gianfranco Burdi (excerpt, Exh. 2, Mandujano Deposition) , and Terrie Vince; the "Encounter Summary Report" from Ms. Snider's prior admission to the Merced County Jail in 2016; the July 2018 Correctional Medical Group Companies, Inc. "Registered Nurse Protocols"; the October 2018 Correctional Medical Group Companies, Inc. "Policy & Procedures Manual"; the CFMG Medical Record for Rene Snider, including the Pre-Screen and Screening Interview; the Segregated Population Observation Log for 3/20/2019; Notes from Interviews with Correctional Officer Swafford of 7/21/2019; the Reprimand for CO Adriana Castaneda of 9/23/2019; multiple Power Points as well as Merced County Training materials on Suicide Prevention; Court documents regarding Ms. Snider; the February 28, 2019 PC 1370 Placement Evaluation of CONREP;  the Review of Death, May 10, 2019 by Dr. Ken Bird; and the Medical Records file of Dr. Bruce Steven Milin,

### III.  Chronology of Events

Ms. Snider was arrested and charged with felony crimes including the kidnapping of her children in October, 2016.  She was found incompetent to stand trial by a court in November, 2018. At the court's behest, she was ordered in early 2019 to be evaluated by CONREP (Central Valley Conditional Release Program) for possible incompetence to stand trial and for placement

recommendations.  CONREP provided a February 28, 2019 letter to Hon. Carol Ash, Merced County Superior Court, reporting "there was evidence of underlying paranoid and grandiose delusional ideations."   CONREP concurred with Dr. Phillip Hamm's "thorough and comprehensive psychological competency evaluation report of 9/5/2018," where Dr. Hamm had diagnosed "Paranoid Delusional Disorder, Rule Out Schizophrenia Spectrum Disorder and Rule out Medication/Drug induced Dementia." The CONREP letter also reflects their telephone contact with Donald Bender, MFCT, who saw Ms. Snider in treatment for approximately 2 ½ years and diagnosed delusional disorder and paranoid personality disorder.  They also contacted Dr. Bruce Milin, Ms. Snider's treating psychiatrist since 2010, who opined that Ms. Snider was "acting on all the paranoid delusions." Dr. Milin reported to CONREP that she has an explosive temper and cannot be rational. CONREP found Ms. Snider to be "fragile with a sense of desperation,.. and not stable at this time." They recommended that Ms. Snider "be referred to the California Department of State Hospitals in order to receive competency training in a locked forensic setting." They recommended that the judge consider involuntary antipsychotic medication as part of the court's order. Thus, three clinicians in the community as well as the CONREP team found Ms. Snider to be delusional, psychotic, labile, under the influence of drugs, incompetent to stand trial and needing inpatient psychiatric treatment on a locked ward, possibly with involuntary medications. Ms. Snider appeared in Merced County Superior Court on March 18, 2019, where Judge Hon. Carol Ash (Minute Orders, 3/18/2019) found her Incompetent to Stand Trial and, "Based on the Report by CONREP, the defendant is remanded into custody; Defendant has medical conditions; The Court Orders Jail Medical Staff to Conduct a medical examination on the defendant" (CFMG-RS 000314).

Ms. Snider was admitted to Merced County Jail on March 18, 2019.  A prior period of incarceration at the jail in 2016 is documented in an "Encounter Summary Report," booking date 11/28/2016 (See Exhibit 6, Quinn-Fitzpatrick Deposition). The 2026 Encounter Summary Report includes documentation of medical care for breast cancer, and that she was taking Dilaudid for pain.

At 1500 hour on March 18, 2019, a Medical Pre-Screen questionnaire was completed. On the upper segment of the pre-screening form, "Arresting Officer Observations/Questions," all questions are ticked "NO," including the question, "Does the subject behavior suggest risk or

4

danger to self, officers, or others?"  But below that entry, in the Booking Officer Observations,
"Inmate Questions "segment of the Pre-Screen form, "YES" was ticked to the following questions:

> 2.  Are you under the care of a doctor for medical or
>     psychiatric reasons? - Yes
>
> 5. Do you take medications?  Yes
>
> 11. Do you have muscle aches and pain?  Yes
>
> 13. Any unexpected weight loss, night sweats, or fatigue?
> Yes
>
> 17. Do you have any urinary discomfort or sexual
> transmitted disease?  Yes
>
> 18. Have you ever been the victim of sexual assault?  Yes
>
> 20. Do you expect to withdraw from alcohol or drugs?  Yes
>
> 21. Do you have any Mental Health problems?  Yes
>
> 22. Are you suicidal?  NO
>
> 23. Have you ever attempted suicide?  Yes
>
> 24. Have you ever been treated by a Psychologist?  Yes
>
> 26. Are you currently under Conservatorship?  Yes
>
> 27. Do you have any disabilities, impairments, or medical
> issues that require special consideration?  Yes
>
> 30. Do you have any other medical problems?  Yes.
>
> The Pre-Screening Form was signed by officer Fred
>
> Swafford, and by Ms. Atwal, R.N. (County 0408-0409)

A 3/18/2019 "Medical Intake Triage/Receiving Screening - CMG" form was completed by
Amanpreet Atwal, R.N.  On this form, it is noted that Ms. Snider had been previously incarcerated,
was not "under the influence" when booked at the jail, "YES" was ticked for history of drug use,
and "NO" was ticked for drug withdrawal.  Current medications was ticked "YES," Prozac and
Dilaudid were listed, and it was noted that an ROI was sent (request for confirmation of medication
prescription).  "NO" was ticked for past mental health hospitalizations and for outpatient mental

health treatment (a response contradicted in the CONREP report she had been treated by Dr. Milin and Mr. Bender, and by the booking officer entering she was under the care of a doctor and taking medications, had mental health problems and had been receiving mental health treatment). "NO" was ticked for Suicide Watch on prior incarceration, NO for prior suicide attempts (an incorrect response since Officer Swafford had ticked YES on the pre-screening form and Dr. Milin's medical records reflect suicide attempt by pill ingestion as an adolescent), and NO was ticked for being suicidal now or having a plan. No was ticked for being homicidal, No was ticked for having a social support system, No was ticked for History of Abuse (contradicted by booking officer ticking YES for prior sexual assault), and No was ticked to the question "Does the patient behavior suggest a danger to self or other." NO was ticked to "Worried about a major problem? (almost certainly incorrect since she must have been worried about custody of her children and her pending felony charges). NO was ticked to signs of depression and to signs of Anxiety. It is noted that "Patient instructed on how to access health care." There was no patient signature, the box is ticked for patient being unable to sign. (CFMG - RS - 000211-213).

Amanpreet Atwal testified at her Deposition that a medical screening takes about an hour and a half, when she did the screening she had available only the Wellpath medical record from Ms. Snider's 2016 prior admission to the jail, and she could have ordered Ms. Snider be housed in a "Safety Cell." She testified that on account of Ms. Snider's report of PTSD, she did fill out a referral for a mental health evaluation (which would occur on 3/20/2019). At p. 75 of her Deposition she testified that if the patient tells her something different than what she told the arresting or booking officer, she as the screener relies on what the patient tells her. On p. 85 she testifies that if the officer ticks YES to a question about a prior suicide attempt and the inmate tells her no, she records the NO that she was told, and she might ask the inmate about it. (Note: she does not feel a need to note the discrepancy and investigate the reason for it). She testified similarly about a history of sexual abuse, if the patient tells the officer she has been abused but the patient tells her she has not, she goes with what the patient tells her. She testified that she would not attempt to continue the prescription of Dilaudid in jail because it is a controlled substance, but she would continue the Prozac after confirming from the prescriber (Dr. Milin) or the pharmacy that it had been previously prescribed. (According to policy, the person doing the screening should communicate with the provider by the end of the shift if something needs to be done about previously prescribed medications -- she does not remember doing that and said it's not on the

6

EMR. [p. 156]).  She mistakenly said that Prozac is like Xanax and is prescribed for anxiety (actually, Prozac is an SSRI antidepressant that can be prescribed for anxiety because one of its side effects is the alleviation of anxiety, but it is an entirely different kind of medication than the benzodiazapine tranquilizer Xanax).  She testified that she would not ask any questions not listed on the screening form (thus missing the critical question why she told the booking officer one thing and Ms. Atwal another on several questions).  She testified she knew about Ms. Snider being prescribed psychiatric medications, and knew about her being diagnosed Posttraumatic Stress Disorder (PTSD), but based on what Ms. Snider told her she concluded there were no special health needs (pp. 164-16)].  She testified she did not consider special housing such as a safety cell because Ms. Snider said she was not suicidal (p. 166).  She testified she sent for Ms. Snider's medical records to verify medications, set up a COW drug withdrawal protocol and referred Ms. Snider to mental health.  When asked if, knowing Ms. Snider committed suicide several days after her screening, would she have done anything differently while screening Ms. Snider, she responded no, "I think I followed the whole policy and procedure."

A mental health assessment occurred on the day following Ms. Atwal's medical screening, conducted by RN Debbie Mandujano, a psychiatric nurse and the person who designed and conducted suicide training for correction officers at the jail.  Documentation of this follow-up evaluation is contained in Exhibit 006 to the Quinn-Fitzpatrick Deposition.  It is noted in the "Task Priority" that on 3/19/2019 Ms. Debbie Mandujano met with Ms. Snider (Ms. Mandujano states in her Deposition that the meeting occurred at Ms. Snider's cell, they both had to kneel to speak through the food port, and the meeting lasted approximately 15 minutes -- Mandujano Deposition, p. 52).  The 3/19/2019 "Task Priority" note reflects that Ms. Snider is referred from intake for a mental health follow-up, she takes Prozac, she is upset because she is not yet receiving her medications (plural in the note, but only Prozac is mentioned), she states she is going to be transferred to a state hospital, she denies thoughts of self-harm, and she requests to see a counselor. Ms. Mandujano's Objective assessment is unremarkable except she reports, "Is anxious and pressured in her speech and her thoughts are racing."  She denies hallucinations and thoughts of self-harm.  Ms. Mandujano's assessment is Anxiety, and she notes she awaits verification of medications to start her on medications.  Appointments are made with Dr. Burdi via telepsych and to see a counselor (Terri Vince) the next day.  She also testifies that Ms. Snider failed to tell her she was taking Dilaudid, did not tell her she was seeing a psychologist, and while she said she was

going to the state hospital she did not reveal she had been found incompetent to stand trial by the court. On p. 38 of her Deposition, Ms. Mandujano testifies: "So when you ask me statistically was she suicidal, no, she wasn't. She told me no. I believed her. So that makes me say, no, she was not suicidal. And, no, there was no threat of suicide from her. And I will stand on that." On p. 63 of her Deposition, Ms. Mandujano testifies that she did not need to review notes prior to her examination, from Dr. Milin, the psychologist who was treating Ms. Snider in the community, but if she had those notes she would have relayed them to Dr. Burdi, the psychiatrist scheduled to see Ms. Snider by telehealth at a later date.

A 3/20/2019 Mental Health Chart Entry by Heather Shepherd reflects Ms. Snider's participation in a social group where she was cooperative, active and related well to other participants. As reflected in a 3/20/2019 Mental Health Chart Entry by Terrie Vince, Ms. Snider complained it has been three days since she has been off her medications, and she is feeling the effects of discontinuation of the medications, she is anxious and she is upset her medications had not been re-started. Ms. Snider said "I'm concerned my mental health will suffer." She expressed concern she will not get the treatment she needs in the jail. The clinician tried to help her "reduce some of the frustration she feels by using coping skills." The clinician told her she would try to gain clearance to reinstate her medications and would refer her for a psychiatric evaluation a week hence, and a mental health evaluation would occur within a week. Mental status was unremarkable with no hallucinations, delusions, suicide ideation or homicide impulses. The written plan was for Ms. Snider to receive mental health counseling.

Ms. Snider was re-started on Prozac, 20 mg. per day, on 3/21/2019 or 3/22/2019, after Dr. Boggs received confirmation that she had been taking Prozac prior to her admission to the jail.

Ms. Snider was housed in "lockdown" or solitary confinement, possibly in part, on account of unacceptable behaviors including two altercations with other prisoners, but there are also notations on the chart that she was in lockdown when she died because she had not yet been fully classified and assigned a housing situation. In any case, there is no mental health assessment at the time she was consigned to lockdown to determine if solitary confinement would cause her harm.

Custody staff at the jail did not check on Ms. Snider for over an hour and twenty minutes on 3/23/2019, in spite of jail policy requiring hourly safety checks. She hung herself in her solitary

jail cell. She was discovered hanging, cut down, emergency measures were taken and she was pronounced dead.

There is a "Review of Death" dated May 10, 2019, by Dr. Ken Bird, Interim Health Officer, Merced Co Dept of Public health. Dr. Bird notes prior suicide attempt history with no details given. Dr. Bird wrote that she had been admitted to the jail on 3/18/2019, and a mental health visit on 3/20/2019 found no suicidal ideation. She had been without her medications for 3 days when Prozac was re-started on 3/21 after confirmation of prior prescriptions. She was on COWS, a narcotic withdrawal monitoring protocol, and there were no symptoms of withdrawal. Dr. Bird concluded: "It is my opinion that this inmate was appropriately evaluated and managed and I have no recommendations for improvement of care." (CFMG - RS - 000191)

## Opinions:

1. Suicide is a very big problem in jails and prisons. The rate of suicide behind bars is much greater than in the general community, and the highest period of risk is the first few days following admission to the jail.[2]
2. There are standards regarding the prevention of suicide in jail and mental health interventions with the suicidal inmate. First and foremost is the standard of care in the community -- which is applicable in the jail setting. In order to delineate the specifics of the standard of care in the community, one can turn to the National Commission on Correctional Health Care (NCCHC) Standards for Local Detention Facilities, especially Section J-B-05 "Suicide Prevention and Intervention," available at <https://www.ncchc.org/filebin/Resources/Standard_J-B-05.pdf>. Accreditation by the N.C.C.H.C. is elective, but their standards, according to which they audit, are the best delineation we have of the standard of care in the community. The October 2018 Correctional Medical Group Companies, Inc. "Policy & Procedures Manual," as applied in Merced County Jail, cites relevant sections of the N.C.C.H.C. standards at the beginning of

---

[2] Lindsay Hayes, "Suicide Prevention in Correctional Facilities: Reflections and Next Steps." *International Journal of Law and Psychiatry* 36 (2013) 188–94. <www.ncianet.org/suicide-prevention-in-correctional-facilities-reflections-and-next-steps/.>

each policy topic.   There are also guidelines produced by the American Psychiatric Association and other bodies.[3]

3.   Screening for suicide and other mental health problems within a short time of jail admission is required per all standards, and by the CMGC "Policy & Procedures Manual."

At the time of screening, suicide risk is assessed on the basis of history and mental status examination, chart review and the determination of "risk factors." An example of a risk factor is a previous attempt at suicide. Someone who has made a prior suicide attempt is at much greater risk than the average person of committing suicide in jail. Likewise, someone who is suffering from a serious mental illness is at heightened risk of suicide when incarcerated. Someone who is in withdrawal from illicit drugs is at heightened risk because her behavior is unpredictable and in addition, the fact that she is "high" or in withdrawal makes questionable her responses to staff's queries about the potential for suicide. Individuals who suffer from serious mental illness and are addicted to illicit substances or in withdrawal are potentially very unpredictable -- they might sincerely tell a clinician they are absolutely not suicidal one minute, and then fall into deep despair and become suicidal the next. Besides prior suicide attempts, the presence of mental illness and a history of substance abuse, suicide risk factors include past sexual abuse or trauma, feelings of hopelessness, impulsivity, a significant recent loss, legal problems, the expectation of going to prison, physical illness and so forth.

4.   By the time of her admission to the Merced County Jail on March 18, 2019, Ms. Rene Snider had been treated as an outpatient by Dr. Bruce Milin for Posttraumatic Stress Disorder, ADHD, Active but Unspecified nonorganic psychosis, and post-procedural pain for over ten years and prescribed powerful anti-psychotic, antidepressant and pain medications (Dr. Milin's medical records, CFMG - RS - 000303 to 000305). She had also been in psychotherapy with Don Bender for 2 ½ years (see CONREP letter). She had been declared by the court Incompetent to Stand Trial based on mental health evaluations by Dr. Hamm (2018) and CONREP (February 2019), and was on a conservatorship. CONREP had recommended admission to the state psychiatric hospital and competency restoration

---

[3] See *Psychiatric Services in Correctional Facilities*, American Psychiatric Association, 2016, Third Edition.

treatment, but the Court ordered she be remanded to Merced County Jail on March 18 and that her medical condition be evaluated at the Jail.

5.  Ms. Snider was, upon admission to Merced County Jail on March 18, 2019, at very high risk of suicide, based to start with by the long list of risk factors she presented.  The Centers for Disease Control and Prevention publish this list of risk factors for suicide in individuals:

- Previous suicide attempt
- Mental illness, such as depression
- Social isolation
- Criminal problems
- Financial problems
- Impulsive or aggressive tendencies
- Job problems or loss
- Legal problems
- Serious illness
- Substance use disorder[4]

At the time of her admission to Merced County Jail in March, 2019, Ms. Snider exhibited most of these risk factors for suicide, as explained in Section III of this report, "Chronology of Events."  She also exhibited likely withdrawal from prescribed (Dilaudid) as well as unprescribed drugs (cannabis) and a history of repeated trauma.  And she must have been deeply worried about her "legal problems."  She believed (possibly delusional) that her children were in grave danger at the hands of their father, and she was facing at least two felony charges related to that belief -- certainly her legal problems were cause for great worry.  This long list of risk factors should have sufficed to trigger an urgent comprehensive mental health examination, and should have caused staff at the jail to keep her safe -- and in jail this means locking her in a "Safety Cell."  These measures were indicated on an urgent or emergency basis because the entire purpose of looking for risk factors is to flag individuals who are at a relatively high risk for suicide.  Ms. Snider was at very high risk based on risk

---

[4] Centers for Disease Control and Prevention, "Suicide Prevention," available at <https://www.cdc.gov/suicide/factors/index.html>

factors alone, and medical staff, nurse Atwal, should have initiated measures to keep her safe until she could be thoroughly evaluated by mental health clinicians. This was not done.

6. In general, custody staff and medical staff who are not thoroughly trained or licensed to complete comprehensive mental health examinations are required to institute safety measures, such as direct observation or a safety cell, when there is reason to be concerned an inmate is at risk of self-harm. The general rule, and the correct practice, is for a relatively lower level/less trained staff member (custody or medical staff) to initiate safety precautions including a safety cell or suicide "watch," but subsequently only a fully qualified and licensed mental health professional can order the discontinuation of the safety precautions.

7. The screening of Ms. Snider for mental health needs at the Merced County Jail, including suicide risk, was deficient and substandard. The screening procedure at the Merced County Jail as of March 18, 2019, included a pre-screening questionnaire completed by the admitting officer and citing the report of the arresting officer, and the form, "Medical Intake Triage/Receiving Screening - CMG," was completed by Ms. Atwal, a nurse working for Wellpath/CFMG at the jail. Ms. Atwal testified in deposition that she would take the prisoner's word over that of the officer completing the pre-screening, for example if the prisoner told her she was not suicidal, even after the officer said she told him she was, Ms. Atwal would believe the prisoner and not initiate safety precautions. This is not an acceptable practice. In fact it is a very dangerous practice. The very fact that Ms. Snider told the officer one thing and then directly contradicted that response upon questioning by Ms. Atwal at screening indicates she was lying to one or the other. At that point the screener should have detected that something was very wrong, should have known that lying on pre-screening or screening is itself a risk factor for suicide, and should have instituted precautions to keep Ms. Snider safe while awaiting a comprehensive mental health evaluation. Ms. Mandujano, while completing the mental health evaluation, also missed that discrepancy -- the fact that Ms. Snider was lying to one or the other individuals performing pre-screening and screening examinations -- and failed to sufficiently take into account the discrepancy between what she told the officer at pre-screening and what she told Ms. Atwal as a risk factor for suicide. In her Deposition, Ms. Mandujano testifies that she reviews medical intake, not the officer's pre-screen, "because I trust the medical to be more complete." (Mandujano Deposition, p. 20). Her assumption that the officer's report is less complete

12

detered her from considering the possibility that discrepancies between the pre-screening and screening reports could indicate a high risk for suicide.

8.  Communication is one of the most important preventive measures regarding jail suicide; communication between arresting officer and jail personnel, between custody staff and health and mental health staff, and so forth. Lindsay Hayes, a pre-eminent national authority on jail suicides whose protocol for suicide prevention is included among the training materials submitted to discovery in this matter, stresses the importance of communication in the prevention of jail suicide: "Communication among facility staff (correctional, medical, and mental health personnel). Effective management of suicidal inmates depends on communication between the facility's correctional personnel and other professional staff. Because inmates can become suicidal at any point during confinement, correctional staff must maintain awareness, share information, and make appropriate referrals to mental health and medical staff"[5] A suicidal inmate will often tell one or another member of the jail staff about risk factors, about her plan to commit suicide or about other significant facts. That information has to be shared, and then any discrepancies between what the inmate tells different staff members must be considered in determining the seriousness of suicide risk. In Ms. Snider's case, she told Officer Swafford about a previous suicide attempt and responded "YES" to a number of risk factors. That information should have been known and relied upon by medical and mental health staff, including Ms. Atwal and Ms. Mandujano. Too often we find out retrospectively, after a jail suicide, that someone other than the mental health clinician had information the mental health clinician should have known about -- e.g. an officer knew Ms. Snider had a prior suicide attempt. If Ms. Atwal and Ms. Mundujano had taken seriously the discrepancy between what Ms. Snider told Officer Swafford and what Ms. Snider told them, they would have realized there was a high risk of suicide and Ms. Snider should have been placed on monitoring while awaiting a more thorough mental health evaluation.

9.  The questionnaire utilized in both the pre-screening and screening assessment contains only two questions about suicide: "Are you suicidal?" and "Have you ever attempted suicide.?" This is a shortcoming of the jail and Wellpath policy. It is important to ask quite a few

---

[5] Lindsay Hayes, National Study of Jail Suicides: Twenty Years Later. U.S. Department of Justice, National Institute of Corrections, April, 2010.

questions about suicide along with the direct one, "are you suicidal?"  More questions, such as "Do you ever feel nothing seems worth doing?" or "Do you feel nobody would miss you if you were gone?," provide a much more complete basis for determining suicide risk.  The reason we ask quite a few relevant questions rather than limiting our assessment to an avowal or denial of suicide intent is that many inmates being admitted to the jail will brusquely utter denial when asked point blank whether they are suicidal, but after several related questions are asked will respond affirmatively about something, and then the screener can double back and say something like "So you quickly responded that you are not suicidal, but it appears you are actually having some thoughts of harming yourself."  Also, quite a few truly suicidal individuals will deny they are suicidal when asked directly about that, right up to the time they kill themselves.  It is easy to identify an incoming prisoner in a jail who says "I plan to kill myself."  That individual must be closely monitored and seen urgently by mental health.  But if someone is truly intent on committing suicide, she is very likely to say no to the question whether she plans to commit suicide.  She knows that were she to answer truthfully, she would be placed on suicide watch and her plans would be foiled.  So she lies.  A big part of the reason we spend so much effort creating lists of risk factors for suicide is that we want to know which individuals entering the jail are at great risk even when they will not tell the screener directly.  When someone has a lot of risk factors and yet calmly answers "NO" to a question about a plan to commit suicide – and Ms. Snider fit this picture -- that person must be urgently and thoroughly evaluated for suicide risk, and be monitored for safety at all times until mental health staff determine she is not at risk.

10. There is the additional question who had access to which documents, and when.  For example, Thanya Ryland, RN, was in touch with Dr. Dr. Bruce Millin's office, and noted that on 3/20/2019 Dr. Millin replied to a record request that he needed a signed release of information before he could release his psychiatric records for Ms. Snider (see Chart Notes, Medical Notes, 3/20/2019 by Thanya Ryland, EX 010 to Manjujano Deposition, CFMG-RS 000241).  That means that Ms. Atwal and Ms. Mandujano would not have had access to Dr. Millin's file when they did their screening and mental health evaluation, respectively.  However they did know she was taking Prozac, and that she had been ordered to the jail by the court.  The most likely reason for her court-ordered admission to the jail would have been a ruling of incompetent to stand trial.  And I would guess that when an individual is court-

ordered to be admitted to jail and undergo medical examination prior to transfer to a state hospital for competency restoration treatment, the court order would be on the medical chart or otherwise accessible to jail mental health staff. But in any case, there was a history of prior mental health treatment, prescribed antidepressant and opioid medications, a history of substance abuse and report of withdrawal, and prior suicide attempts (a prior suicide attempt is reflected in jail mental health chart notes from a prior, 2016, admission to the jail). A basic principle in mental health treatment is that when the clinical situation is unclear but there is the possibility of high risk of suicide, more strenuous efforts to access medical records are required so that treatment choices can proceed, including the choice to place a newly admitted prisoner on some kind of monitoring just in case she is at significant risk of mental breakdown or suicide.

11. Ms. Snider said "YES" when asked by the booking officer, "Have you ever attempted suicide?" And then she told Ms. Atwal "NO." She was lying when she talked to one or the other. (And on the other questions where she told the admitting officer one thing and the nurse something entirely opposite). The Wellpath/CFMG medical file contained this progress note from a prior (2016) admission of Ms. Snider to the jail: "She made a suicide attempt in her teens by an overdose of sleeping pills. She has not had significant suicidal thoughts recently."

12. The discovery of lying during a mental health/suicide screening evaluation is itself a strong risk factor for suicide, and definitely cause for concern about the risk that Ms. Snider was at high risk of suicide. The bottom line is that, if she is inclined to lie, jail staff do not know whether or not she plans to kill herself. She may be lying about that. That should cause the clinician screening her to declare her a high risk for suicide until proven otherwise, and initiate precautions. Between the pre-screen by Officer Swafford and the screening by Ms. Atwal she gave a large number of "YES" responses to screening questions designed to evaluate the true risk of suicide, and then when asked directly by Ms. Atwal, she denied feeling suicidal.

13. With as many risk factors for suicide as Ms. Snider exhibited, and contradictory responses to questions posed on pre-screening and screening, the nurse conducting the screening should have ordered her to be housed in a safe cell or suicide observation cell where she could be monitored to prevent her killing herself, and should have called for a thorough mental health

assessment on an emergency basis. There is no real downside to being cautious in this way in conducting a screening. If the individual turns out not to be suicidal, ordering emergency precautions would merely have taken up a few hours of clinical staff's time. But if the individual was truly intent on suicide and was not immediately identified as high risk and kept safe in a safety cell, the result could very well be her death. To prevent her suicide, clinicians should have assumed Ms. Snider, with a long list of troubling risk factors and evidence of lying upon pre-screening or screening, was suicidal until it became convincingly clear she was not. Had Ms. Atwal taken seriously the many risk factors for suicide that were present, and had she uncovered the fact Ms. Snider was lying either to her or to the booking officer, she could have initiated the suicide prevention protocol at the jail, and Ms. Snider would likely not have committed suicide on March 23.

14. Screening for suicide risk is only the first step in a jail's screening and triage system. If an admittee to the jail answers affirmatively to questions at screening aimed at uncovering suicide risk, or if she is detected lying to the screener, she must be placed in a housing situation where she can be continuously monitored and kept safe until a "higher level" mental health clinician can perform a more rigorous mental health assessment and create a treatment plan for preventing suicide. Ms. Snider's many risk factors for suicide should have triggered an urgent face-to-face visit with a psychiatrist, a psychologist or a social worker or a psychiatric nurse practitioner, and a comprehensive mental health assessment should have been accomplished on an urgent basis. (Ms. Mandujano's 15-minute assessment, speaking through the cell door food port, does not constitute a comprehensive or thorough mental health evaluation). This is what triage is all about. It is fine for a medical staff member with no credentials in psychiatry to collect data for the screening instrument. But then, if there is anything inconsistent or concerning about the incoming inmate's responses to the questions on the form, the screener is required to provide for the prisoner's safety and refer to a more trained and credentialed mental health professional, optimally a psychiatrist or clinical psychologist, who can assess the more complicated clinical picture and create a treatment plan. Ms. Adriana Kifan, a custody officer at the jail, testified about that at deposition:

> Q:   What would you do if you determined that
> someone was a suicide risk?

> A:    I would notify medical via the radio, and I
> would escort that person into the safety cell for
> safety cell placement. (Kifan Deposition, p. 88).

But that never happened with Ms. Snider at the jail. Though she had an appointment to see a psychiatrist by video nine days after admission to the jail, she killed herself prior to that date.

15. Ms. Snider had been prescribed and was taking Prozac and Dilaudid when admitted to the jail. Dilaudid was discontinued because it is an opiate and presumably not permitted in the jail. For Prozac, the medical staff was awaiting receipt of proof from the doctor or pharmacy that she was indeed prescribed the medication. But withdrawal from these two medications comes with withdrawal symptoms that can be quite severe. Withdrawal from Prozac can cause anxiety, insomnia, headaches, dizziness, tiredness, irritability, flu-like symptoms, and nausea. Sudden withdrawal from an opiate like Dilaudid can cause agitation, anxiety, muscle aches, increased tearing, insomnia, runny nose, sweating, yawning, abdominal cramping, diarrhea, dilated pupils, goose bumps, nausea, and vomiting. Unfortunately, withdrawal from Prozac or an opiate is also a risk factor for suicide, often because the agitation and other disturbing withdrawal symptoms incline the withdrawing individual to harm him- or herself. Ms. Atwal did place Ms. Snider on a COWS protocol, and she was monitored for withdrawal from Dilaudid. But withdrawal from Dilaudid seems not to have been considered a risk factor for suicide. The Correctional Medical Group Companies, Inc. 10/2018 Policy and Procedure Manual contains a number of provisions about individuals entering the jail while taking prescribed medications. Policy No. D02.1, "Continuation of Medications Begun Prior to Incarceration," contains this provision under the title "Ordering Unverified Medications": "C. By the end of the nursing shift, the nurse will contact the on-call provider for orders to address critical unverified medications or medications with abuse potential, and obtain orders to either continue, discontinue, or substitute with a clinically equivalent formulary alternative. During this consultation, the on-call provider will set the time for a provider to see the patient the next available sick call. The date of the appointment will be reflected in the written record of the order." Policy No. E02, under the heading "Receiving Screening," includes: "E) Prescribed medications will be verified, if possible, within 24 hours of booking to provide continuity of care. Verified psychotropic medications will be bridged using the

same medications, regardless of whether they are included on the formulary." Ms. Atwal did not contact the on-call psychiatrist or medical physician by the end of her shift on the day of admission, in violation of these two provisions in the Policy and Procedural Manual. Rather, Dilaudid ws abruptly discontinued without input from the on-call provider, and Ms. Snider would not be prescribed Prozac for 3 or 4 days after admission to the jail. A 3/20/2019 Progress Note in the Wellpath/CFMG medical record hy Terrie Vince states: "Pt requested MH contact. PTSD/ Prozac Rx. Tells clinician she will be going to state hospital. Anxious, upset meds not re-started. Told will see psychiatrist next week (Tele-health)." The agitation, anxiety, discomfort and other symptoms that accompany withdrawal from Prozac and Dilaudid contributed to a mental state where Ms. Snider was less capable of evaluating her options and deciding not to harm herself. I do not believe that the interruption of medications was the singular causative factor in Ms. Snider's suicide, but it was certainly an important contributing factor.

16. Reading the transcripts of depositions of Ms. Atwal and Ms. Ramirez- Aguilar, another nurse at Mereed County Jail, I have the sense that the staff training for suicide risk assessment is inadequate. Ms. Atwal's failure to pursue discrepancies between her screening and the admitting officer's is a case in point, as is her tendency to place too much confidence in Ms. Snider's verbal denial that she is suicidal in the face of so many risk factors. She should have asked multiple follow-up questions to provide a more complete assessment of Ms. Snider's risk of suicide, she should have ordered precautions to keep her safe, she should have requested expedited psychiatric consultation to provide continuous medications, and she should have arranged a more timely and thorough mental health assessment. Ms. Ramirez-Aguilar testified at deposition:

> Q    Okay, are underlying mental health disorders a red flag for you that someone might be at an increased risk of suicide?
>
> A:   No....
>
> Q: Does that designation of someone as incompetent make you more worried that they might commit suicide?

18

> A:   Just because they're incompetent to stand trial doesn't mean that they're currently suicidal.
>
> Q:   Right, I understand.  So it sounds like it does not make you more concerned that they are at an increased risk of suicide just because they're listed as being incompetent; is that fair?
>
> A:   Yes.
>
> (Ramirez-Aguilar Depo pp. 44-48)

Responses in deposition from Ms. Atwal and Ms. Ramirez-Aguilar leave me with the impression that their training in suicide prevention and risk assessment has not been adequate.

17. Ms. Snider was never seen by a psychiatrist between March 18 - 23 at the Merced County Jail.  She was scheduled to be seen by a psychiatrist via video (telehealth) a few days after her death.  The psychiatrist was not consulted by phone about continuing her psychotropic medications.  This is inadequate psychiatric coverage, especially for a person like Ms. Snider who had numerous risk factors for suicide, was abruptly discontinued from her psychotropic and opiate medications at the time of her arrest, and lied to one of the individuals performing screening assessments at the jail.

18. Ms. Snider was housed in solitary confinement (lockdown) and was alone in a solitary confinement cell when she committed suicide (Segregated Population Observation Log 3/20/2019 & 3/22/2019, CFMG-RS 000210).  There is no mental health evaluation assessing her mental health status related to the risk of psychiatric decompensation or suicide in solitary confinement.  The CFMG Policy & Procedure Manual, Policy E09, "Segregated Patients," states:

> 1. Health care staff are notified when a patient is placed into isolation/segregation.
> 2. Upon notification that a patient is placed in isolation/segregation, a qualified health care professional reviews the patient's health record to determine whether existing

> medical, dental, or mental health needs
> contraindicate the placement, or require
> accommodation. Such review is documented
> in the health record. (CFMG-RS-000426)

19. There is a large literature reflecting that solitary confinement causes great human harm. It has been known for as long as solitary confinement has been practiced that human beings suffer a great deal of pain and mental deterioration when they are consigned to solitary confinement. It is predictable that prisoners' mental and physical state deteriorates in isolation. Human beings require at least some adequate or relatively normal social interactions and productive activities to establish and sustain a sense of identity and to maintain a grasp on reality. In the absence of adequate social interactions, unrealistic ruminations and beliefs cannot be tested in conversation with others, so they build up inside and are transformed into unfocused and irrational thoughts.[6] Disorganized behaviors emerge. Internal impulses linked with anger, fear and other strong emotions grow to overwhelming proportions, especially if there is any degree of mental illness.[7] Sensory deprivation is not total in solitary confinement units; there is the intermittent slamming of doors and there is yelling (one typically has to yell in order to be heard from within one's cell), but this kind of noise does not constitute meaningful human communication. Prisoners in this kind of segregation do what they can to cope. Many pace relentlessly or clean their cell repeatedly, as if the non-productive action will relieve the emotional tension. Those who can read books and write letters do so. The tendency to suffer psychiatric breakdown and become suicidal is made even worse by sleep deprivation, which is a frequent occurrence among prisoners in isolated confinement.[8] Loss of sleep intensifies psychiatric symptoms by interfering with the normal diurnal rhythm (the steady alternation of day and night that provides human beings with orientation as to time), and the resulting sleep loss creates fatigue and magnifies cognitive problems, memory deficits, confusion, anxiety, and sluggishness. It is under these extreme conditions that psychiatric symptoms begin to emerge in previously healthy

---

[6] Stuart Grassian. (1983). "Psychopathological Effects of Solitary Confinement." American Journal of Psychiatry 140(11):1450–54.

[7] Peter Scharff Smith. (2006). The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature. *Crime and Justice* 34:441–528

[8] Craig Haney, Mental Health Issues in Long-Term Solitary and "Supermax" Confinement, CRIME & DELINQUENCY, 49(2), 124-156 (2003).

prisoners, and individuals suffering from mental illness experience an exacerbation of the mental illness or the suicidal crisis.[9],[10]

20. It is well known that 50% of jail and prison suicides take place in solitary confinement settings. Inmates in the midst of mental health deterioration or inmates at risk of suicide, should simply never be consigned to solitary confinement. According to the N.C.C.H.C. standards on suicide prevention, "Unless constant supervision is maintained, a suicidal inmate is not isolated but is housed in the general population, mental health unit, or medical infirmary and located in close proximity to staff. All cells or rooms housing suicidal inmates are as suicide-resistant as possible (e.g., without protrusions that would enable hanging)." Ms. Snider, a prisoner at high risk of suicide, should not have been consigned to a lockdown unit, and should not have been left alone in a cell without rigorous monitoring. Her consignment to solitary confinement without adequate mental health assessment and without adequate monitoring provided her the situation where she could take her own life, and she did precisely that on March 23, 2019. Had she not been consigned to lockdown/ solitary confinement, and had she instead been maintained in a safe housing situation with monitoring, her suicide could have been prevented and her mental disorder could have been adequately assessed and treated. Training for custody, medical and mental health staff must contain rigorous training in the harm of solitary confinement as well as the clinical rationale for prohibiting the consignment of individuals at high risk of suicide to solitary confinement.

---

[9] Terry Kupers. (1999). Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It. New York: Free Press.

[10] There have been a few outlier studies, utilizing very flawed research methodology, that have concluded solitary confinement does not cause harm (see MAUREEN L. O'KEEFE, KELLI J. KLEBE, ALYSHA STUCKER, KRISTIN STURM & WILLIAM LEGGETT, ONE YEAR LONGITUDINAL STUDY OF THE PSYCHOLOGICAL EFFECTS OF ADMINISTRATIVE SEGREGATION (2010). The O'Keefe study as well as others designed to prove no harm from solitary confinement have been roundly debunked in the professional literature, see for example Stuart Grassian & Terry Kupers, *The Colorado Study vs. the Reality of Supermax Confinement*, 13 CORRECTIONAL MENTAL HEALTH REP., May/June 2011; and Craig Haney, *The Psychological Effects of Solitary Confinement: A Systematic Critique*, 47 CRIME & JUST. 365 (2018).

21. By the time Ms. Snider was discovered hanging in her solitary cell,[11] it had been over an hour and twenty minutes since the last time an officer had checked on her.  Policy dictates that safety checks occur at least hourly (B.S.C.C. Title 15 -1027.5; and Merced County Sheriff's Policy No. 03.01), on an irregular schedule, and Officer Castaneda was reprimanded for letting an hour and twenty minutes pass between checks on Ms. Snider's safety (Letter to CO Castenada from Lt. Frank Swiggart on 9/23/2019).  The hour period between checks by custody staff mandated in the CCMGC Policy & Procedures Manual is actually an excessively long period of time between safety checks for prisoners at risk of suicide.  The American Correctional Association March 2021 Performance-Based Standards contains this provision: "5-AC1-4B-11 "Written policy, procedure, and practice require that all Restrictive Housing inmates are personally observed by a correctional officer twice per hour, but no more than 40 minutes apart, on an irregular schedule."  The 5th Edition of the ACA standards were published subsequent to Ms. Snider's suicide, so I cite this requirement only to reference best practices.  But even a 30 minute frequency for safety checks would not necessarily have prevented Ms. Snider's suicide.  Prisoners intent on suicide are adept at discerning when safety checks will occur and timing their suicidal acts to avoid detection.  The point is that Ms. Snider should not have been left alone in a cell, especially a lockdown/solitary confinement cell, where there is no protection against suicide, considering that she was at high risk of suicide.

22. There is a May 10, 2019 "Review of Death" for Ms. Rene Snider by Dr. Ken Bird, Interim Health Officer, Merced Co Dept of Public Health (CFMG-RS-000191).  Dr. Bird notes the history of a prior suicide attempt and the fact that Ms. Snider had her prescribed Prozac discontinued upon admission to the jail and re-instated three days later.  Dr. Bird concludes: "It is my opinion that this inmate was appropriately evaluated and managed and I have no recommendations for improvement of care."  This is a quite inadequate review of death.  Dr. Bird notes an important risk factor for suicide -- a prior suicide attempt -- but fails to mention

---

[11] Ms. Snider's Death occurred in Cell 237 in the lockdown area of the Lattorca facility, per the 4/22/2019 Report of Autopsy, Cause of Death Asphyxia by hanging. (CFMG - RS -- 000192)

that the prior suicide attempt was missed by Ms. Atwal in her screening. He mentions a gap in prescribed psychotropic medication and fails to comment about how this lapse may have contributed to Ms. Snider's suicide. He does not comment about the discrepancy between Ms. Snider's responses at pre-screen and screen. He does not mention that the policy requiring same-shift contact between the nurse conducting the screening and the provider was violated. And he does not comment on the fact that Ms. Snider was not housed in a safety cell, but rather was housed in solitary confinement/lockdown without a mental health assessment, and there is a very high risk of suicide in solitary confinement. A post-mortem review is designed to lead to changes in policies and practices that will make suicide less a future danger at the jail, but it is no accident that with this kind of inadequate review none of the problematic practices I have enumerated in this report have been addressed in the Merced County Jail. The Merced County Sheriff, Merced County Jail, and CFMG/Wellpath Medical Providers have a record of multiple suicides in the jail, with grossly inadequate post-incident analysis and alteration to policies and procedures.

23. It is my considered opinion, to a reasonable degree of medical certainty, that there were many deficient and substandard practices involved in the management, housing and mental health treatment of Ms. Rene Snider during her tenure at the jail from March 18, 2019 until her death by suicide on March 23, 2019. Had she been properly assessed at the time of her screening assessment on March 18 -- i.e., had her many risk factors for suicide been carefully considered, had her prior history of a suicide attempt been noticed in the CFMG/jail medical record, and had the discrepancies between her responses on pre-screening and screening instruments been taken seriously -- had the on-call psychiatrist been timely consulted about her medications, had there been no interruption in her psychotropic medication regimen, had she been housed in a safety cell or in some other way had she been kept safe, had she been provided a timely comprehensive mental health assessment, and had she not been consigned to lockdown/solitary confinement; her suicide would have been prevented.

Respectfully submitted,

*Terry A. Kupers*

Terry A. Kupers, M.D., M.S.P.                    Date  6/21/2023

{9232/002/01617748.DOCX}

# Curriculum Vitae

## Terry Allen Kupers, M.D., M.S.P.

Office Address:
*484 Lake Park Ave, #338, Oakland, California 94610*
phone: 510-654-8333     email: kupers@igc.org

Institute Professor, Emeritus, Graduate School of Psychology,
    The Wright Institute
        2728 Durant Avenue, Berkeley, California 94704

Born: October 14, 1943, Philadelphia, Pennsylvania

## Education:

B.A., With Distinction, Psychology Major, Stanford University, 1964
M.D., U.C.L.A. School of Medicine, 1968
M.S.P. (Masters in Social Psychiatry), U.C.L.A., 1974

## Training:

Intern (Mixed Medicine/ Pediatrics/ Surgery), Kings County Hospital/Downstate Medical
    Center, Brooklyn, New York, 1968-1969.
Resident in Psychiatry, U.C.L.A. Neuropsychiatric Institute, Los Angeles, 1969-
        1972
Registrar in Psychiatry, Tavistock Institute, London (Elective Year of U.C.L.A. Residency)
        1971-1972
Fellow in Social and Community Psychiatry, U.C.L.A. Neuropsychiatric Institute, 1972-1974

License: California, Physicians & Surgeons, #A23440, 1968-

Certification: American Board of Psychiatry and Neurology (Psychiatry, #13387), 1974-

## Honors:

Alpha Omega Alpha, U.C.L.A. School of Medicine,1968.
Distinguished Life Fellow, American Psychiatric Association
Listed: Who's Who Among Human Services  Professionals (1995-); Who's Who in California
        (1995-);  Who's Who in The United States  (1997-);  Who's Who in America (1998-);
        International Who's Who in  Medicine (1995-);  Who's Who in Medicine and Healthcare
        (1997-);  The National Registry of Who's Who (2000-); Strathmore's Millenial Edition,
        Who's Who; American Biographical Institute's International Directory of Distinguished
        Leadership; Marquis' Who's Who in the World (2004-); Marquis' Who's Who in Science
        and Engineering, (2006-); Who's Who Among American Teachers & Educators (2007-);

The Global Directory of Who's Who (2012-); International Association of Healthcare
Professionals' The Leading Physicians (2012-).
Helen Margulies Mehr Award, Division of Public Interest (VII), California Psychological
Association, Affiliate of American Psychological Association, March 30, 2001.
Stephen Donaldson Award, Stop Prisoner Rape (Just Detention, Int'l), 2002.
Exemplary Psychiatrist Award, National Alliance for the Mentally Ill, 2005
William Rossiter Award for "global contributions made to the field of forensic mental health,"
Annual Meeting, Forensic Mental Health Association of California, March 18,2009,
Monterey, California
Albert Nelson Marquis Lifetime Achievement Award, Marquis Who's Who, 2018-
Gloria Huntley Award, National Alliance on Mental Illness (NAMI), presented at annual NAMI
meeting in Atlanta via video, July 15, 2020

## Clinical Practice:

Los Angeles County, SouthEast Mental Health Center, Staff Psychiatrist, 1972-1974
Martin Luther King, Jr. Hospital, Department of Psychiatry, Los Angeles; Staff Psychiatrist and
Co-Director, Outpatient Department, 1974-1977.
Contra Costa County, Richmond Community Mental Health Center, Staff Psychiatrist and Co-
Director, Partial Hospital, 1977-1981
Private Practice of Psychiatry, Los Angeles and Oakland, 1972 until retirement in 2017

## Teaching:

Assistant Professor, Department of Psychiatry and Human Behavior, Charles Drew Postgraduate
Medical School, Los Angeles, and Assistant Director, Psychiatry Residency Education,
1974-1977.
Institute Professor, Graduate School of Psychology, The Wright Institute, Berkeley, 1981 to
present
Courses Taught at: U.C.L.A. Social Science Extension, California School of Professional
Psychology (Los Angeles), Goddard Graduate School (Los Angeles), Antioch-West (Los
Angeles), New College Graduate School of Psychology (San Francisco).

## Professional Organizations:
American Psychiatric Association (Distinguished Life Fellow); Northern California Psychiatric
Society; East Bay Psychiatric Association (President, 1998-1999); American
Orthopsychiatric Association (Fellow); American Association of Community
Psychiatrists; Physicians for Social Responsibility; American Academy of Psychiatry and
the Law.

## Committees and Offices:

Task Force on the Study of Violence, Southern California Psychiatric Society, 1974-1975
Task Force on Psychosurgery, American Orthopsychiatric Association, 1975-1976
California Department of Health Task Force to write "Health Standards for Local Detention

Facilities," 1976-77
Prison/ Forensic Committee, Northern California Psychiatric Society, 1976-1981; 1994-
Psychiatry Credentials Committee, Alta Bates Medical Center, Berkeley, 1989-1994 (Chair,
   Subcommittee to Credential Licensed Clinical Social Workers)
President, East Bay Chapter of Northern California Psychiatric Society, 1998-1999
Co-Chair, Committee on Persons with Mental Illness Behind Bars of the American Association
   of Community Psychiatrists, 1998-2003

Consultant/Staff Trainer:
Contra Costa County Mental Health Services; Contra Costa County Merrithew Memorial
   Hospital Nursing Service; Bay Area Community Services, Oakland; Progress
   Foundation, San Francisco; Operation Concern, San Francisco; Marin County Mental
   Health Services; Berkeley Psychotherapy Institute; Berkeley Mental Health Clinic;
   Oregon Department of Mental Health; Kaiser Permanente Departments of Psychiatry in
   Oakland, San Rafael, Martinez and Walnut Creek; Human Rights Watch, San Francisco
   Connections collaboration (Jail Psychiatric Services, Court Pre-Trial Diversion,
   CJCJ and Progress Foundation); Contra County Sheriff's Department Jail Mental Health
   Program.

   Consultant to Protection & Advocacy, Inc. (Disability Rights), re Review of State
   Hospital Suicides

   National Advisory Panel, The Equitas Project, Denver, CO


## Forensic Psychiatry (partial list):

Testimony in Madrigal v. Quilligan, U.S. District Court, Los Angeles, regarding informed
   consent for surgical sterilization, 1977
Testimony in Rutherford v. Pitchess, Los Angeles Superior Court, regarding conditions and
   mental health services in Los Angeles County Jail, 1977
Testimony in Hudler v. Duffy, San Diego County Superior Court, regarding conditions and
   mental health services in San Diego County Jail, 1979
Testimony in Branson v. Winter, Santa Clara County Superior Court, regarding conditions and
   mental health services in Santa Clara County Jail, 1981
Testimony in Youngblood v. Gates, Los Angeles Superior Court, regarding conditions and
   mental health services in Los Angeles Police Department Jail, 1982
Testimony in Miller v. Howenstein, Marin County Superior Court, regarding conditions and
   mental health services in Marin County Jail, 1982
Testimony in Fischer v. Geary, Santa Clara County Superior Court, regarding conditions and
   mental health services in Santa Clara County Women's Detention Facility, 1982
Testimony in Wilson v. Deukmejian, Marin County Sup Court, regarding conditions and mental
   health services at San Quentin Prison, 1983
Testimony in Toussaint/Wright/Thompson v. Enomoto, Federal District Court in San Francisco,
   regarding conditions and double-celling in California State Prison security housing units,
   1983

Consultant, United States Department of Justice, Civil Rights Division, regarding conditions and mental health services in Michigan State Prisons, 1983-4

Testimony in Arreguin vs. Gates, Federal District Court, Orange County, regarding "Rubber Rooms" in Orange County Jail, 1988

Testimony in Gates v Deukmejian, in Federal Court in Sacramento, regarding conditions, quality of mental health services and segregation of inmates with HIV positivity or AIDS at California Medical Facility at Vacaville, 1989

Testimony in Coleman v. Wilson, Federal Court in Sacramento, regarding the quality of mental health services in the California Department of Corrections' statewide prison system, 1993

Testimony in Cain v. Michigan Department of Corrections, Michigan Court of Claims, regarding the effects on prisoners of a proposed policy regarding possessions, uniforms and classification, 1998

Testimony in Bazetta v. McGinnis, Federal Court in Detroit, regarding visiting policy and restriction of visits for substance abuse infractions, 2000

Testimony in Everson v. Michigan Department of Corrections, Federal Court in Detroit, regarding cross-gender staffing in prison housing units, 2001

Testimony in Jones 'El v. Litscher, Federal Court in Madison, Wisconsin, regarding confinement of prisoners suffering from severe  mental  illness in supermax, 2002

Testimony in Russell v. Johnson, Federal Court in Oxford, Mississippi, regarding conditions of confinement and treatment prisoners with mental illness on Death Row at Parchman, 2003

Testimony in Austin v. Wilkinson, Federal Court in Cleveland, Ohio, regarding proposed transfer of Death Row into Ohio State Penitentiary (supermax), August, 2005

Testimony in Roderick Johnson v. Richard Watham, Federal Court in Wichita Falls, Texas, regarding staff responsibility in case of prison rape, September, 2005

Testimony in Presley v. Epps, No. 4:05CV148-JAD, N.D., Oxford, Mississippi, 2005 & 2007, involving consitions in Supermax Unit 32 at Mississippi State Penitentiary and Treatment of Prisoners with Serious Mental Illness.

Testimony in DAI, Inc. v. NYOMH, Federal Court, So. Dist. NY, April 3, 2006,  regarding mental health care in NY Dept. of Correctional Services

Testimony in Neal v. Michigan DOC, State of Michigan, Circuit Court for the County of Washtenaw, January 30, 2008, File No. 96-6986-CZ, regarding custodial misconduct & sexual abuse of women prisoners

Testimony in Hadix v. Caruso, No. 4:92-cv-110, USDistCt, WDistMichiganTestimony, USDistCt, WDistMichigan, Grand Rapids, Michigan, regarding mental health care in prison, April 29, 2008

Testimony in John Doe v. Michigan D.O.C., Detroit, 2014.

Testimony in A.B. v. WA State Dept Soc'l & Health Services, USDistCtWDistWA, No. 14-cv-011 78-MJP, Seattle, March 17, 2015, regarding Competency Evaluations and Competency Restoration Treatment

Testimony (deposition) in Ashker v. Governor of California, USDistCtNoDistCA, Oakland, No. C 09-05796 CW, 2015, regarding confinement in excess of 10 years in Security Housing Unit at Pelican Bay State Prison.

Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-JCG, March 14-15, 2018, regarding psychiatric effects of conditions in solitary confinement

Unit at Eastern Mississippi Correctional Facility.

Testimony (deposition) in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI) Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019, Oakland, CA, regarding the situation of minors sentenced as adults to the Michigan D.O.C.

Testimony in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co. of Marin, May 27, 2021. Case No. SC212933, et al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San Quentin Prison.

## Journal Editorial Positions:

Men and Masculinities, Editorial Advisory Panel (in the past)
Juvenile Correctional Mental Health Report, Editorial Board (in the past)
Correctional Mental Health Report, Contributing Editor (current)

## Presentations and Lectures (partial list):

"Expert Testimony on Jail and Prison Conditions." American Orthopsychiatric Association Annual Meeting, San Francisco, March 30, 1988,  Panel 137: "How Expert are the Clinical Experts?

"The Termination of Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, February 24, 1989.

"Big Ideas, and Little Ones." American Psychiatric Association Annual Meeting, San Francisco, April, 1989.

"Men in Psychotherapy." Psychiatry Department Grand Rounds, Mills/Peninsula Hospitals, Burlingame, September 29, 1989.

"Psychodynamic Principles and Residency Training in Psychiatry." The Hilton Head Conference, Hilton Head Island, South Carolina, March 15, 1991.

Panelist:  "The Mentally Ill in Jails and Prisons," California Bar Association Annual Meeting, Annaheim, 1991.

"The State of the Sexes: One Man's Viewpoint."  The Commonwealth Club of California, San Mateo, March 25, 1992.

Keynote Address:  "Feminism and the Family."  17th National Conference on Men and Masculinity, Chicago, July 10, 1992.

Panel Chair and Contributor: "Burnout in Public Mental Health Workers." Annual Meeting of the American Orthopsychiatric Association, San Francisco, May 22, 1993.

Panel Chair and Contributor:  "Socioeconomic Class and Mental Illness." Annual Meeting of the American Psychiatric Association, San Francisco, May 26, 1993.

"Public Mental Health."  National Council of Community Mental Health Centers Training Conference, San Francisco, June 12, 1993.

Psychiatry Department Grand Rounds: "Men's Issues in Psychotherapy." California Pacific Medical Center, San Francisco, February 24, 1993.

"The Effect of the Therapist's Gender on Male Clients in Couples and Family Therapy."  Lecture at Center for Psychological Studies, Albany, California, April 15, 1994.

"Pathological Arrhythmicity and Other Male Foibles." Psychiatry Department Grand Rounds,
    Alta Bates Medical Center, June 7, 1993.

Roger Owens Memorial Lecture. "Prisons and Mental Illness." Department
    of    Psychiatry, Alta Bates Medical Center, March 6, 1995.

Keynote Address: "Understanding Our Audience: How People Identify with Movements and
    Organizations."  Annual Conference of the Western Labor Communications Association,
    San Francisco, April 24, 1998.

"Men in Groups and Other Intimacies."  44th Annual Group Therapy Symposium, University of
    California at San Francisco, November 6, 1998.

"Men in Prison."  Keynote, 24th Annual Conference on Men and Masculinity, Pasadena, July 10,
    1999.

"Trauma and Posttraumatic Stress Disorder in Prisoners" and "Prospects for Mental Health
    Treatment in Punitive Segregation."  Staff Training Sessions at New York State
    Department of Mental Health, Corrections Division, at Albany, August 23, 1999, and at
    Central New York Psychiatric Institution at Utica, August 24.

"The Mental Health Crisis Behind Bars."  Keynote, Missouri Association for Social Welfare
    Annual Conference, Columbia, Missouri, September 24, 1999.

"The Mental Health Crisis Behind Bars."  Keynote, Annual Conference of the Association of
    Community Living Agencies in Mental Health of New York State, Bolton Landing, NY,
    November 4, 1999.

"Racial and Cultural Differences in Perception Regarding the Criminal Justice
    Population."  Statewide Cultural Competence and Mental Health Summit VII, Oakland,
    CA, December 1, 1999.

"The Criminalization of the Mentally Ill," 19th Annual Edward V. Sparer Symposium,
    University of Pennsylvania Law School, Philadelphia, April 7, 2000.

"Mentally Ill Prisoners."  Keynote, California Criminal Justice Consortium Annual Symposium,
    San Francisco, June 3, 2000.

"Prison Madness/Prison Masculinities," address at the Michigan Prisoner Art Exhibit, Ann
    Arbor, February 16, 2001.

"The Mental Health Crisis Behind Bars," Keynote Address,  Forensic Mental Health Association
    of California, Asilomar, March 21, 2001.

"Madness & The Forensic Hospital," grand rounds, Napa State Hospital, 11/30/01.

Commencement Address, The Wright Institute Graduate School of Psychology, June 2, 2002.

"Mental Illness & Prisons: A Toxic Combination," Keynote Address, Wisconsin Promising
    Practices Conference, Milwaukee, 1/16/02.

"The Buck Stops Here: Why & How to Provide Adequate Services to Clients Active in the
    Criminal Justice System,"  Annual Conference of the California Association of Social
    Rehabilitation Agencies, Walnut Creek, California, 5/2/02.

Keynote Address, "Mental Illness in Prison," International Association of Forensic
    Psychotherapists, Dublin, Ireland, May 20, 2005

Invited Testimony (written) at the Vera Institute of Justice, Commission on Safety and Abuse in
    America's Prisons, Newark, NJ, July 19, 2005

Invited Testimony at the National Prison Rape Elimination Commission hearing in San
    Francisco, August 19, 2005

Lecture, Prisoners with Serious Mental Illness: Their Plight, Treatment and Prognosis,"
    American Psychiatric Association Institute on Psychiatric Services, San Diego, October

7, 2005

Grand Rounds, "The Disturbed/Disruptive Patient in the State Psychiatric Hospital," Napa State
Hospital, June 26, 2007

Lecture, "Our Drug Laws Have Failed, Especially for Dually Diagnosed Individuals," 19th
Annual Conference, California Psychiatric Association, Huntington Beach, CA, October
6, 2007

Panel: "Mental Health Care and Classification," Prison Litigation Conference, George
Washington University Law School, Washington, D.C., March 28, 2008.

Keynote Address: "Winning at Rehabilitation," Annual Meeting of the Forensic Mental Health
Association of California, Monterey, California, March 18, 2009

Panel: "Construction of Masculinity and Male Sexuality in Prison," UCLA Women's Law
Journal Symposium, Los Angeles, April 10, 2009

Panel: "Solitary Confinement in America's Prisons," Shaking the Foundations Conference,
Stanford Law School, October 17, 2009.

Commencement Address, San Francisco Behavioral Health Court Graduation Ceremony,
October 21, 2009.

Panel: "Negotiating Settlements of Systemic Prison Suits," Training & Advocacy Support
Center, Protection & Advocacy Annual Conference, Los Angeles, June 8, 2010.

Grand Rounds, "Recidivism or Rehabilitation in Prison?," Alta Bates Summit Medical Center,
November 1, 2010

Keynote Address: "Prison Culture & Mental Illness: a Bad Mix," University of Maryland
Department of Psychiatry Cultural Diversity Day, Baltimore, Maryland, March 24, 2011.

Grand Rounds, "The Role of Misogyny & Homophobia in Prison Sexual Abuse," Alta Bates
Summit Medical Center, October 17, 2011

Special Guest, "Offering Hope and Fostering Respect in Jail and Prison," 2011 ZIA Partners
UnConvention, Asilomar Conference Center, October 24, 2011.

Invited Lecture, "Suicide Behind Bars: The Forgotten Epidemic," 2011 Institute on Psychiatric
Services, American Psychiatric Association, San Francisco, October 28, 2011.

Lecture: "How Can We Help Persons with Mental Illness in the Criminal Justice System?,"
Solano County Re-entry Council, Fairfield, CA, January 15, 2012.

Lecture: "The Prison System in the U.S.A.: Recent History and Development, Structure, Special
Issues," Conference of the American Bar Association Rule of Law Initiative, Cross-
National Collaboration: Protecting prisoners in the US and Russia, Moscow, Russia,
January 20, 2012.

Continuing Medical Education (CME) Presentation: "Correctional Psychiatry Overview," The
Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic (co-
sponsored by the American Association of Community Psychiatrists), national
videoconference originating in Pittsburg, PA, February 2, 2012.

Grand Rounds, "Mental Health Implications of the Occupy Movement," Alta Bates Summit
Medical Center, October 8, 2012

Invited Speaker: "Solitary Confinement: Medical and Psychiatric Consequences," Session:
Multi-Year Solitary Confinement in California and the Prisoner Hunger Strikes of 2011-
2012, American Public Health Association Annual Meeting, Moscone Convention
Center, San Francisco, October 29, 2012.

Keynote Address: "Solitary Confinement and Mental Health," Conference of the Midwest
Coalition for Human Rights, Northeastern Illinois University, Chicago, November 9,

2012.

Symposium Presentation: "The Experience of Individuals with Mental
Illness in the Criminal Justice System," American Psychiatric Association Annual
Meeting, Moscone Center, San Francisco, May 20, 2013.

Presentation: Incarceration and Racial Inequality in the U.S., Roundtable on the Role of Race
and Ethnicity Among Persons Who Were Formerly Incarcerated, California Institute for
Mental Health, Sacramento, California, February 28, 2014.

Testimony at Nevada Advisory Commission on the Administration of Justice on Isolated
Confinement, Las Vegas, Nevada, March 5, 2014.

Lecture, "The Death Penalty and Mental Health," General Assembly of the World Coalition
Against the Death Penalty, San Juan, Puerto Rico, June 21, 2014.

Staff Training: "Ethical Care in Managing and Treating the Disturbed/Disruptive Patient," Napa
State Hospital, October 2, 2014.

Lecture: "The Multiple Traumas of Youth in Detention," American Psychiatric Association
Institute on Psychiatric Services, San Francisco, November 1, 2014.

Guest Expert: Community Psychiatry Forum: "The Social, Economic and Political Impact of
Incarceration."; The Center for Public Service Psychiatry at the University of Pittsburg,
and the American Association of Community Psychiatrists, video-conference from
Pittsburg, March 12, 2015.

Lecture: "The Struggles of People with Mental Illness in Jails," The Mental Health Board of San
Francisco, San Francisco Department of Public Health, September 16, 2015.

Lecture: "A Psychoanalytic Response to the Effects of Forced Isolation in the Age of Mass
Incarceration," Northern California Society for Psychoanalytic Psychology, Scientific
Meeting, San Francisco, April 2, 2016.

Panel: "Mental Health, Neuroscience and the Physical Environment," Academy of Neuroscience
for Architecture Conference, September 23, 2016, Salk Institute, University of California
at San Diego.

Paper presentation: "Gender and Domination in Prison," Law Review Symposium on Gender
and Incarceration, Western New England School of Law, Springfield, MA, October 14,
2016.

Presentation, " Working with Experts: An Expert and Lawyer Conversation," with Rachel
Higgins, New Mexico Criminal Defense Lawyers' Association, Solitary Confinement &
Prisoner Civil Rights, Albuquerque, New Mexico, May 5, 2017.

Keynote Address: "Corrections, Solitary Confinement and Prisoner Mental Health," Conference
on Supporting Prisoner Mental Health, Vancouver, British Columbia, June 2, 2017.

Webinar, "The Humane Imperative: Ending Solitary Confinement. SAMHSA & NAMI, July
27,2017.

Lecture, "Masculinity Behind Bars: Violence on the Yards, Terror in Isolation," Center for the
Study of Men and Masculinities, SUNY Stony Brook, delivered at Fordham University,
Manhattan, October 24, 2017.

Lecture and Panel, "Solitary Confinement," Georgetown University, January 16, 2018

Participant, "National Summit on Mental Health & Criminal Justice Law & Policy," sponsored
by the Equitas Project at Georgetown University, Washington, D.C., Jan. 17-18, 2018.

Featured Speaker, "Mental Illness and the Criminal Justice System," NAMI (National Alliance
on Mental Illness), Contra Costa County, Feb 21, 2019

Presentation, "The Harm of Solitary Confinement," Washington State House Of Representatives,

Public Safety Committee (by video), March 5, 2019.

Panel: "Solitary Confinement," University of California Human Rights Law Student Association and National Lawyers' Guild, University of California School of Law, Boalt Hall, Berkeley, March 5, 2019.

Panel: "Knowledge and Power: Contending with Science in Psychiatry," annual meeting of the American Psychiatric Association, San Francisco, May 19, 2019.

Panel: "Psychologists and Mass Incarceration," Healing Justice: Ending Mass Incarceration Conference, The Wright Institute, Berkeley, November 2, 2019.

Panel: "COVID-19 AND INCARCERATION: Mental Health Implications." UCLA Center for Social Medicine, Zoom Conference, April 18, 2020.

Panel: Solitary Confinement in Queensland, and University of Queensland Law School, Australia, May, 2020, video available at <https://law.uq.edu.au/research/human-rights/solitary-confinement-panel>

Panel: Solitary Confinement: A Public Health Hazard, The Louisiana Stop Solitary Coalition, New Orleans via video, July 15, 2020.
    <https://www.youtube.com/watch?v=w8a70eML5f0>

Panel: Open MI Door: Ending Segregation in the State of Michigan, Lansing via video
    https://www.facebook.com/MICitizensforPrisonReform/videos/384069609652610/

Presentation: "The Decimation of Life Skills and the SHU Post-Release Syndrome," International Symposium on Solitary Confinement, Thomas Jefferson University, Philadelphia, PA (virtual), November 5, 2020.

Panel Moderator & Panelist, "Mass Incarceration in the Pandemic: Health Care Inside & Out," UCLA Center for Social Medicine & UCLA Law COVID-19 Behind Bars Data Project, Los Angeles (virtual), May 8, 2021.

Presentation, "Correctional Psychiatry," The Center for Public Service Psychiatry of Western Psychiatric Institute and Clinic, Pittsburg, PA via video, October 21, 2021.

Panelist, "Solitary Confinement: Peers Leading a Path Towards Elimination," Annual Conference of the National Association of Peer Supporters, October 21, 2021.

Panelist, "From Baraga to Brazil: A Historic Conversation on Solitary Confinement," Human Rights Watch, HaltSolitary, Open MI Door & Unlock the Box, November 11, 2021, Detroit MI via video.

Participant, Roundtable: "Shifting the Approach: Alternatives to Solitary Confinement for People Suffering From Mental Illness in Prison," from Tel Aviv, Israel via Zoom, January 10, 2022

Panelist, "How Mental Health Information Can Be Used in Resentencing and in Challenging Conditions of Confinement," at Denver virtual conference, Mental Health, Resentencing, and Challenging Conditions of Confinement, April 26, 2022, Sponsored by Equitas Project and Eighth Amendment Project

Panelist, "Securing Mental Health Treatment for People in Custody," Prison Law and Advocacy Conference, Northwestern School of Law, May 21, 2022.

Panelist, "Litigation Efforts to End Solitary," Symposium to End Solitary Confinement, Costa Mesa, California, July 17, 2022.

Panelist & Presenter, Beyond Punishment; Human Rights Summit on California Aging Prisoners and Solitary Confinement, Oakland, CA, February 25, 2023.

Presentation to United Nations (UN) Subcommittee on the Prevention of Torture in support of the *Guiding Statement on Alternatives to Solitary Confinement*, proposed by Physicians for Human Rights Israel and Antigone, Zurich, Switzerland (via video), June 13, 2023.

## Books Published:

Public Therapy: The Practice of Psychotherapy in the Public Mental Health Clinic.  New
York:  Free Press/ MacMillan, 1981.  Re-published as e-Book, 2015, at
<http://www.freepsychotherapybooks.org/product/208-public-therapy-the-practice-of-
psychotherapy-in-the-public-mental-health-clinic/category_pathway-14>

Ending Therapy: The Meaning of Termination.  New York: New York University Press, 1988.
Re-published as e-Book, 2014, at <http://freepsychotherapybooks.org/product/118-
ending-therapy-the-meaning-of-termination>

(Editor):  Using Psychodynamic Principles in Public Mental Health.   New Directions for
Mental Health Services, vol. 46.  San Francisco: Jossey-Bass, 1990.

La Conclusione della Terapia: Problemi, metodi, conseguenze.  Rome: Casa Editrice Astrolabio,
1992. (trans. of Ending Therapy.)

Revisioning Men's Lives: Gender, Intimacy and Power.  New York: Guilford Publications,
1993.  (trans. into Chinese, 2000; re-published as e-Book, 2014, at <
https://www.freepsychotherapybooks.org/ebook/revisioning-mens-lives-gender-intimacy-
and-power/>

Prison Madness: The Mental Health Crisis Behind Bars and What We Must Do About It.  San
Francisco: Jossey-Bass/Wiley, 1999.

(Co-Editor & contributor): Prison Masculinities.  Philadelphia: Temple University Press, 2001.

Solitary: The Inside Story of Supermax Isolation and How We Can Abolish It.  Berkeley, CA:
University of California Press, 2017.

## Other Publications:

"The Depression of Tuberculin Delayed Hypersensitivity by Live Attenuated Mumps Virus,"
Journal of Pediatrics, 1970, 76, 716-721.

Editor and Contributor, An Ecological Approach to Resident Education in Psychiatry, the
product of an NIMH Grant to the Department of Psychiatry and Human Behavior, Drew
Medical School, 1973.

"Contact Between the Bars - A Rationale for Consultation in Prisons," Urban Health, Vol. 5,
No. 1, February, 1976.

"Schizophrenia and History," Free Associations, No. 5, 1986, 79-89.

"The Dual Potential of Brief Psychotherapy," Free Associations, No. 6, 1986, pp. 80-99.

"Big Ideas, and Little Ones," Guest Editorial in Community Mental Health Journal, 1990, 26:3,
217-220.

"Feminist Men," Tikkun, July/August, 1990.

"Pathological Arrhythmicity in Men," Tikkun, March/April, 1991.

"The Public Therapist's Burnout and Its Effect on the Chronic Mental Patient." The Psychiatric
Times, 9,2, February, 1992.

"The State of the Sexes: One Man's Viewpoint," The Commonwealth, 86,16, April, 1992.

"Schoolyard Fights." In Franklin Abbott, Ed., Boyhood. Freedom, California: Crossing Press,
1993; Univeristy of Wisconsin Press, 1998.

"Menfriends." Tikkun, March/April, 1993

"Psychotherapy, Neutrality and the Role of Activism." Community Mental Health Journal,1993.

"Review: Treating the Poor by Mathew Dumont." Community Mental Health Journal,
    30(3),1994, 309-310.

"The Gender of the Therapist and the Male Client's Capacity to Fill Emotional Space." Voices,
    30(3), 1994, 57-62.

"Soft Males and Mama's Boys: A Critique of Bly." In Michael Kimmel, Ed., The Politics of
    Manhood: Profeminist Men Respond to the Mythopoetic Men's Movement (And
    Mythopoetic Leaders Respond). Philadelphia: Temple University Press, 1995.

"Gender Bias, Countertransference and Couples Therapy." Journal of Couples Therapy, 1995.

"Jail and Prison Rape." TIE-Lines, February, 1995.

"The Politics of Psychiatry: Gender and Sexual Preference in DSM-IV." masculinities, 3,2, 1995,
    reprinted in Mary Roth Walsh, ed., Women, Men and Gender,  Yale University Press,
    1997.

"What Do Men Want?, review of M. Kimmel's Manhood in America." Readings, 10, 4, 1995.

Guest Editor, issue on Men's Issues in Treatment,  Psychiatric Annals,2,1, 1996.

"Men at Work and Out of Work," Psychiatric Annals, 2,1, 1996.

"Trauma and its Sequelae in Male Prisoners." American Journal of Orthopsychiatry, 66, 2, 1996,
    189-196.

"Consultation to Residential Psychosocial Rehabilitation Agencies."  Community Psychiatric
    Practice Section, Community Mental Health Journal, 3, July, 1996.

"Shame and Punishment: Review of James Gilligan's Violence: Our Deadly Epidemic and its
    Causes," Readings, Sept., 1996.

"Community Mental Health: A Window of Opportunity for Interracial Therapy," Fort/Da,
    2,2,1996.

"Men, Prison, and the American Dream," Tikkun, Jan-Feb., 1997.

"Dependency and Counter-Dependency in Couples," Journal of Couples Therapy, 7,1, 1997, 39-
    47.  Published simultaneously in When One  Partner is Willing and the Other is Not,  ed.
    Barbara Jo Brothers, The Haworth Press, 1997, pp. 39-47.

"Shall We Overcome: Review of Jewelle Taylor Gibbs' Race and Justice," Readings, December,
    1997.

"The SHU Syndrome and Community Mental Health," The Community Psychiatrist, Summer,
    1998.

"Review of Jerome Miller's Search and Destroy," Men and Masculinities, 1, 1, July, 1998.

"Will Building More Prisons Take a Bite Out of Crime?," Insight, Vol. 15, No. 21, June 7, 1999.

"The Mental Health Crisis Behind Bars," Harvard Mental Health Letter, July, 2000.

"Mental Health Police?," Readings, June, 2000.

"The Men's Movement in the U.S.A.," in Nouvelles Approches des Hommes et du Masculine,
    ed. Daniel Weizer-Lang, Les Presses Universitaires du Mirail, Toulouse, France, 2000.

"Symptoms, Meanings and Social Progress," Voices, 36, 4, 2000.

"Psychotherapy with Men in Prison," in A New Handbook of Counseling & Psychotherapy
    Approaches for Men,  eds. Gary Brooks and Glenn Good, Jossey-Bass, 2001.

"A Very Wise Decision by the Montana Supreme Court," Correctional Mental Health Report,
    5,3, 35-36, Sept./Oct, 2003.

"Review of William Roller's The Dead are Dancing," Psychiatric Services,  54,11,1660-1661,
    2003.

"The Future of Correctional Mental Health," Correctional Mental Health Report, 6,1, May/June,

2004.

"Foreword," David Jones (ed.): Working with Dangerous People: The Psychotherapy of Violence, Oxon, UK: Radcliffe Medical Press Ltd., 2004.

"Malingering in Correctional Settings," Correctional Mental Health Report, 5, 6, 81-, March/April, 2004.

"Prisons," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 630-633, 2004.

"Mental Illness," in Michael Kimmel & Amy Aronson (eds.), Men & Masculinities: A Social, Cultural, and Historical Encyclopedia, Santa Barbara, CA & Oxford, GB, ABC Clio, pp. 537-539, 2004.

"Toxic Masculinity as a Barrier to Mental Health Treatment in Prison," Journal of Clinical Psychology, 61,6,1-2, 2005.

"Posttraumatic Stress Disorder (PTSD) in Prisoners," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic,Kingston, NJ: Civic Research Institute, 2005.

"Schizophrenia, its Treatment and Prison Adjustment," in Managing Special Populations in Jails and Prisons, ed. Stan Stojkovic, Kingston, NJ: Civic Research Institute, 2005.

"The Prison Heat Issue," Correctional Mental Health Report, 7,2, July/August, 2005.

"How to Create Madness in Prison," in Humane Prisons, Ed. David Jones, Oxford: Radcliffe Publishing, 2006.

"Conditions on Death Row,Terrell Unit,Texas," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA (pp. 69-77). Carbondale: University of Illinois Press, pp. 69-77, 2006.

"Prison madness in Mississippi," in M. Mulvey-Roberts (Ed.), Writing for their lives: Death Row USA, Carbondale: University of Illinois Press, pp. 281-287, 2006.

"Working with Men in Prison," In International Encyclopedia of Men and Masculinities, 1 vol., eds. M. Flood, J.K. Gardiner, B. Pease, and K. Pringle. London & New York: Routledge, 2007.

"Post-Incarceration Civil Commitments and Public Mental Health: An Essay," Correctional Mental Health Report, 9,4, 2007.

"Violence in Prisons, Revisited," Hans Toch & Terry Kupers, Journal of Offender Rehabilitation, 45,3/4, 49-54, 2007.

"Posttraumatic Stress Disorder in Prisoners," Correctional Health Care Report, Vol. 9, Nos. 2 & 3, January/February, 2008

"Prison and the Decimation of Pro-Social Life Skills," in The Trauma of Psychological Torture, Editor Almerindo E. Ojeda, Vol 5 of Disaster and Trauma Psychology Series, Series Editor Gilbert Reyes, Westport, Connecticut: Praeger, 2008

"What To Do With the Survivors?: Coping With the Long-Term Effects of Isolated Confinement." Criminal Justice and Behavior, Vol. 35 No. 8, August 2008, pp. 1005-1016

"Beyond Supermax Administrative Segregation: Mississippi's Experience Rethinking Prison Classification and Creating Alternative Mental Health Programs," T.A. Kupers, T. Dronet, M. Winter, et al., Criminal Justice and Behavior, October, 2009.

"Introduction." King, R. (2009). From the Bottom of the Heap: The Autobiography of Black Panther Robert Hillary King. Oakland: PM Press.

"Mutual Respect and Effective Prison Management," in Transforming Corrections: Humanistic

Approaches to Corrections and Offender Treatment, Editors David Polizzi & Michael Braswell, Durham: Carolina Academic Press, pp. 121-134, 2009.

"Preparing an Expert's Report," Correctional Mental Health Report, 12,1, 2010

"Treating Those Excluded from the SHU," Correctional Mental Health Report, 12,4, 2010.

"The Role of Misogyny and Homophobia in Prison Sexual Abuse," UCLA Women's Law Journal, 18,1, 2010.

Stuart Grassian & Terry Kupers, "The Colorado Study vs. the Reality of Supermax Confinement," Correctional Mental Health Report, Vol. 13, No. 1, May/June, 2011

"Preparing an Expert's Report," in Practical Guide to Correctional Mental Health and the Law, by Fred Cohen (with Terry Kupers,) Kingston, NJ: Civic Research Institute, 2011

"The Role of Psychiatry in Correctional Settings: A Community Mental Health Model," Correctional Mental Health Report, Vol. 13, No. 3, September/October, 2011

"Testimony of Terry Kupers, M.D., at August 23, 2011 Hearing of California Assembly Public Safety Committee Regarding Conditions at Pelican Bay State Prison Security Housing Units," Correctional Law Reporter, Vol XXIII, No. 4, December/January 2012

"A Community Mental Health Model for Corrections," Correctional Mental Health Report, Vol. 13, No. 5, January/February, 2012

"Programming Cells are Neither the Problem nor the Solution," Correctional Mental Health Report, 2012

"Isolated Confinement: Effective Method for Behavior Change or Punishment for Punishment's Sake?," The Routledge Handbook of International Crime and Justice Studies, Eds. Bruce Arrigo &
Heather Bersot, Oxford: Routledge, 2013, pp. 213-232.

"The Psychiatrist's Obligation to Report Patient Abuse: A Dialogue with Fred Cohen," Correctional Mental Health Report, Vol 15, No. 5, Jan/Feb 2014

"Safety, Yes; Near Total Isolation and Idleness, No," Correctional Law Reporter, XXVI, No. 1, June/July 2014.

"A Community Mental Health Model in Corrections," Stanford Law & Policy Review, 26, 119-158, Spring, 2015.

Co-signatory, Brief of Amici Curiae, Alfredo Prieto v. Harold C. Clarke, Supreme Court of the U.S.A., No. 15-31, 2015.

Committee Member, Group for the Advancement of Psychiatry (GAP), People With Mental Illness in the Criminal Justice System: A Cry for Help, Washington, D.C.: American Psychiatric Association Press, 2016.

"How to Create Madness in Prison," in Hell is a Very Small Place, Editors Jean Casella, James Ridgeway & Sarah Shourd, New Press, 2016, pp. 163-178.

"The SHU Post-Release Syndrome," Correctional Mental Health Report, 17, 6, March/April, 2016.

"Alternatives to Long-Term Solitary Confinement," Correctional Law Reporter, Vol. XXVIII, No. 3, Oct. – Nov., 2016.

"Gender and Domination in Prison." Western New England Law Review, 39, 2017.

"The Asylum, The Prison and the Future of Community Mental Health," chapter in Community Mental Health: Challenges for the 21st Century, Editors Jessica Rosenberg and Samuel J. Rosenberg, New York & London: Taylor & Francis/Routledge, 2017.

36

"Waiting Alone to Die,' In *Living on Death Row: The Psychology of Waiting to Die*, edited by
  Hans Toch, James Acker and V.M. Bonventre.  American Psychological Association
  Press, 2018.
"Posttraumatic Stress Disorder in Incarcerated Offenders, Treatment of," in the *Sage
  Encyclopedia of Criminal Psychology*, Sage Publications, 2019.
"Imprisonment and Stress," in the *Sage Encyclopedia of Criminal Psychology*, Sage
  Publications, 2019.
"Prospects for Correctional Mental Health Litigation," *Correctional Mental Health Report*, 21,4,
  November/December, 2019.
"ASPD Then and Now," *Correctional Mental Health Report*, 22, 1, May/June, 2020.
 "We Need to Talk Nondefensively About Race and Admit Shortcomings," *Psychiatric News*,
  American Psychiatric Association, Vol. 55, No. 14, July 17, 2020.
"Supermax Prison Isolation in Pre-Crime Society."  In *THE PRE- CRIME SOCIETY: Crime,
  Culture and Control in the Ultramodern Age*.  Eds. Bruce A. Arrigo & Brian G. Sellers,
  Bristol University Press, 2021.
"Review of *What We Know: Solutions from our Experiences in the Justice System*," Editor Jules
  Lobell, *Rutgers University Criminal Law and Criminal Justice Book Reviews*,
  September, 2021.
"Future Prospects for *Correctional Mental Health*." *Correctional Mental Health Report*, Vol.
  23, No. 2, Fall, 2021, pp. 33-34.
"The Cell-Front Interview." *Correctional Mental Health Report*, Vo. 24, No. 4, Spring, 2022.
"Foreword," *Way Down in the Hole: Race, Intimacy, and the Reproduction of Racial Ideologies
  in Solitary Confinement*, A.J. Hattery & E. Smith, Rutgers University Press, 2022.


# Depositions and Court Testimony in Past Four Years
# by Terry A. Kupers, M.D.


Testimony in Dockery v. Hall, USDistCtSoDistMississippi, Jackson, No. 3:13CV326WHB-JCG, March
  14-15, 2018, regarding psychiatric effects of conditions in solitary confinement Unit at
  Eastern Mississippi Correctional Facility.

Testimony in State v. Travis Smoot, Bakersfield Superior Court, Case No.
  BF164146A, March 20, 2019, criminal trial about murder of
  prisoner's cellmate.

Deposition in Jay Vermillion v. Mark Levenhagen, 1:15-cv-605-RLY-TAB,
  U.S.Dist.Ct,So.Dist.Indiana, in San Francisco, May 30, 20
  about effects of Solitary Confinement at Westville Corr. Facil.


Deposition in William Richards v. County of San Bernadino et al, Case No. 5:17-cv-00497-
  SJO-SP, USDistCtCentralDistCA, in Oakland, July 19, 2019, re exoneration
  following false conviction.

37

Deposition in John Doe et al. v. Michigan DOC, et al., Washtenaw County (MI) Circuit Court, Case Nos. 13-1196-CZ and 15-1006-CZ, August 7 & 8, 2019, Oakland, CA.  Class action regarding effects on juveniles of incarceration in adult prison facilities.

Deposition in Luong v. Alameda County, USDistCtNoDistCA No: 3:17-cv-06675-EMC, September 5, 2019, Oakland, CA, re death in custody at Santa Rita Jail Facility.

Deposition in Finley v. Huss et al, USDISTCtWestDistMichigan, North Division, No. 2-18-cv-100, October 15, 2019, Oakland, CA, re self-harm in solitary confinement.

Deposition in Andrew Wilson v. City of Los Angeles, U.S.Dist.Ct.CentralDist.CA, CASE NO. CV18-05775-KS, April 24, 2020, Berkeley & Los Angeles, telephonic, re exoneration following false conviction.

Deposition in Atayde vs. Napa State Hospital et al., Case # 1:16-cv-00398-DAD-SAB, April 29, 2020, Berkeley, CA via video, re death by suicide in jail.

Deposition in Samuel Kolb vs. County of Placer, USDistCtEDistCA Case No. 2:19-cv-00079-DB, July 8, 2020, Berkeley, CA via video, re police-involved shooting.

Deposition in Gosier/Malone v. Wicomico County, Maryland. USDistCt for the Dist of Maryland. Case No. 1:19-CV-02412-SAG, March 4, 2021, Maryland/California via video, re jail suicide.

Testimony at Trial (in person), State of Florida v. William E. Wells, Circuit Court of the Eighth Judicial Circuit, in and for Bradford County, Florida, Case No. 04-2019-CF-000706-A, April 27 & 28, 2021, Starke, Bradford County, Florida. Capital Murder Trial.

Deposition in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co. of Marin, May 4, 2021. Case No. SC212933, et al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San Quentin Prison.

Court Testimony (by video) in Michael Hall (SC212933) et.al. & In Re Von Staich (SC212566), Sup. Ct., Co. of Marin, May 27, 2021. Case No. SC212933, et al, Case No. SC213244, et al., Case No. SC213534, et al.  Regarding COVID-19 and response by CDCR at San Quentin Prison.

Deposition in Gerald Len Cooley v. William Jeha et. al, USDistCtNoDistCA, Case No. 4:18-cv-00719-YGR.  Video Deposition.  October 20, 2021.  Regarding effects of 4 month jail confinement following wrongful arrest.

Deposition in Martinez & M. Martinez v. City of Los Angeles, USDistCtCentralDistCAWestDiv, October, 2021.  Video Deposition.  Regarding false conviction/exoneration/innocence.

38

Testimony at Evidentiary Hearing (by video), Melendez v. Inch et al, USDistCtMidDistFlorida, Jacksonville, Florida, 3:20-cv-01023-BJD-JBT, January 21, 2022.  Regarding Solitary Confinement and Mental Health Issues for single prisoner.

Deposition in Michael Denton v. Karie Rainer, USDistCtWestDistWA,NO. 3:19-cv-05743-BHS-TLF, April 7, 2022.  Video Deposition.  Regarding long-term confinement of Prisoner with Mental Illness in Solitary Confinement.

Deposition in State of Florida vs. Keith Hartley Wittemen, Jr., Circuit Court of the 20th Judicial Circuit in and for Charlotte County, Case No. 92-000487CF – (SHC) (BRB), August 5, 2022, by video.  Re-sentencing consideration related to conviction for murder.

Testimony in court by video, State of Florida vs. Keith Hartley Wittemen, Jr., Circ. Ct of the 20th Judicial Circuit, Charlotte County, Florida.  Case No. 92-000487CF – (SHC) (BRB) Felony/Capital, 9/15/2022.  Re-sentencing hearing following almost 30 years in Florida DOC for murder that occurred when defendant was 17.

Testimony in court, Evidentiary Hearing, by video, State of Texas v John Falk, January 17, 2023. Competency issues at trial re prisoner on Death Row.

Deposition (by video), Melendez v. Inch et al, USDistCtMidDistFlorida, Jacksonville, Florida, 3:20-cv-01023-BJD-JBT, February 2 & 16, 2023.  Regarding Solitary Confinement and Mental Health Issues for single prisoner.

Deposition (by video), Vega vs. Management & Training Corporation, Case No. 3:21-CV-01770-GPC-MSB, February 8, 2023.  Effects of solitary confinement for prisoner at the I.C.E. Imperial Regional Detention Facility.

Testimony at Evidentiary Hearing, Michael Denton v. Karie Rainer, USDistCtWestDistWA, NO. 3:19-cv-05743-BHS-TLF, February 9, 2023, Federal Court in Seattle via video. Effects of solitary confinement on prisoner with serious mental illness.

Deposition (by video), James Gibson v. City of Chicago, USDistCt,NDistILEasternDiv,  No. 2019 CV 04152, April 18, 2023. Psychological effects of torture at the hands of Chicago Police, false conviction and almost 30 years in the Illinois D.O.C.

Deposition (by video), Howard v. Laura Williams, Case No. 2:20-cv-1389, USDistCtWDistPA, May 16, 2023.  Class action re mental health care and utilization of solitary confinement at the Allegheny County Jail, PA.

Trial Testimony, USA vs. Anthony Gay, Case No. 20-40026, USDistCt,CntrlDistIL, Peoria, Illinois, May 23, 2023.  Sentencing Phase re possession of gun by felon.

# EXHIBIT "C"

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| D.M and L.M., minors, by and through their Guardian ad litem Jose Martinez, on their own behalf and on the behalf of the Estate of Rene Snider, decedent; DENISE SAWYER, on her own behalf; and DOUG SNIDER, on his own behalf<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF MERCED, WELLPATH, LLC CALIFORNIA FORENSIC MEDICAL GROUP, INC., AMANPREET ATWAL, C.O. CASTANEDA, ALICIA DUNWOODY, GIANFRANCO BURDI, KERIANN QUINN-FITZPATRICK, DYLAN FULCHER, SHAWN AUTREY, PAO CHAND, JESSICA RAMIREZ-AGUILAR, JAMIE BURNS, THANYA RYLAND, and DOES 1-10, inclusive,<br><br>Defendants. | ) Case No.: 1:20-CV00409-NONE-SAB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Expert Report of Taylor Ehrlich, CPA/ABV, CFE**
**Dated: June 23, 2023**

**TABLE OF CONTENTS**

I.    INTRODUCTION AND QUALIFICATIONS ................................................................. 3

II.   BACKGROUND AND SCOPE OF WORK ................................................................. 4

III.  DOCUMENTS CONSIDERED AND RESERVATIONS ................................................ 4

IV.   SUMMARY OF OPINIONS ...................................................................................... 5

V.    DETAILED ANALYSIS ............................................................................................ 5

   A.   Opinion 1: Plaintiffs suffered economic damage of $9,037,001 as a result of Ms. Snider's death assuming she had remained incarcerated or under the care of the State of California until the end of her life expectancy. .............................................................................................. 6

   B.   Opinion 2: Plaintiffs suffered economic damage between $6,068,130 and $6,412,843 as a result of Ms. Snider's death assuming she remained incarcerated for 4.5 to 8 years after the date of her death. . 10

   C.   Opinion 3: Plaintiffs suffered economic damage of $5,540,119 as a result of Ms. Snider's death assuming she had no additional incarcerations or commitments to State care. ..................................... 12

## I.  INTRODUCTION AND QUALIFICATIONS

1.  I am a licensed Certified Public Accountant with an Accreditation in Business Valuation ("CPA"/"ABV") and Certified Fraud Examiner ("CFE"). I have participated in engagements involving economic damages, loss of earnings, business valuations, forensic investigations, and audit/accounting malpractice. My experience has included engagements involving companies ranging in size from thousands to billions of dollars in assets and/or revenues. I have experience in numerous industries including real estate, consumer products, financial services, health care, business services, and manufacturing, amongst others. Additionally, I have performed audits of financial services companies as well as a global logistics and supply chain company pursuant to Generally Accepted Auditing Standards ("GAAS") and PCAOB Auditing Standards in connection with U.S. Securities and Exchange Commission ("SEC") Form 10-K, Form 10-Q, and other related filings.

2.  I am currently a Partner in the Financial Advisory Services practice of Resolution Economics, LLC ("ResEcon"). I have been with ResEcon since July of 2014. My current business address is 1925 Century Park East, 15th floor, Los Angeles, CA 90067. My client responsibilities include, but are not limited to, providing expert witness services in matters involving economic damages, forensic investigations, Generally Accepted Accounting Principles ("GAAP"), GAAS, and SEC investigations. Prior to joining ResEcon, I was part of the Los Angeles Litigation Practice for AlixPartners LLP. I held that position between 2012 and July 2014. Prior to AlixPartners, I was a financial statement auditor at Deloitte and Touche LLP. I hold a Bachelor of Science degree in Business Administration and Master's in Accounting from the University of Southern California.

3.  My curriculum vitae and testifying experience over the last four years are attached as **Appendix A** and **Appendix B** to this report. I have been retained by the Plaintiff in this matter through the law firm of Wanger Jones Helsley PC ("Counsel"). The time I have spent on this matter is being billed at a rate of $500 per hour.

## II.   BACKGROUND AND SCOPE OF WORK

4.   Rene Snider ("Ms. Snider") was born on November 17, 1979 in Merced, California and was a member of the Pechanga Band of Mission Indians ("Pechanga Tribe").[1]  Ms. Snider had a history of mental illness and was under the care of psychiatrists and therapists from at least 2010 onward.[2]  On March 18, 2019 Ms. Snider was remanded into the custody of the California Department of State Hospitals "in order to receive competency training in a locked forensic setting."[3] On March 23, 2019, Ms. Snider died by suicide at the Merced County Jail.[4] On April 13, 2020 the mother, father and children of Ms. Snider ("Plaintiffs") filed a lawsuit against the County of Merced and a number of other entities and individuals ("Defendants") claiming violations of the Fourteenth Amendment, California Civil Code, and wrongful death.[5]

5.   I have been retained by Counsel for Plaintiffs to calculate Plaintiffs' economic damages, assuming liability.

## III.   DOCUMENTS CONSIDERED AND RESERVATIONS

6.   In connection with my work on this matter, I and/or members of my staff have reviewed and analyzed, among other things, certain documents and information produced in this case, and independently compiled information available from publicly available and other subscription services. A listing of information that has been considered in rendering the opinions set forth herein is included as **Appendix C** to this report.

---

[1] First Amended Complaint for the Violations of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983, California Civil Code § 52.1, and Wrongful Death, filed 4/13/20 ("First Amended Complaint") at para. 28; DMLM002073; Attachment to Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action filed January 20, 2021 in this matter.
[2] First Amended Complaint at para. 33.
[3] First Amended Complaint at paras. 45 and 46. Documents Produced by Central Valley Conditional Release Program (01202782).
[4] First Amended Complaint at para. 1 and 32.
[5] First Amended Complaint at paras. 92 – 121.

4

7.  The opinions expressed in this report are based on analyses performed to date, and information available to me as of the date of this report. To the extent documents or other information which might affect the opinions and conclusions expressed herein should become available subsequent to the date of this report, I respectfully reserve the right to supplement and/or amend this report on that basis, or for other reasons.

8.  Further, I may independently create, or be asked by counsel to create, exhibits after the issuance of this report. These exhibits may then be used as demonstratives during trial.

## IV.  SUMMARY OF OPINIONS

9.  Based on my review and analysis, which is detailed in the remainder of my report, I have formed the following opinions:

  - Opinion 1 - Plaintiffs suffered economic damage of **$9,037,001** as a result of Ms. Snider's death assuming she had remained incarcerated or under the care of the State of California until the end of her life expectancy.

  - Opinion 2: Plaintiffs suffered economic damage between **$6,068,130 and $6,412,843** as a result of Ms. Snider's death assuming she remained incarcerated for 4.5 to 8 years after the date of her death.

  - Opinion 3 - Plaintiffs suffered economic damage of **$5,540,119** as a result of Ms. Snider's death assuming she had no additional incarcerations or commitments to State care.

## V.  DETAILED ANALYSIS

10. To determine economic damages, I calculated the amount of lost earnings that the Plaintiffs could have reasonably expected to receive had Ms. Snider survived.[6] My analysis which estimates what Ms. Snider would have earned absent her death is often referred to as "But-

---

[6] The Comprehensive Guide to Economic Damages, Sixth Edition. Business Valuation Resources, 2020 ("BVR Guide to Economic Damages") at p. 797.

For" earnings and is equivalent to the present value of her future gross income until the end of her life expectancy less personal consumption. A summary of my conclusions and calculations are presented as **Exhibit 1a and 1b** of this report. The detailed calculations for my opinions are presented as **Exhibits 2 to 4** of this report. My calculations and assumptions are discussed in detail in the following sections.

### A. Opinion 1: Plaintiffs suffered economic damage of $9,037,001 as a result of Ms. Snider's death assuming she had remained incarcerated or under the care of the State of California until the end of her life expectancy.

*But-For Base Earnings and Anticipated Growth Rate*

11. As a member of the Pechanga Tribe, Ms. Snider was entitled to a pro-rata share of Tribal Funds that were distributed to the membership.[7] The distributions to members originated in 1995 and are expected to continue until after the date of Ms. Snider's life expectancy.[8] Review of tax forms provided to Ms. Snider by the Pechanga Tribe between 2010 and 2018 indicate that she annually received a low of $228,043 in 2017 and a high of $271,558 in 2010 in distributions from the Pechanga Tribe.[9] Her average distributions between 2010 and 2018 were $256,847. A summary of Ms. Snider's earnings are presented in **Exhibit 5.**

12. A review of the distributions received by Ms. Snider indicates some variability year to year, which are attributable to the changing macroeconomic conditions affecting gaming revenues of the Pechanga Tribe as well changes in the number of Tribal members for which the Tribal Funds are distributed. Accordingly, to account for the fluctuations, I have assumed Ms. Snider's 2019 distribution would be equal to the average distribution received between 2010

---

[7] DMLM002073.
[8] In 2000, the State of California and Pechanga Tribe signed a Compact with a term until December 31, 2020. In 2016, a new Compact was signed that provided for a term of 25 years (until 2041). I am not aware of any evidence that the Compact would not be extended past this date. Accordingly, I have assumed the distributions would continue for as long as the State of California has a Compact with the Pechanga Band of Luiseno Indians. See 2000 Tribal-State Compact Between the State of California and the Pechanga Band of Luiseno Mission Indians at p. 34 and 2016 Tribal-State Compact Between the State of California and the Pechanga Band of Luiseno Indians at p. 96.
[9] DMLM002074 – DMLM002082 (Form 1099-MISC for 2010 – 2019).

and 2018. Next, I assumed that her distributions in 2020 would have declined by 9.4% due to the impact of COVID, consistent with overall industry trends at that time.[10] In 2021 and 2022, I have assumed that Ms. Snider's distributions would have been equal to the distributions received by her mother, Denise Sawyer.[11] Due to the variability in distributions between 2010 and 2022, I have assumed the distribution for 2023 would equal the average between 2010 and 2022. See analysis of historical income at **Exhibit 5.**

13. I estimated future earnings would grow only at projected inflation based on data published by the Bureau of Labor and Statistics and Federal Reserve Bank of Philadelphia. See summary of inflation data at **Exhibit 6.** I found this to be a conservative assumption in light of 5% to 9% near-term projected growth in revenues in the Lottery and Native American Casino industry.[12]

*Other Income Sources*

14. In addition to the distributions discussed above, Ms. Snider received income, as evidenced by her 1099s for work she performed for Mary Phelps between 2011 and 2014.[13] It appears that Ms. Snider did not perform any material amount of work for Ms. Phelps after 2014 and prior to her death in 2019.[14] The average annual income from 2010 to 2018, including years when Ms. Snider did not perform any material work, was $10,799. See **Exhibit 5.** While it is possible that Ms. Snider could have returned to the work force but-for her death in 2019, I have not made any future estimate of additional 1099 income due to the duration of time that Ms. Snider remained out of the work force prior to her death and her incarceration.

---

[10] Govdysh, Alexander. Industry Report 71329, Lotteries & Native American Casinos in the US. IBISWorld. March 2023 ("Lotteries & Native American Casinos IBIS Report") at p. 39.
[11] Denise Sawyer's Form 1040 for tax years 2021 and 2022.
[12] Lotteries & Native American Casinos IBIS Report at p. 39.
[13] Ms. Snider's 2011 – 2014 Form 1099-MISC.
[14] QuickBooks report of Mary Jane Phelps, *Payments to Rene Snider or Rene Mora.*

*Life Expectancy*

15. As noted above, Ms. Snider died on March 23, 2019 at the age of 39.3. But for Ms. Snider's death in March 2019, I assumed she would have received distributions from the Pechanga Tribe until the end of her life expectancy. To determine her life expectancy, I relied on the National Vital Statistics Reports published in 2020, which considers factors such as current age, sex, and ethnicity.[15] Accordingly, I determined her life expectancy to be 74.9 years based on her age at the date of her death, her gender, and her ethnicity as a Native American.[16]

*Personal Consumption*

16. Typically, in wrongful death and survivor actions, a decedent's gross income is reduced by an estimate of their personal consumption. Personal consumption represents the amount of personal expenditures that would not be available to the beneficiaries.[17] It is my understanding that Ms. Snider was incarcerated a number of times prior to her death and was sentenced to be committed under the care of the State at the time of her death. Assuming Ms. Snider remained either incarcerated, or under the care of the state until the end of her life expectancy, there would have been nominal personal consumption expenditures. Accordingly, under this scenario I have assumed that there is no offset for personal consumption.

*Child Support*

17. It is my understanding that Ms. Snider paid child support for her two children, Liza and Drea, of $2,000 and $1,500 per month respectively.[18] I have assumed that but-for Ms. Snider's death, she would have continued making child support payments (adjusted for inflation) until each child reached 18 years old plus one month. The results of my analysis indicate that

---

[15] National Vital Statistics Reports Vol. 71 Number 1, *United States Life Tables 2020.* Elizabeth Arias, Ph.D., and Jiaquan Xu, M.D., Division of Vital Statistics, published August 8, 2022.
[16] Id. at Table 9. Life table for non-Hispanic American Indian or Alaska Native females: United States, 2020.
[17] BVR Guide to Economic Damages at p. 797.
[18] Deposition of Jose Armando Martinez dated April 17, 2023 ("Martinez Deposition") at 14:2 – 24.

$77,172 would have been paid for Liza and $81,368 for Drea, respectively, until they reach 18 years old. See **Exhibit 7** for detailed calculation.

*Prejudgment Interest*

18. Prejudgment interest can be awarded for economic damages sustained prior to the trial date. Accordingly, I have calculated prejudgment interest by applying a statutory 10% simple interest rate to damages incurred between March 23, 2019 and the anticipated date of trial of July 14, 2024.

*Discount Rate*

19. As discussed earlier, economic damage theory requires that future lost earnings be discounted to present value. Typically, in wrongful death matters, the discount rate represents the risk-free rate that the Plaintiffs would be able to realize if they were to invest the lump sum award. Accordingly, I discounted future lost earnings by the yields on U.S. Treasury bonds as these are widely considered to be risk-free. I have also assumed that the Plaintiffs would withdraw the award steadily over the damages period and therefore have considered the rates on Treasury bonds with maturities of 1, 3, 5, 7, 10, 20 and 30-years.

20. I also accounted for current economic conditions and the possibility of near-term recession on future Treasury yields. Currently, the yield curve is inverted meaning yields on short-term bonds are higher than the yields on long-term bonds signaling a possible recession. Accordingly, I calculated the average historical Treasury yields on the above maturities since the last yield curve inversion in 2006 to 2019, to account for the impact of a near-term recession and subsequent recovery, as well as exclude the impact of COVID-19 on rates. Based on the above, I used a discount rate of 2.53% to present value future damages. See analysis at **Exhibit 8.**

*Conclusion*

21. Based on my analysis described above, the economic damage to Plaintiffs is **$9,037,001**, including prejudgment interest. See **Exhibit 2.**

**B. Opinion 2: Plaintiffs suffered economic damage between $6,068,130 and $6,412,843 as a result of Ms. Snider's death assuming she remained incarcerated for 4.5 to 8 years after the date of her death.**

22. It is my understanding that based on charges levied against Ms. Snider, absent her death it would have been likely she would have remained incarcerated for an additional 4.5 to 8 years. For purposes of Opinion 2, I have been asked to calculate economic damage under two scenarios. The first scenario assumes that absent her death she would have remained incarcerated for an additional 8 years. The second scenario assumes she would have remained incarcerated an additional 4.5 years. As described in further detail below, the same methodology and assumptions used in Opinion 1 were applied to these scenarios, with the exception of personal consumption. Accordingly, for this opinion, I only discuss my assumptions with respect to personal consumption below.

*Personal Consumption*

23. I estimated Ms. Snider's personal consumption, which represents the amount of her personal expenditures that would not be available to the beneficiaries had she remained outside of the care of the State of California.[19] To derive this estimate, I relied upon the Patton-Nelson studies. These studies are widely referenced in wrongful death litigation to measure personal consumption.[20] The studies are based on data from the Consumer Expenditure Survey ("CEX") published by the United States Department of Labor.[21]

---

[19] BVR Guide to Economic Damages at p. 797.
[20] Michael R. Ruble, Robert T. Patton, and David M. Nelson. 2019. Patton-Nelson Personal Consumption Tables 2016–17. Journal of Legal Economics 25(1–2): pp. 75–89 ("Patton-Nelson Tables") at p. 75.
[21] Id.

24. Patton-Nelson first published the personal consumption tables in 1991 and since then have periodically published updates in 1998, 2004, 2009, 2014, and most recently in 2019.[22] For purposes of my analysis, I have relied upon the most recently published Patton-Nelson tables, which utilizes CEX data from 2016-2017. The Patton-Nelson methodology first divides total income by average consumer expenditures less pensions and social security. A second consumption percentage is calculated by further reducing average consumer expenditures by vehicles purchases and household furnishing and equipment. The second consumption percentage assumes that expenditures on household furnishings and equipment and vehicle purchases give rise to asset accumulation equal to the amount spent on these expenditures.[23] However, this would likely not hold true as depreciation would certainly result in an ultimate asset accumulation less than the price paid for such expenditures. Accordingly, Patton-Nelson suggests that the appropriate consumption percentage for purposes of a wrongful death and survival action is somewhere in between the first and second consumption percentages.[24] The Patton-Nelson study provides a table reflecting the results of the personal consumption percentage calculation by gender and income.[25] The table indicates that Ms. Snider's personal consumption would range from 36.8% to 38.8%.[26] Accordingly, I assumed Ms. Snider would have been expected to have personal consumption equal to the average of that range, or 37.8%.

   *Conclusion*

25. For the first scenario, I have assumed that Ms. Snider would have zero personal consumption while incarcerated for 8 years after the date of her death, or until March 21, 2027. Subsequent to this date, she would have personal consumption equal to 37.8% until the end of her life

---

[22] Id.
[23] Id. at p. 76.
[24] Id.
[25] Id. at pp. 77 and 84 – 85.
[26] Id. at p. 85.

11

expectancy. Under these assumptions, economic damage to Plaintiffs is equal to **$6,412,843**, including prejudgment interest. See detailed calculation at **Exhibit 3a**.

26. For the second scenario, I have assumed that Ms. Snider would have zero personal consumption while incarcerated for 4.5 years after the date of her death, or until September 20, 2023. Subsequent to this date, she would have personal consumption equal to 37.8% until the end of her life expectancy. Under these assumptions, the economic damage to Plaintiffs is equal to **$6,068,130**, including prejudgment interest. See detailed calculation at **Exhibit 3b**.

   ### C. *Opinion 3: Plaintiffs suffered economic damage of $5,540,119 as a result of Ms. Snider's death assuming she had no additional incarcerations or commitments to State care.*

27. For purposes of Opinion 3, I assumed that absent her death Ms. Snider would have remained outside of the care of the State. The same methodology and assumptions used in Opinions 1 and 2 were applied to this scenario, except I applied a personal consumption of 37.8% for all periods after the date of her death until the end of her life expectancy.

28. Based on the analysis, as described in Opinion 1, as well as the application of personal consumption, the economic damage to Plaintiffs under this scenario is equal to **$5,540,119**, including prejudgment interest. See detailed calculation at **Exhibit 4**.

This report has been prepared on June 23, 2023 by:

Taylor Ehrlich
Partner, Resolution Economics, LLC.

12

# APPENDIX A



resolution economics LLC

1925 Century Park East
15th Floor
Los Angeles, CA 90067
Office.310.275.9137
Fax.310.275.9086

# TAYLOR EHRLICH, CPA/ABV, CFE

Taylor Ehrlich is a Partner at Resolution Economics, LLC.  With experience as both a financial statement auditor and forensic accountant, he has consulted on and solved a wide range of complex accounting, forensic, and auditing issues across diverse industries.

Taylor Ehrlich joined the Los Angeles office of Resolution Economics in June 2014.  Prior to joining Resolution Economics, Taylor worked at AlixPartners, LLC in the Financial Advisory Services Practice. At AlixPartners he focused on international forensic investigations, audit and accounting malpractice, and economic damage analysis.  Previous to AlixPartners, Taylor was an Audit Senior at Deloitte & Touche, LLP in the Audit and Advisory practice.  At Deloitte, Taylor conducted financial statement audits of both publicly and privately held companies in the global supply chain management and financial services industries.

Taylor has extensive experience in a variety of litigation consulting matters including economic damages, forensic investigations, purchase price disputes, as well as audit and accounting malpractice. In the economic damages and forensic context, he has worked on cases involving breach of contract, false advertising, insurance and indemnity claims, misappropriation of funds, among others. Taylor has also worked extensively on audit and accounting malpractice cases involving alleged breaches of Generally Accepted Accounting Principles (GAAP), Generally Accepted Auditing Standards (GAAS), International Financial Reporting Standards (IFRS) and other standards and regulations issued by the PCAOB, AICPA, IRS and SEC. He also has experience with matters involving alleged violations of the Foreign Corrupt Practices Act (FCPA). His experience encompasses a wide variety of industries, including real estate, consumer products, retail trade, manufacturing, agriculture, and financial services.

Taylor holds a Masters in Accounting and B.S. in Business Administration from the University of Southern California. He is a Certified Public Accountant in the state of California with an Accreditation in Business Valuation and a Certified Fraud Examiner.

## Representative Engagements

- Valued the implied ownership interest of equity investors in a cannabis-related entity after it was alleged that the managing partner misused investor funds to develop his other cannabis related investments which he ultimately sold for over $100 million.

- Computed economic damages which included valuing an individual's minority equity interest in a privately owned satellite company based in Hong Kong relating to allegations that Defendants failed to compensate Plaintiff for his role in the acquisition of satellite assets and capital fundraising.

- Valued the ownership interest of an equity investor in a world-renowned equestrian center based on claims that the domestic partner of the Defendant was a part owner of the company.

- Assisted counsel of an accounting firm in responding to a SEC Wells notice related to a Business Development Company's valuation of its portfolio companies. The engagement involved evaluating the internal valuations of non-public start-up companies based on allegations from the SEC that the company's disclosures had inflated its investment holdings.



- Valued the interest of a private equity firm in a global toy manufacturer after it was determined that the purchase price was materially inflated due to the misapplication of U.S. Generally Accepted Accounting Principles. Also assessed overall performance returns of the private equity firm based on the valuations of comparable fund portfolio companies.

- Computed the value of beverage distribution contracts in multiple matters involving alleged breach of contracts between the beverage manufacturers and distributors.

- Assessed the value of RSU awards granted to an executive of a global streaming music company in a wrongful termination matter.

- Valued the ownership interest and assessed the propriety of distributions in a dispute between shareholders of a medical care services company.

- Evaluated the disclosures and 409A valuations provided to executives of a global real estate company in a matter involving allegations that the valuations were materially misstated and misrepresented to employees prior to the company's Initial Public Offering.

- Calculated the enterprise value of a seafood distribution company in a matter where the acquiror of the company alleged that the seller made material misrepresentations about key customers and suppliers.

- Assessed the value of trade secrets allegedly misappropriated from a company that provided Broker Price Opinions and other mortgage industry valuation products by leveraging a nationwide network of brokers and appraisers.

- Testified to the loss of earnings of an investment manager in a FINRA arbitration involving allegations of wrongful termination.

- Involved in numerous litigations relating to the accounting and disclosures of sub-prime mortgage originators and sponsors of residential mortgage-backed securities to determine whether repurchase reserves on defective mortgages sold to RMBS trusts were adequately evaluated and disclosed. Issues revolved around appropriate SEC disclosures and the compliance of the originator and sponsor with respect to the representations and warranties provided to monoline insurers of certain RMBS securities.

- Examined financial transactions, contracts, and accounting records for alleged misappropriation of funds by a real estate developer and hotel management company.

- Engaged to determine whether a branch manager at a national banking institution was facilitating an ATM machine Ponzi scheme.

- Assessed whether a Big-4 accounting firm adhered to the appropriate standard of care in providing audit services to a hedge fund that engaged Bernard Madoff as its investment advisor and ultimately lost substantial sums of investor's contributions.

- Investigated the funding and repayment of a series of Merchant Cash Advances made to a millwork construction company and assessed the economic damage as a result of alleged overpayments to the MCA company.

- Analyzed distributions from Low Income Housing Tax Credit entities to various Trusts and related entities in order to determine the amount and extent to which investors could claw back payments made to affiliated individuals.



- Performed on-site investigation in Macau, China to determine whether a casino had violated FCPA provisions by providing illegal payments to government officials in order to obtain regulatory approvals.

- Performed on-site investigation in Manila, Philippines to determine whether an international beauty and cosmetics company made illegal payments under the FCPA to facilitate shipping and other local operations.

- Performed on-site review and document collection in response to FCPA allegations related to a medical device importer based in Mexico City.

- Evaluated whether a Big 4 accounting firm complied with PCAOB standards in the performance of their audit around the accounting and disclosure of investments in residential mortgage-backed securities of a publicly traded Real Estate Investment Trust.

- Calculated the economic loss resulting from the alleged misappropriation of a customer list by a recruiter at a wealth management firm after he was terminated.

- Assessed the diminution of value of an ice distributor in a matter involving an accident that destroyed a key ice making component and resulted in a dispute of whether the company's insurance policy covered the loss.

- Designated as an accounting expert to evaluate the profitability of numerous bases of one of the largest air ambulance services in the United States.

- Calculated damages of an executive who was allegedly wrongfully terminated from a multinational entertainment production company.

- Calculated damages resulting from an alleged fraudulent misrepresentation in a line of credit agreement between a national bank and textile company.

- Calculated lost profits of a pistachio manufacturer that were allegedly caused by a breach of contract with a supplier.

- Computed the lost profits suffered by restaurant and bar owner after an international mall developer and manager made material misrepresentations and breached its contractual obligations.

- Calculated damages of a beverage company resulting from alleged false advertising of one of its flagship products.

- Computed economic damages in an insurance dispute involving a cosmetic company that incurred losses from the destruction of product inventory and business interruption as a result of a flooding incident.

- Investigated the conduct of a consulting group at a global real estate firm involved in assisting clients in obtaining state and local tax incentives and grants based on retaining or relocating jobs to a particular jurisdiction.

- Examined financial and accounting records provided to a shareholder of a cannabis company to determine whether there was indicia of fraud and misappropriation of funds by its owners.

- Analyzed the flow of funds between an agricultural company and its shareholders/partners to determine whether certain stakeholders were disadvantaged.

- Identified cash payments to and from certain individuals and related entities with alleged interest in a large dairy company.



- Evaluated the financial statement audits performed by a regional accounting firm of a medical supply distributor who went bankrupt after allegations of improper insurance claim adjudication practices.

- Evaluated the tax services provided by an accounting firm to individuals who owned numerous entities, including a large nationwide Pharmacy Benefit Manager.

- Consulted on a matter involving an international accounting firm as it relates to their audits of a real estate investment trust whose financial statements filed with the SEC were restated for material misstatements and resulted in the revision of key REIT performance metrics.

- Assisted counsel of an international public accounting firm in responding to an SEC Wells notice relating to the audit of a publicly traded professional staffing company. Issues involved the misappropriation of short term investments held by the company and whether the audit firm applied the appropriate standard of care in the performance of its audit and reviews.

- Evaluated the accounting and disclosures of a publicly traded health insurance provider related to substantial legal settlements resulting from the underpayment of out-of-network reimbursement claims. The matter involved determining whether the settlements were contractual in nature and thereby covered by certain insurance policies.

- Assisted a global market maker and broker-dealer in response to requests from FINRA and the SEC to evaluate whether certain transactions between the broker-dealer and an affiliated entity met the true-sale criteria under Accounting Standards Codification 860.

- Evaluated the audits of one of the nation's largest cable companies performed by a Big-4 accounting firm for compliance with GAAS. Specific issues involved whether the audit procedures performed around the company's co-borrowing arrangements and subsequent actions taken by the auditors met the relevant standard of care.

- Evaluated the professional conduct of a Big-4 accounting firm in providing assistance to a nationwide hospitality company in the implementation of an Employee Stock Ownership Plan.

- Evaluated the accounting performed by executives at a publicly traded medical device company charged by the DOJ of a $750 million fraud scheme resulting from improper revenue recognition.

- Evaluated whether a Los Angeles based accounting firm complied with GAAS in the audit of an automotive parts distributor. Issues involved the audit procedures performed on assets that collateralized a substantial line of credit which the company ultimately defaulted on.

- Performed forensic investigation to determine the amount of funds loaned in a real estate construction project.

- Calculated economic damages in a matter involving the alleged defamation of a senior investment advisor at a global wealth management firm.

- Calculated economic damages caused by an alleged breach of contract between an air transportation business and NFL franchise.

- Evaluated whether a Big-4 accounting firm violated the standard of care in providing contract compliance services to a pharmaceutical company.



- Computed economic damages caused as a result of actions taken by a local government against a wedding and events business in California.

- Evaluated whether the financial statements relied on in the acquisition of an entertainment production studio were in accordance with GAAP.

- Evaluated whether a CPA adhered to the relevant standard of care in recommending a tax position to his client.

- Performed a forensic accounting evaluation of the public disclosures and accounting records of a technology company as it relates to the determination of whether payments made pursuant to the terms of the trade secret settlement agreement relate in whole, or in part, to the trade secret litigation.

- Performed a forensic investigation into whether the funds of an agricultural company were used for the personal benefit of Defendant.

# APPENDIX B

## TESTIFYING EXPERIENCE

| | Case | Year | Law Firm | Client | Deposition Date | Trial Date | Court/Venue | Case Number |
|---|---|---|---|---|---|---|---|---|
| 1 | Santa Clarita LLC v. Blue Ox Holdings, LLC | 2020 | Foley Bezek | Plaintiff | May 2020 | N/A | Superior Court of the State of California, County of Los Angeles, Central District | 20STCV12017 |
| 2 | CAC Investment Ventures v. Andrew Jolley et al. | 2021 | Foley Bezek | Plaintiff | November 2021 | March 2023 | District Court, Clark County, Nevada | A-19-802088-B |
| 3 | Kettler v. Gould | 2021 | Fredman Lieberman Pearl | Cross-Complainant | September 2021 | June 2022 | Superior Court of the State of California, County of Los Angeles | LC101909 |
| 4 | Farooqui v. Wong et al. | 2022 | Kaplan Hecker | Plaintiff | May 2022 | TBD | Superior Court of the District of Columbia | 2019 CA 006899 B |
| 5 | Laurie Hall v. Phillip Bullock | 2022 | Burke, Williams, & Sorensen | Defendant | June 2022 | N/A | Superior Court of California, County of Santa Clara | 18CV325347 |
| 6 | Birringer v. Morgan Stanley | 2023 | Singer Deutsch | Plaintiff | N/A | Dec. 2022 | FINRA Arbitration | N/A |
| 7 | Black v. Phoenix | 2023 | RK Law | Plaintiff | February 2023 | TBD | Supreme Court of the State of New York, County of New York | 652460 / 2020 |
| 8 | Poirson v. Matilock, Inc. | 2023 | GBG LLP | Defendant | April 2023 | TBD | United States District Court, Northern District of California | 4:22-CV-01971 |

**Appendix C**
**Documents Considered**

| | The following documents have been considered by Taylor Ehrlich in this report. |
|---|---|
| | All documents referenced in the report of Taylor Ehrlich dated June 26, 2023 are incorporated herein. |

**Legal Filings**

| 1 | First Amended Complaint for Violations of the Fourteenth Amendment and Wrongful Death filed April 13, 2020. |
|---|---|
| 2 | Plaintiff Denise Sawyer's Responses to Interrogatories, Set One filed February 22, 2021. |
| 3 | Guardian Ad Litem For Minor Plaintiff L.M., Jose Martinez' Responses to Interrogatories, Set One filed February 22, 2021. |
| 4 | Guardian Ad Litem For Minor Plaintiff D.M., Jose Martinez' Responses to Interrogatories, Set One filed February 22, 2021. |
| 5 | Plaintiffs' Supplemental Initial Disclosures filed April 28, 2022. |

**Depositions & Exhibits**

| 1 | Deposition of Jose Armando Martinez, dated April 17, 2023. |
|---|---|

**Publicly Available Information**

| 1 | Arias, Elizabeth, Ph.D., Xu, Jiaquan, M.D., National Vital Statistics Reports Vol. 71 Number 1, *United States Life Tables, 2020*, August 8, 2022. |
|---|---|
| 2 | Ruble, Michael R., Patton, Robert T., Nelson, David M., Patton-Nelson Personal Consumption Tables 2016-17, *Journal of Legal Economics*, 25(1-2) 2019. |
| 3 | Skoog, Gary R., Ciecka, James E., Krueger, Kurt V., The Markov Process Model of Labor Force Activity: Extended Tables of Central Tendency, Shape, Percentile Points, and Bootstrap Standard Errors, *Journal of Forensic Economics*, Vol. 22, No. 2 (August 2011). |
| 4 | Second Quarter 2023 Survey of Professional Forecasters, *Federal Reserve Bank of Philadelphia*, May 12, 2023. |
| 5 | US Federal Reserve Website, H15, Selected Interest Rates, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15. |
| 6 | Govdysh, Alexander, Industry Report 71329, Lotteris & Native American Casinos in the US, *IBISWorld*, March 2023. |
| 7 | Fannon, Nancy J., Dunitz, Jonathan M., Pappas, Jimmy S., Scally, William, and Veenema, Steven M., The Comprehensive Guide to Economic Damages, Sixth Edition, *Business Valuation Resources, LLC*. 2020. |
| 8 | Weil, Roman L., Lentz, Daniel G., Evans, Elizabeth A., Litigation Services Handbook, Sixth Edition, *John Wiley & Sons, Inc.* 2017. |

**Additional Documents Received**

| 1 | Mary Jane Phelps Payments to Rene Snider or Rene Mora, All Transactions beginning February 12, 2009 through April 10, 2023. |
|---|---|
| 2 | 1099-Misc Income Tax Forms from Mary Jane Phelps for Rene Snider/Rene Mora, 2011 through 2014. |
| 3 | Tribal-State Compact Between the State of California and the Pechanga Band of Luiseno Mission Indians, dated September 10, 1999. Addendums included. |
| 4 | Tribal-State Compact Between the State of California and the Pechanga Band of Luiseno Indians, dated August 4, 2016. |
| 5 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, dated January 20, 2021, Documents Produced by Central Valley Conditional Release Program. |
| 6 | 1040 Income Tax Return for Denise M Sawyer, 2021 and 2022. |



**Exhibit 1a**
**Summary of Damages**

| Exhibit 1b<br>Summary of Damages | | | | |
|---|---|---|---|---|
| Component | Opinion 1 | Opinion 2a | Opinion 2b | Opinion 3 |
| Gross Income | $12,665,509 | $12,665,509 | $12,665,509 | $12,665,509 |
| Personal Consumption | $0 | ($4,032,345) | ($4,382,110) | ($4,787,562) |
| Child Support | ($158,540) | ($158,540) | ($158,540) | ($153,540) |
| Prejudgment Interest | $279,803 | $279,803 | $275,637 | $153,070 |
| Present Value Discount | ($3,749,771) | ($2,341,584) | ($2,332,358) | ($2,332,358) |
| Total | $9,037,001 | $6,412,843 | $6,068,130 | $5,540,119 |

**Exhibit 2**
**Economic Damages assuming Mr. Gridler Remains Incarcerated or Under State Care**

| Description | Assumptions | Ref | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 11/11/1972 | | 46.1 | 47.1 | 48.1 | 49.1 | 44.1 | 44.7 | 45.1 | 46.1 | 47.1 | 48.1 | 50.1 | 51.1 | 52.1 | 52.1 | 54.1 | 55.1 | 56.1 | 57.1 | 58.1 | 59.1 |
| Inflation | | Sch. 6 | | | | | | 2.50% | 2.56% | 2.30% | 2.30% | 2.36% | 2.36% | 2.36% | 2.36% | 2.38% | 2.30% | 2.36% | 2.36% | 2.36% | 2.36% | 2.30% |
| **Key Dates** | | | | | | | | | | | | | | | | | | | | | | |
| Date of Death | | | 02/20/18 | | | | | | | | | | | | | | | | | | | |
| Life Expectancy | | | | | | | | | | | | | | | | | | | | | | |
| **Loss of Earnings** | | | | | | | | | | | | | | | | | | | | | | |
| Tribal Distributions | | | | | | | | | | | | | | | | | | | | | | |
| BIA Per | Inflation | Sch. 6 | $285,547 | $230,705 | $254,280 | $222,400 | $232,216 | $254,622 | $254,622 | $264,408 | $270,711 | $277,100 | $283,639 | $290,333 | $297,186 | $304,194 | $311,378 | $318,729 | $326,248 | $333,948 | $341,829 | $349,896 |
| Actual | | | | | | | | | | | | | | | | | | | | | | |
| Fraction of Year | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.54 | 0.49 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.23 | 1.00 | 1.00 | 1.00 |
| Total Bid-for Income | | | $185,766 | $203,705 | $254,280 | $232,400 | $232,216 | $328,597 | $119,265 | $264,403 | $270,711 | $277,100 | $283,938 | $290,333 | $297,196 | $304,189 | $311,378 | $319,729 | $328,248 | $333,948 | $341,923 | $343,896 | $352,153 |
| **Deductions** | | | | | | | | | | | | | | | | | | | | | | |
| Personal Consumption | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Child Support | DataOut | Sch. 7 | | | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **Loss of Earnings** | | | $161,126 | $157,361 | $207,291 | $197,402 | $346,063 | $198,997 | $119,209 | $264,409 | $270,711 | $287,100 | $283,639 | $290,395 | $297,196 | $304,199 | $311,378 | $319,759 | $329,248 | $330,348 | $341,929 | $343,896 | $358,153 |
| **Interest** | | | | | | | | | | | | | | | | | | | | | | |
| Period Start | | | 02/20/18 | 01/01/20 | 01/01/21 | 01/01/22 | 01/01/23 | 01/01/24 | | | | | | | | | | | | | | |
| Period End | | | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 | 12/31/23 | 07/14/24 | | | | | | | | | | | | | | |
| Midyear | | | 06/11/18 | 06/01/20 | 07/02/21 | 06/02/22 | 07/02/23 | 04/02/24 | | | | | | | | | | | | | | |
| Trial Date | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | | | | | | | | | | | | | | |
| Periods | | | 4.92 | 4.20 | 3.02 | 2.03 | 1.03 | 0.27 | | | | | | | | | | | | | | |
| Interest Rate | | | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | | | | | | | | | | | | | | |
| Interest | | | $71,352 | $75,599 | $62,982 | $40,556 | $23,625 | $3,769 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Discount** | | | | | | | | | | | | | | | | | | | | | | |
| Period Start | | | | | | | | | 01/15/24 | 01/01/25 | 01/01/26 | 01/01/27 | 01/01/28 | 01/01/29 | 01/01/30 | 01/01/31 | 01/01/32 | 01/01/33 | 01/01/34 | 01/01/35 | 01/01/36 | 01/01/37 | 01/01/38 |
| Period End | | | | | | | | | 12/31/24 | 12/31/25 | 12/31/26 | 12/31/27 | 12/31/28 | 12/31/29 | 12/31/30 | 12/31/31 | 12/31/32 | 12/31/33 | 12/31/34 | 12/31/35 | 12/31/36 | 12/31/37 | 12/31/38 |
| Midyear | | | | | | | | | 10/04/24 | 07/02/25 | 07/02/26 | 07/02/27 | 07/02/28 | 07/02/29 | 07/02/30 | 07/02/31 | 07/02/32 | 07/02/33 | 07/02/34 | 07/02/35 | 07/02/36 | 07/02/37 | 07/02/38 |
| Trial Date | | | | | | | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 |
| Periods | | | | | | | | | 0.25 | 0.97 | 1.97 | 2.97 | 3.97 | 4.97 | 5.97 | 6.97 | 7.97 | 8.97 | 9.97 | 10.97 | 11.97 | 12.97 | 13.97 |
| Discount Rate | | Sch. 8 | | | | | | | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% | 2.52% |
| Discount Factor | | | | | | | | | 0.99 | 0.99 | 0.96 | 0.93 | 0.91 | 0.88 | 0.86 | 0.84 | 0.82 | 0.80 | 0.78 | 0.76 | 0.74 | 0.72 | 0.71 |
| Discount | | | N/A | N/A | N/A | N/A | N/A | N/A | | | | | | | | | | | | | | |
| **Total** | | | $215,977 | $192,954 | $272,173 | $237,606 | $272,587 | $142,297 | $116,612 | $258,152 | $287,720 | $157,289 | $156,649 | $355,411 | $355,782 | $356,554 | $395,117 | $264,992 | $360,830 | $265,307 | $362,564 | $322,541 |

**Exhibit 3a**
**Economic Damages assuming Ms. Snider Remain Incarcerated or Under State Case for 8 Years**

| Description | Assumptions | Ref | 2018 | 2019 | 2020 | 2021 | 2022 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 11/17/79 | | 40.1 | 41.1 | 42.1 | 43.1 | 44.1 | 48.1 | 49.1 | 50.1 | 51.1 | 52.1 | 53.1 | 54.1 | 55.1 | 56.1 | 57.1 | 58.1 | 59.1 | 60.1 | |
| Inflation | | kth. 4 | | | | | 2.50% | 1.50% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% | 2.20% |

**Key Dates**

| Description | Assumptions | Ref | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Death | | | 03/23/19 | | | | | | | | | | | | | | | | | | |
| Date of Release from State Case | 8 Years | | | | | | | | 03/23/27 | | | | | | | | | | | | |
| Life Expectancy | | | | | | | | | | | | | | | | | | | | | |

**Loss of Earnings**

| Description | Assumptions | Ref | 2018 | 2019 | 2020 | 2021 | 2022 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *Tribal Distributions* | | | | | | | | | | | | | | | | | | | | | |
| Out-For | Inflation | Exh. 6 | $205,047 | $270,703 | $254,290 | $203,480 | $292,279 | $259,520 | $256,220 | $264,409 | $270,711 | $277,100 | $283,533 | $290,330 | $297,165 | $304,139 | $311,270 | $316,726 | $326,248 | $283,946 | $341,825 |

| Total | | | $201,677 | $261,954 | $270,175 | $307,830 | $373,157 | $142,207 | $116,512 | $256,191 | $215,700 | $181,046 | $169,709 | $169,489 | $192,221 | $158,984 | $159,683 | $168,412 | $156,147 | $157,492 | $157,612 |

[1] Michael R. Ruble, Robert T. Patton, and David M. Nelson, 2018, Patton-Nelson Personal Consumption Tables 2016-17, Journal of Legal Economics 25(1-2): pp. 75-89, Table 3b, (2016-17) Incremental Consumption Cost Percentage – Females.

| Description | Assumptions | Ref | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 | 2053 | 2054 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 1/3/1979 | | 61.3 | 62.1 | 63.1 | 64.1 | 65.1 | 66.1 | 67.1 | 68.1 | 69.1 | 70.1 | 71.1 | 72.1 | 73.1 | 74.1 | 75.1 | |
| Initiation | | Exh. X | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | 3.38% | |

*(Remaining spreadsheet rows — Key Dates, Loss of Earnings, Total Distributions, Deductions, Subtotal, Discount — contain numeric values that are illegible at this resolution.)*

**Exhibit 3b**
Economic Damages assuming Mrs. Snider Remain Incarcerated or Under State Care for 4.5 Years

| Description | Assumptions | Ref | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 11/07/79 | | 39.1 | 40.1 | 41.1 | 42.1 | 44.1 | 44.7 | 45.1 | 46.1 | 47.1 | 48.1 | 49.1 | 50.1 | 51.1 | 52.1 | 53.1 | 54.1 | 55.1 | 56.1 | 57.1 | 58.1 | 59.1 |
| Inflation | | Exh. 4 | | | | | | 2.60% | 2.92% | 2.30% | 2.30% | 2.30% | 2.30% | 2.29% | 2.30% | 2.30% | 2.30% | 2.30% | 2.30% | 2.30% | 2.30% | 2.30% | 2.31% |
| **Key Dates** | | | | | | | | | | | | | | | | | | | | | | | |
| Date of Death | | | 09/29/19 | | | | | | | | | | | | | | | | | | | | |
| Date of Release from State Care | 4.5 Years | | | | | | 09/2023 | | | | | | | | | | | | | | | | |
| Life Expectancy | | | | | | | | | | | | | | | | | | | | | | | |
| **Loss of Earnings** | | | | | | | | | | | | | | | | | | | | | | | |
| *Tribal Distributions* | | | | | | | | | | | | | | | | | | | | | | | |
| But-For | Inflation | Exh. 5 | $226,847 | $232,702 | $254,260 | $223,400 | $252,216 | $251,922 | $205,923 | $264,450 | $270,711 | $277,100 | $283,520 | $290,333 | $297,165 | $304,995 | $311,376 | $318,726 | $328,245 | $332,546 | $341,829 | $349,209 | $356,155 | $369,608 |
| Actual Income | | | (52,062) | | | | | | | | | | | | | | | | | | | | |
| Fraction of Year | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.54 | 0.45 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Total But-for income | | | $196,764 | $232,703 | $254,269 | $223,400 | $252,218 | $136,257 | $119,204 | $264,455 | $270,711 | $277,196 | $283,522 | $290,333 | $297,165 | $304,996 | $311,376 | $318,726 | $328,245 | $332,546 | $341,829 | $349,305 | $356,153 | $369,608 |
| *Deductions* | | | | | | | | | | | | | | | | | | | | | | | |
| Personal Consumption | 37.00% | [1] | (54,196) | (65,874) | (94,173) | (84,422) | (95,517) | (52,726) | (45,624) | (97,492) | (100,191) | (102,446) | (104,742) | (107,284) | (109,852) | (112,472) | (115,144) | (117,972) | (120,911) | (123,142) | (126,677) | (129,242) | (132,208) | (137,629) |
| Fraction of Year | | | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Adjusted for Incarceration | 4.5 Years | | $0 | $0 | $0 | $0 | (108,778) | (95,057) | (93,049) | (131,052) | (134,477) | (137,249) | (140,224) | (143,610) | (147,096) | (152,576) | (156,044) | (160,232) | (163,729) | (167,372) | (171,217) | (175,111) | (175,609) | (196,098) |
| Child Support | Inflation | Exh. 7 | (52,439) | (49,173) | (54,606) | (56,133) | (47,013) | | | | | | | | | | | | | | | | |
| Subtotal | | | (54,585) | (98,344) | (154,764) | (159,703) | (102,114) | (52,726) | (45,624) | (131,052) | (134,477) | (137,249) | (140,224) | (143,610) | (147,096) | (152,576) | (156,044) | (160,232) | (163,729) | (167,372) | (171,217) | (175,111) | (175,609) | (196,098) |
| **Loss of Earnings** | | | $144,125 | $137,366 | $227,391 | $157,467 | $214,834 | $96,308 | $74,147 | $164,656 | $168,983 | $172,956 | $176,404 | $180,687 | $184,849 | $180,213 | $193,677 | $190,346 | $203,926 | $207,715 | $210,418 | $217,626 | $222,771 | $233,523 |
| **Interest** | | | | | | | | | | | | | | | | | | | | | | | |
| Period Start | | | 03/23/19 | 01/01/20 | 01/01/21 | 01/01/22 | 01/01/23 | 01/01/24 | | | | | | | | | | | | | | | |
| Period End | | | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 | 12/31/23 | 07/14/24 | | | | | | | | | | | | | | | |
| Midpoint | | | 08/11/19 | 07/01/20 | 07/01/21 | 07/02/22 | 07/02/23 | 04/07/24 | | | | | | | | | | | | | | | |
| Trial Date | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | | | | | | | | | | | | | | | |
| Periods | | | 4.92 | 4.03 | 3.03 | 2.03 | 1.03 | 0.27 | | | | | | | | | | | | | | | |
| Interest Rate | | | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | | | | | | | | | | | | | | | |
| Interest | | | $71,362 | $75,826 | $82,892 | $46,156 | $33,277 | $2,591 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Discount** | | | | | | | | | | | | | | | | | | | | | | | |
| Period Start | | | | | | | | 07/15/24 | 01/01/26 | 01/01/27 | 01/01/28 | 01/01/29 | 01/01/30 | 01/01/31 | 01/01/32 | 01/01/33 | 01/01/34 | 01/01/35 | 01/01/36 | 01/01/37 | 01/01/38 | 01/01/39 |
| Period End | | | | | | | | 12/31/24 | 12/31/25 | 12/31/26 | 12/31/27 | 12/31/28 | 12/31/29 | 12/31/30 | 12/31/31 | 12/31/32 | 12/31/33 | 12/31/34 | 12/31/35 | 12/31/36 | 12/31/37 | 12/31/38 | 12/31/39 |
| Midpoint | | | | | | | | 10/07/24 | 07/02/25 | 07/02/26 | 07/02/27 | 07/02/28 | 07/02/29 | 07/02/30 | 07/02/31 | 06/01/32 | 07/02/33 | 07/02/34 | 07/02/35 | 07/02/36 | 07/02/37 | 07/02/38 | 07/02/39 |
| Trial Date | | | | | | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 |
| Periods | | | | | | | | 0.23 | 0.97 | 1.97 | 2.97 | 3.97 | 4.97 | 5.97 | 6.97 | 7.89 | 8.97 | 9.97 | 10.97 | 11.97 | 12.97 | 13.97 | 14.97 |
| Discount Rate | | Exh. 8 | | | | | | 2.52% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% |
| Discount Factor | | | | | | | | 0.99 | 0.98 | 0.95 | 0.93 | 0.91 | 0.89 | 0.86 | 0.84 | 0.82 | 0.80 | 0.78 | 0.76 | 0.74 | 0.72 | 0.71 | 0.69 |
| Discount | | | N/A | N/A | N/A | N/A | N/A | 806 | (4,322) | (11,109) | (15,199) | (18,472) | (15,342) | (19,245) | (22,227) | (24,567) | (24,924) | (30,024) | (33,473) | (36,749) | (39,690) | (42,939) | (51,459) |
| **Total** | | | $215,377 | $252,254 | $270,172 | $237,558 | $245,031 | $88,005 | $71,314 | $160,370 | $164,302 | $160,834 | $159,769 | $163,466 | $163,221 | $163,634 | $168,035 | $160,452 | $158,147 | $157,892 | $157,515 | $157,596 | $150,918 |

[1] Mahlord M. Ruble, Robert T. Patton, and David M. Nelson, 2019, Patton-Nelson Personal Consumption Tables 2016–17, Journal of Legal Economics 25(1-2); pp. 75–80, Table 2a. (2015-17) Incremental Consumption Cost Percentage = Females.

| Description | Assumptions | Ref | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 | 2053 | 2054 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 11/17/79 | | 61.1 | 62.1 | 63.1 | 64.1 | 65.1 | 66.1 | 67.1 | 68.1 | 69.1 | 70.1 | 71.1 | 72.1 | 73.1 | 74.1 | 75.1 | |
| Inflation | | Exh. 6 | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | |
| **Key Dates** | | | | | | | | | | | | | | | | | | |
| Date of Death | | | | | | | | | | | | | | | | | | |
| Date of Release from Shim Case | 4.5 Years | | | | | | | | | | | | | | | | | |
| Life Expectancy | | | | | | | | | | | | | | | | | | 10/24/54 |
| **Loss of Earnings** | | | | | | | | | | | | | | | | | | |
| Tribal Distributions | | | | | | | | | | | | | | | | | | |
| Bulk-For | Inflation | Exh. 6 | $375,250 | $384,114 | $393,179 | $402,459 | $411,956 | $421,678 | $431,620 | $441,816 | $452,243 | $462,910 | $472,841 | $483,024 | $493,470 | $504,197 | $526,190 | $12,031,643 |
| Actual Income | | | | | | | | | | | | | | | | | | |
| Fraction of Year | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.82 | |
| Total Bulk-for Income | | | $375,250 | $384,114 | $393,179 | $402,459 | $411,956 | $421,678 | $431,620 | $441,816 | $452,243 | $462,910 | $472,841 | $483,024 | $493,470 | $504,197 | $425,146 | $12,445,599 |
| Deductions | | | | | | | | | | | | | | | | | | |
| Personal Consumption | 37.60% | [1] | | | | | | | | | | | | | | | | |
| Fraction of Year | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | |
| Adjusted for Consumption | 4.5 Years | | | | | | | | | | | | | | | | | |
| Child Support | Inflation | Exh. 7 | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | |
| Loss of Earnings | | | $233,410 | $238,913 | $244,357 | $250,328 | $256,237 | $262,284 | $268,474 | $274,810 | $281,336 | $287,914 | $294,738 | $301,635 | $308,906 | $316,023 | $266,328 | $6,134,651 |
| **Interest** | | | | | | | | | | | | | | | | | | |
| Period Start | | | | | | | | | | | | | | | | | | |
| Period End | | | | | | | | | | | | | | | | | | |
| Midpoint | | | | | | | | | | | | | | | | | | |
| Trial Date | | | | | | | | | | | | | | | | | | |
| Period | | | | | | | | | | | | | | | | | | |
| Interest Rate | | | | | | | | | | | | | | | | | | |
| Interest | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $275,497 |
| **Discount** | | | | | | | | | | | | | | | | | | |
| Period Start | | | 01/01/40 | 01/01/41 | 01/01/42 | 01/01/43 | 01/01/44 | 01/01/45 | 01/01/46 | 01/01/47 | 01/01/48 | 01/01/49 | 01/01/50 | 01/01/51 | 01/01/52 | 01/01/53 | 01/01/54 | |
| Period End | | | 12/31/40 | 12/31/41 | 12/31/42 | 12/31/43 | 12/31/44 | 12/31/45 | 12/31/46 | 12/31/47 | 12/31/48 | 12/31/49 | 12/31/50 | 12/31/51 | 12/31/52 | 12/31/53 | 10/18/54 | |
| Midpoint | | | 07/01/40 | 07/02/41 | 07/02/42 | 07/02/43 | 07/02/44 | 07/02/45 | 07/02/46 | 07/02/47 | 07/02/48 | 07/02/49 | 07/02/50 | 07/02/51 | 07/01/52 | 07/02/53 | 05/31/54 | |
| Trial Date | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | |
| Period | | | 15.97 | 16.97 | 17.97 | 18.97 | 19.97 | 20.97 | 21.97 | 22.97 | 23.97 | 24.97 | 25.97 | 26.97 | 27.97 | 28.97 | 29.88 | |
| Discount Rate | | Exh. 8 | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.52% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | |
| Discount Factor | | | 0.67 | 0.65 | 0.64 | 0.62 | 0.61 | 0.59 | 0.58 | 0.56 | 0.55 | 0.54 | 0.52 | 0.51 | 0.50 | 0.48 | 0.47 | |
| Discount | | | | | | | | | | | | | | | | | | |
| **Total** | | | $156,550 | $156,303 | $156,021 | $155,740 | $155,404 | $155,225 | $154,969 | $154,710 | $154,446 | $154,182 | $153,924 | $153,606 | $153,404 | $153,143 | $120,402 | $2,248,350 |

[1] Michael R. Rubin, Robert T. Patton, and David M. Nelson, 2049, Patton-Nelson Fares.

Exhibit 4
Economic Damages assuming Mr. Solder Does Not Remain Incarcerated or Under State Care

| Description | Assumptions | Ref | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 12/17/73 | | 39.1 | 41.1 | 42.1 | 43.1 | 44.1 | 44.7 | 45.1 | 46.1 | 47.1 | 48.1 | 49.1 | 50.1 | 51.1 | 52.1 | 53.1 | 54.1 | 55.1 | 56.1 | 57.1 | 58.1 | 59.1 |
| Inflation | | Exh. 5 | | | | | | 2.59% | 2.90% | 3.30% | 3.25% | 2.36% | 2.30% | 2.30% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.36% | 2.35% |
| **Key Dates** | | | | | | | | | | | | | | | | | | | | | | | |
| Date of Death | | | 03/23/15 | | | | | | | | | | | | | | | | | | | | |
| Life Expectancy | | | | | | | | | | | | | | | | | | | | | | | |
| **Loss of Earnings** | | | | | | | | | | | | | | | | | | | | | | | |
| *Total Distributions* | | | | | | | | | | | | | | | | | | | | | | | |
| Solder | Inflation | Exh. 6 | $258,647 | $332,703 | $254,268 | $223,490 | $252,316 | $368,523 | $256,725 | $264,460 | $270,711 | $277,109 | $283,629 | $290,339 | $257,185 | $304,100 | $311,278 | $318,248 | $333,845 | $341,828 | $348,908 | $358,153 | $366,508 |
| Actual Income | | | (77,592) | | | | | | | | | | | | | | | | | | | | |
| Fraction of Year | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.54 | 0.49 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 |
| Total Solder Income | | | $181,056 | $332,703 | $284,268 | $221,490 | $252,316 | $198,697 | $119,208 | $264,460 | $270,711 | $277,109 | $283,629 | $290,333 | $297,185 | $304,100 | $311,278 | $328,248 | $333,848 | $341,828 | $349,538 | $358,153 | $366,608 |
| **Deductions** | | | | | | | | | | | | | | | | | | | | | | | |
| Personal Consumption | 37.00% | [1] | | | | | | | | | | | | | | | | | | | | | |
| Child Support | Inflation | Exh. 7 | | | | | | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | | | | | | |
| Loss of Earnings | | | $77,780 | $89,494 | $111,181 | $132,987 | $151,203 | $84,569 | $74,147 | $164,530 | $168,381 | $172,958 | $176,424 | $180,247 | $184,241 | $188,212 | $193,577 | $197,340 | $232,915 | $237,715 | $210,688 | $237,050 | $238,023 |
| **Interest** | | | | | | | | | | | | | | | | | | | | | | | |
| Period Start | | | 03/23/19 | 01/01/20 | 01/01/21 | 01/01/22 | 01/01/23 | 01/01/24 | | | | | | | | | | | | | | | |
| Period End | | | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 | 12/31/23 | 07/14/24 | | | | | | | | | | | | | | | |
| Midpoint | | | 08/11/19 | 07/01/20 | 07/01/21 | 07/02/22 | 07/02/23 | 04/07/24 | | | | | | | | | | | | | | | |
| Trial Date | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | | | | | | | | | | | | | | | |
| Periods | | | 4.92 | 4.03 | 3.03 | 2.03 | 1.03 | 0.27 | | | | | | | | | | | | | | | |
| Interest Rate | | | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | 10.00% | | | | | | | | | | | | | | | |
| Interest | | | $28,382 | $40,102 | $39,737 | $33,976 | $15,558 | $2,381 | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A |
| **Discount** | | | | | | | | | | | | | | | | | | | | | | | |
| Period Start | | | | | | | | | 07/14/24 | 01/01/25 | 01/01/26 | 01/01/27 | 01/01/28 | 01/01/29 | 01/01/30 | 01/01/31 | 01/01/32 | 01/01/33 | 01/01/34 | 01/01/35 | 01/01/36 | 01/01/37 | 01/01/38 | 01/01/39 |
| Period End | | | | | | | | | 12/31/24 | 12/31/25 | 12/31/26 | 12/31/27 | 12/31/28 | 12/31/29 | 12/31/30 | 12/31/31 | 12/31/32 | 12/31/33 | 12/31/34 | 12/31/35 | 12/31/36 | 12/31/37 | 12/31/38 | 12/31/39 |
| Midpoint | | | | | | | | | 10/07/24 | 07/02/25 | 07/02/26 | 07/02/27 | 07/01/28 | 07/02/29 | 07/02/30 | 07/02/31 | 07/01/32 | 07/02/33 | 07/02/34 | 07/02/35 | 07/02/36 | 07/02/37 | 07/02/38 | 07/02/39 |
| Trial Date | | | | | | | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 |
| Periods | | | | | | | | | 0.23 | 0.97 | 1.97 | 2.97 | 3.97 | 4.97 | 5.97 | 6.97 | 7.97 | 8.97 | 9.97 | 10.97 | 11.97 | 12.97 | 13.97 | 14.97 |
| Discount Rate | | Exh. 8 | | | | | | | 2.53% | 2.53% | 2.57% | 2.53% | 2.57% | 2.53% | 2.51% | 2.52% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% |
| Discount Factor | | | | | | | | | 0.99 | 0.98 | 0.95 | 0.93 | 0.91 | 0.88 | 0.86 | 0.84 | 0.82 | 0.80 | 0.76 | 0.76 | 0.74 | 0.72 | 0.71 | 0.69 |
| Discount | | | N/A | N/A | N/A | N/A | N/A | N/A | | | | | | | | | | | | | | | |
| **Total** | | | $195,991 | $133,596 | $144,998 | $127,325 | $166,962 | $89,860 | $72,714 | $159,976 | $164,363 | $162,604 | $168,769 | $159,489 | $153,235 | $158,954 | $188,693 | $159,412 | $192,147 | $197,693 | $197,653 | $197,244 | $157,236 | $158,519 |

[1] Michael R. Pable, Robert T. Platen, and David M. Nelson, 2019. Platen-Nelson Personal Consumption Tables 2016-17, Journal of Legal Economics 25(1-2), pp. 75-89, Table 3b, (2016-17) Incremental Consumption Cost Percentage — Females.

| Distribution | Assumptions | Ref | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 | 2051 | 2052 | 2053 | 2054 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DOB/Age | 11/7/72 | | 61.1 | 62.1 | 63.1 | 64.1 | 65.1 | 66.1 | 67.1 | 68.1 | 69.1 | 70.1 | 71.1 | 72.1 | 73.1 | 74.1 | 75.1 | |
| Inflation | | Exh. 6 | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | 2.06% | |
| **Key Dates** | | | | | | | | | | | | | | | | | | |
| Date of Death | | | | | | | | | | | | | | | | | | |
| Life Expectancy | | | | | | | | | | | | | | | | | 10/25/64 | |
| **Loss of Earnings** | | | | | | | | | | | | | | | | | | |
| Initial Distribution | | | | | | | | | | | | | | | | | | |
| Base-Yr | Inflation | Exh. 5 | $375,258 | $384,114 | $393,179 | $402,458 | $411,950 | $421,678 | $431,630 | $441,816 | $452,243 | $462,916 | $473,841 | $485,024 | $496,470 | $508,187 | $520,181 | $13,351,943 |
| Actual Income | | | | | | | | | | | | | | | | | | |
| Fraction of Year | | | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 1.00 | 0.83 | |
| Total Base-Yr Income | | | $375,258 | $384,114 | $393,179 | $402,458 | $411,950 | $421,678 | $431,630 | $441,816 | $452,243 | $462,916 | $473,841 | $485,024 | $496,470 | $508,187 | $430,146 | $13,065,895 |
| **Deductions** | | | | | | | | | | | | | | | | | | |
| Personal Consumption | 37.60% | [1] | | | | | | | | | | | | | | | | |
| Child Support | Inflation | Exh. 7 | | | | | | | | | | | | | | | | |
| Subtotal | | | | | | | | | | | | | | | | | | |
| Loss of Earnings | | | $233,410 | $238,919 | $244,567 | $250,293 | $256,237 | $262,304 | $268,474 | $274,810 | $281,326 | $287,934 | $294,730 | $301,595 | $308,854 | $316,692 | $268,250 | $7,713,407 |
| **Interest** | | | | | | | | | | | | | | | | | | |
| Period Start | | | | | | | | | | | | | | | | | | |
| Period End | | | | | | | | | | | | | | | | | | |
| Midpoint | | | | | | | | | | | | | | | | | | |
| Trial Date | | | | | | | | | | | | | | | | | | |
| Periods | | | | | | | | | | | | | | | | | | |
| Interest Rate | | | | | | | | | | | | | | | | | | |
| Interest | | | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | N/A | $153,076 |
| **Discount** | | | | | | | | | | | | | | | | | | |
| Period Start | | | 01/01/40 | 01/01/41 | 01/01/42 | 01/01/43 | 01/01/44 | 01/01/45 | 01/01/46 | 01/01/47 | 01/01/48 | 01/01/49 | 01/01/50 | 01/01/51 | 01/01/52 | 01/01/53 | 01/01/54 | |
| Period End | | | 12/31/40 | 12/31/41 | 12/31/42 | 12/31/43 | 12/31/44 | 12/31/45 | 12/31/46 | 12/31/47 | 12/31/48 | 12/31/49 | 12/31/50 | 12/31/51 | 12/31/52 | 12/31/53 | 10/25/54 | |
| Midpoint | | | 07/02/40 | 07/02/41 | 07/02/42 | 07/02/43 | 07/01/44 | 07/02/45 | 07/02/46 | 07/02/47 | 07/01/48 | 07/02/49 | 07/02/50 | 07/02/51 | 07/01/52 | 07/02/53 | 05/31/54 | |
| Trial Date | | | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | 07/14/24 | |
| Periods | | | 15.97 | 16.97 | 17.97 | 18.97 | 19.97 | 20.97 | 21.97 | 22.97 | 23.97 | 24.97 | 25.97 | 26.97 | 27.97 | 28.97 | 29.88 | |
| Discount Rate | | Exh. 9 | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | 2.53% | |
| Discount Factor | | | 0.67 | 0.65 | 0.64 | 0.63 | 0.61 | 0.59 | 0.58 | 0.56 | 0.55 | 0.54 | 0.52 | 0.51 | 0.50 | 0.48 | 0.47 | |
| Discount | | | | | | | | | | | | | | | | | | |
| **Total** | | | $156,692 | $156,293 | $155,821 | $153,703 | $155,484 | $155,229 | $155,949 | $154,710 | $154,446 | $154,183 | $153,924 | $152,664 | $153,494 | $153,543 | $136,407 | $5,340,118 |

[1] Michael R. Ruble, Robert T. Patton, and David M. Nelson, 2019. Patton-Nelson-Patton.

| Exhibit 5 Ms. Snider's Historical Income | | | | |
|---|---|---|---|---|
| Year | Tribal Distributions | Growth | | Other 1099 Income |
| 2010 | $271,588 | - | | |
| 2011 | $263,748 | -2.89% | | $12,305 |
| 2012 | $259,421 | -1.64% | | $18,030 |
| 2013 | $253,429 | -2.31% | | $2,000 |
| 2014 | $248,090 | -2.11% | | $10,863 |
| 2015 | $262,731 | 5.90% | | |
| 2016 | $257,203 | -2.10% | | |
| 2017 | $228,043 | -11.34% | | |
| 2018 | $267,371 | 17.25% | | |
| 2019* | $256,847 | -3.94% | [1] | |
| 2020 | $232,703 | -9.40% | [2] | |
| 2021 | $254,260 | 9.26% | [3] | |
| 2022 | $223,400 | -12.14% | [3] | |
| | | | | |
| Average (2010 - 2022) | $252,218 | | | $10,799 |
| | | | | |
| [1] Average of 2010 - 2018. | | | | |
| [2] Assumed 9.4% decline due to COVID. See Govdysh, Alexander. Industry Report 71329, Lotteries & Native American Casinos in the US. IBISWorld. March 2023 at p. 39. | | | | |
| [3] Equal to distributions received by Denise Sawyer in 2021 and 2022 per her IRS Form 1040's. | | | | |
| | | | | |
| Source: DMLM002074 - 83; Form 1099-MISC from Mary Phelps. | | | | |

| | | | | | | | Exhibit 6 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Historical and Projected Inflation | | | | | | | |
| | | | | | | CPI-U 12-Month Percent Change | | | | | | | | |
| Year | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | HALF1 | HALF2 |
| 2013 | 1.90% | 2.00% | 1.90% | 1.70% | 1.70% | 1.60% | 1.70% | 1.80% | 1.70% | 1.70% | 1.70% | 1.70% | 1.80% | 1.70% |
| 2014 | 1.60% | 1.60% | 1.70% | 1.80% | 2.00% | 1.90% | 1.90% | 1.70% | 1.70% | 1.80% | 1.70% | 1.60% | 1.80% | 1.70% |
| 2015 | 1.60% | 1.70% | 1.80% | 1.80% | 1.70% | 1.80% | 1.80% | 1.80% | 1.90% | 1.90% | 2.00% | 2.10% | 1.70% | 1.90% |
| 2016 | 2.20% | 2.30% | 2.20% | 2.10% | 2.20% | 2.20% | 2.20% | 2.30% | 2.20% | 2.10% | 2.10% | 2.20% | 2.20% | 2.20% |
| 2017 | 2.30% | 2.20% | 2.00% | 1.90% | 1.70% | 1.70% | 1.70% | 1.70% | 1.70% | 1.80% | 1.70% | 1.80% | 2.00% | 1.70% |
| 2018 | 1.80% | 1.80% | 2.10% | 2.10% | 2.20% | 2.30% | 2.40% | 2.20% | 2.20% | 2.10% | 2.20% | 2.20% | 2.10% | 2.20% |
| 2019 | 2.20% | 2.10% | 2.00% | 2.10% | 2.00% | 2.10% | 2.20% | 2.40% | 2.40% | 2.30% | 2.30% | 2.30% | 2.10% | 2.30% |
| 2020 | 2.30% | 2.40% | 2.10% | 1.40% | 1.20% | 1.20% | 1.60% | 1.70% | 1.70% | 1.60% | 1.60% | 1.60% | 1.80% | 1.60% |
| 2021 | 1.40% | 1.30% | 1.60% | 3.00% | 3.80% | 4.50% | 4.30% | 4.00% | 4.00% | 4.60% | 4.90% | 5.50% | 2.60% | 4.50% |
| 2022 | 6.00% | 6.40% | 6.50% | 6.20% | 6.00% | 5.90% | 5.90% | 6.30% | 6.60% | 6.30% | 6.00% | 5.70% | 6.20% | 6.10% |
| 2023 | 5.60% | 5.50% | 5.60% | 5.50% | 5.30% | | | | | | | | | |
| 2016 - 2019 | | | | | | | | | | | | 6.43% | | |
| Projections | | | | | | | | | | | | | | |
| 2024 | | | | | | | | | | | | 2.50% | | |
| 2025 | | | | | | | | | | | | 2.30% | | |
| 2023 - 2032 | | | | | | | | | | | | 2.36% | | |

Source: Bureau of Labor and Statistics, CPI for All Urban Consumers (CPI-U) 12-Month Percent Change; Philadelphia Federal Reserve Second Quarter 2023 Survey of Professional Forecasters, May 12, 2023.

**Exhibit 7**
**Child Support Payments**

| | DOB | Date at Age 18 + 1 Month | Monthly Amt | Annual Amt | 2019 [1] | 2020 | 2021 | 2022 | 2023 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Inflation | | | | | 6.43% | 1.70% | 3.60% | 6.20% | 5.50% | |
| | | | | | | | | | | |
| Liza | 01/28/04 | 03/01/22 | $2,000 | $24,000 | $25,544 | $25,978 | $26,913 | $28,582 | N/A | |
| | | | | Fraction of Year | 0.78 | 1.00 | 1.00 | 0.16 | | |
| | | | | | $19,805 | $25,907 | $26,840 | $4,620 | | $77,172 |
| | | | | | | | | | | |
| Drea | 02/25/05 | 04/01/23 | $1,500 | $18,000 | $19,158 | $19,484 | $20,185 | $21,436 | $22,615 | |
| | | | | Fraction of Year | 0.78 | 1.00 | 1.00 | 1.00 | 0.25 | |
| | | | | | $14,654 | $19,430 | $20,130 | $21,378 | $5,576 | $81,368 |
| | | | | | | | | | | |
| Total | | | | $42,000 | $34,659 | $45,337 | $46,969 | $25,998 | $5,576 | $158,540 |
| | | | | | | | | | | |
| [1] Inflation calculated as change in CPI-U from December 2016 to December 2019 per Philadelphia Federal Reserve. | | | | | | | | | | |

| Exhibit 8 Discount Rate Calculation | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Average U.S. Treasury Constant Maturity Rates | | | | | | | |
| Year | 1 YR | 3 YR | 5 YR | 7 YR | 10 YR | 20 YR | 30 YR | Avg. |
| 2006 | 4.94% | 4.77% | 4.75% | 4.76% | 4.80% | 5.00% | 4.88% | 4.84% |
| 2007 | 4.53% | 4.35% | 4.43% | 4.51% | 4.63% | 4.91% | 4.84% | 4.60% |
| 2008 | 1.83% | 2.24% | 2.80% | 3.17% | 3.66% | 4.36% | 4.28% | 3.19% |
| 2009 | 0.47% | 1.43% | 2.20% | 2.82% | 3.26% | 4.11% | 4.08% | 2.62% |
| 2010 | (.32% | 1.11% | 1.93% | 2.62% | 3.22% | 4.03% | 4.25% | 2.50% |
| 2011 | 0.18% | 0.75% | 1.52% | 2.16% | 2.78% | 3.62% | 3.91% | 2.13% |
| 2012 | 0.17% | 0.38% | 0.76% | 1.22% | 1.80% | 2.54% | 2.92% | 1.40% |
| 2013 | 0.13% | 0.54% | 1.17% | 1.74% | 2.35% | 3.12% | 3.45% | 1.79% |
| 2014 | 0.12% | 0.90% | 1.64% | 2.14% | 2.54% | 3.07% | 3.34% | 1.97% |
| 2015 | 0.32% | 1.02% | 1.53% | 1.89% | 2.14% | 2.55% | 2.84% | 1.76% |
| 2016 | 0.61% | 1.00% | 1.33% | 1.63% | 1.84% | 2.22% | 2.59% | 1.61% |
| 2017 | 1.20% | 1.58% | 1.91% | 2.16% | 2.33% | 2.65% | 2.89% | 2.10% |
| 2018 | 2.33% | 2.63% | 2.75% | 2.85% | 2.91% | 3.02% | 3.11% | 2.80% |
| 2019 | 2.05% | 1.94% | 1.95% | 2.05% | 2.14% | 2.40% | 2.58% | 2.16% |
| 2020 | 0.37% | 0.42% | 0.53% | 0.72% | 0.89% | 1.35% | 1.56% | 0.83% |
| 2021 | 0.10% | 0.46% | 0.86% | 1.20% | 1.45% | 1.98% | 2.06% | 1.16% |
| 2022 | 2.80% | 3.05% | 3.00% | 3.01% | 2.95% | 3.30% | 3.11% | 3.03% |
| 2023 | 4.82% | 3.99% | 3.73% | 3.68% | 3.61% | 3.91% | 3.77% | 3.93% |
| Avg. 2006 - 2019 | | | | | | | | 2.53% [1] |

Notes:
[1] Discount Rate is the average of the annual 1 Year, 3 Year, 5 Year 7 Year, 10 Year, 20 Year, and 30 Year Treasury Rates for 2006-2019.
Source: US Federal Reserve Website, H15. Selected Interest Rates:
https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15.

## PROOF OF SERVICE

I am a citizen of the United States and employed in Fresno County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is Wanger Jones Helsley PC, 265 E. River Park Circle, Suite 310, Fresno, CA 93720.

On the date indicated below, I served the following documents described as:

- **PLAINTIFFS' EXPERT WITNESS DESIGNATION; DECLARATION OF JAY A. CHRISTOFFERSON**

on all interested parties as follows:

__X__    (ELECTRONIC MAIL)  I caused such document to be scanned into PDF format and sent via electronic mail to the electronic mail address(es) of the addressee(s) designated.

____    (BY CM/ECF)   Upon the filing of the foregoing document with the Clerk of the Court using the CM/ECF system, a notification of such filing (NEF) will be transmitted to the following:

| | |
|---|---|
| Peter G. Bertling<br>Jemma A. Parker Saunders<br>Bertling Law Group<br>15 W. Carrillo Street<br>Santa Barbara, CA 93101<br>peter@bertlinglawgroup.com<br>jemma@bertlinglawgroup.com<br>cyndi@bertlinglawgroup.com<br>stephanie@bertlinglawgroup.com<br><br>**Attorneys for Wellpath, L.L.C., California Forensic Medical Group, Inc., Amanpreet Atwal, Alicia Dunwoody, Gianfranco Burdi, Keriann Quinn-Fitzpatrick, Dylan Fulcher, Shawn Autrey, Pao Chang, Jessica Ramirez-Aguilar, Jamie Burns, and Thanya Ryland** | Jerome M. Varanini<br>The Law Offices of Jerome M. Varanini<br>641 Fulton Avenue, Suite 200<br>Sacramento, CA 95825<br>jvaranini@tsvlaw.com<br><br>**Attorneys for County of Merced and Adrian Kifan [erroneously sued as C.O. Castaneda]** |

__X__    (FEDERAL)   I declare that I am employed in the office of a member of the bar of this court at whose direction this service was made.  Executed on June 26, 2023, at Fresno, California.

*Dena Richardson*

Dena Richardson

**Exhibit B**

Deposition of

**Gianfranco Burdi**

March 03, 2022

D.M. and L.M.

vs.

County of Merced



www.aptusCR.com | 866.999.8310

Gianfranco Burdi

1      A.   No.

2      Q.   Okay.  Do you know when new patients that need

3  mental health care are entering into Merced County Jail?

4      A.   No.

5      Q.   Okay.  So someone else schedules patients for

6  you to see; is that correct?

7      A.   Yes.

8      Q.   Okay.  And are you ever -- or do you ever serve

9  on an on-call or emergency basis for CFMG?

10      A.   I've been on-call for many times.

11      Q.   Okay.  Do you currently still do that?

12      A.   I have not been called in probably at least

13  since the COVID started, but until then I was called

14  regularly -- regularly -- whenever there was a need.

15      Q.   Okay.  So what were the types of situations that

16  you would be called for where there would be a need to

17  call you on an on-call basis?

18      A.   The on-call physician is called basically to

19  verify that the patient -- the inmate is incarcerated and

20  he's on medications and that medication need to be

21  approved.  So that would be the nature of the being

22  on-call, not -- not for any other reason.

23      Q.   So the only reason that you would be called is

24  if a patient was on a medication and they needed --

25  somebody at the jail needed authorization before they

Gianfranco Burdi

1    continued that medication?

2        A.    That that has been my -- my -- my on-call work.

3    It could happen that the patient comes in and is

4    psychotic so they might call the on-call physician and

5    say, well, this person is psychotic, can we prescribe,

6    what do you think?

7        Q.    Okay.  And so are there medications that you are

8    understanding is the jail staff or the CFMG staff can

9    continue prescribe them without consulting you first?

10       A.    Well, I'm not sure.  I don't know if there is a

11   specific protocol.  I know for sure that certain things

12   would never be continued, such as opioids,

13   benzodiazepines without -- without the approval of a

14   physician.  But things like Prozac that the patient has

15   been on or Zoloft or Celexa certainly would be continued,

16   you know, no questions.

17       Q.    So in this case, understanding that Rene had

18   previously been taking both Prozac and Dilaudid, you

19   would expect the CFMG staff to continue her on Prozac but

20   not continue her on Dilaudid without talking to you; is

21   that fair?

22             MR. BERTLING:  Lack foundation.  Well, go ahead

23   and answer the question, Doctor.

24             THE WITNESS:  I would expect that the Prozac

25   would be continued but certainly not the Dilaudid because

Gianfranco Burdi

```
 1    STATE OF CALIFORNIA        )
                                 )      ss
 2    COUNTY OF FRESNO           )

 3

 4         I, Rachel Fernandez, CSR No. 13070, a Certified

 5    Shorthand Reporter in and for the County of Fresno, State

 6    of California, do hereby certify:

 7         That prior to being examined,the witness named in

 8    the foregoing deposition was, by me, duly sworn via video

 9    conference to testify the truth, the whole truth, and

10    nothing but the truth.

11         That said deposition was held via video conference

12    at the time and place set forth in the deposition notice

13    and was taken down by me in shorthand and thereafter

14    reduced to computerized transcription under my direction

15    and supervision, and I hereby certify the foregoing

16    deposition is a full, true, and correct transcript of my

17    shorthand notes as taken.

18         I further certify that I am neither counsel for nor

19    related to any party to said action, nor in any way

20    interest in the outcome thereof.

21         IN WITNESS WHEREOF, I have hereunto subscribed my

22    name this 23rd day of March, 2022.

23

24    _____

          Rachel Fernandez
25        Certified Shorthand Reporter No, 13070
```

**Exhibit C**

Deposition of

**Amanpreet Atwal**

November 19, 2021

D.M. and L.M.

vs.

County of Merced



www.aptusCR.com | 866.999.8310

Amanpreet Atwal

D.M. and L.M. vs.
County of Merced

1     A     Yes.

2     Q     And then Number 23, "Have you ever attempted

3   suicide?"  And that's answered, "Yes."  Do you see that?

4     A     Yes.

5     Q     In those particular instances, what would that

6   trigger for you as part of the intake process when

7   someone has circled they're not suicidal at that moment,

8   but have attempted suicide in the past?

9     A     As an intake nurse I would ask them if they

10  were suicidal at the moment, and if they answer no, we

11  just make a mental health referral due to past attempted

12  suicide.

13    Q     To your knowledge, was any mental health

14  referral provided to Ms. Snider?

15    A     On my charting she said no, so I made a

16  referral because she had PTSD.

17    Q     And who did she see?

18    A     I don't remember.

19    Q     And would any type of an assessment be included

20  within Wellpath's file, to your knowledge, if one was

21  done?

22    A     Yes.

23    Q     Did you ever have an opportunity to review any

24  such report or evaluation?

25    A     No.

Amanpreet Atwal

```
 1   STATE OF CALIFORNIA      )
                              )        ss.
 2   COUNTY OF FRESNO         )

 3          I, Karla M. Rocha, Certified Shorthand Reporter

 4   licensed in the State of California, License No. 8982,

 5   do hereby certify that the foregoing proceeding was

 6   reported by me and was thereafter transcribed under my

 7   direction into typewriting; that the foregoing is a

 8   full, complete and true record of said proceeding.

 9          I further certify that I am not of counsel or

10   attorney for either or any of the parties in the

11   foregoing proceeding and caption named, or in any way

12   interested in the outcome of the cause named in said

13   caption.

14          Further, that if the foregoing pertains to the

15   original transcript of a deposition in a federal case,

16   before completion of the proceedings, review of the

17   transcript [X] was [ ] was not requested.

18          In witness whereof, I have hereunto set my hand

19   and affixed my seal this day.

20          Date:   December 3, 2021

21

22

23

24   _____
     Karla M. Rocha
25   CSR #8982
```