1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| D.M. and L.M., minors, by and through their Guardian ad litem Jose Martinez, *et al.*,<br><br>    Plaintiffs,<br><br>    v.<br><br>CITY OF MERCED, WELLPATH, LLC, CALIFORNIA FORENSIC MEDICAL GROUP, INC., *et al.*<br><br>    Defendant. | Case No.: 1:20-cv-00409 JLT SAB<br><br>ORDER GRANTING IN PART AND DENYING IN PART WELLPATH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Doc. 127) |

## I.    INTRODUCTION

On March 23, 2019, Rene Snider died by suicide while she was in custody at the Merced County Jail after having been found incompetent to stand trial. (*See* Doc. 11 (First Amended Complaint).) Plaintiffs in this case, the mother[1] and minor children of Ms. Snider, allege that Defendants inadequately screened Ms. Snider for the risk of suicide, improperly withheld her mental health medications, failed to place her in an appropriate custody environment given her risk of suicide, failed to properly monitor her, and failed to notice physical evidence that she had

---

[1] The Complaint also named Ms. Snider's father, Doug Snider, as a Plaintiff in relation to the fourth cause of action for loss of companionship arising under the Fourteenth Amendment. (Doc. 11, ¶¶ 110–15.) As disclosed in a notice filed by Plaintiffs, Mr. Snider passed away on November 5, 2021. (Doc. 70.) Plaintiffs' opposition brief only mentions Ms. Snider's mother, Denise Sawyer, and Ms. Snider's children as the current Plaintiffs. (Doc. 134 at 6.) It is unclear, however, whether the omission of his name from the opposition brief was intended to indicate that Doug Snider's loss of companionship claim was extinguished upon his death; or, rather, that Denise Sawyer or some other Plaintiff can inherit that claim as his heir(s). *See* Fed. R. Civ. P. 25. The parties **SHALL** file a joint statement clarifying this situation at least 21 days before trial.

1  attempted suicide earlier on the day of her death. (*Id.* ¶ 1.) The operative complaint names as

2  defendants the County of Merced; Wellpath, LLC and California Forensic Medical Group, LLC[2];

3  ten employees of Wellpath (Amanpreet Atwal, Alicia Dunwoody, Gianfranco Burdi, Keriann

4  Quinn-Fitzpatrick, Dylan Fulcher, Shawn Autrey, Pao Chang, Jessica Ramirez-Aguilar, Jamie

5  Burns, and Thanya Ryland); and one Merced County Corrections Officer.

6       Before the Court for Decision is a motion for summary judgment, or in the alternative

7  summary adjudication, brought by the Wellpath Defendants as to certain claims and issues. (Doc.

8  127.) Plaintiffs have opposed the motion in its entirety. (Doc. 134.) Defendants replied. (Doc.

9  135.) For the reasons set forth below, the motion is **GRANTED IN PART AND DENIED IN**

10  **PART**.

## II.   FACTUAL BACKGROUND

12       In October 2016, Ms. Snider was arrested at the US/Canada border in North Dakota on

13  charges of kidnapping her daughters. (Doc. 134-3 (Plaintiffs' Response to Defendants' Statement

14  of Undisputed Facts ("SUF")) # 1.) She was arraigned in Merced County Superior Court (FAC,

15  ¶ 39) and released on bond. (SUF #1.) During the criminal process, after her attorney requested a

16  competency hearing, Ms. Snider was found incompetent to stand trial. (SUF #2.) California's

17  Department of State Hospitals concluded she was unsuitable for outpatient competency

18  restoration and recommended that she be remanded to custody as a possible flight risk and danger

19  to her children. (*See* SUF ##2–3.) At a hearing on March 18, 2019, the state court revoked Ms.

20  Snider's bail and ordered her taken directly into custody. (SUF #4.) She was transported to

21  Merced County Jail, apparently to await transfer to a state mental health facility. (*See* Doc. 134 at

22  6; *see also* SUF #13.) The state court judge ordered that Ms. Snider be given a medical

23  examination at the jail. (SUF #4.)

24       Once at the jail, at approximately 1551 hours on March 18, a booking officer asked Ms.

25  Snider questions from a "Medical Pre-Screen" form. (SUF #7; Deposition of Amanpreet Atwal,

---

[2] According to the FAC, California Forensic Medical Group is the former name of Correctional Medical Group Companies and Wellpath is an entity formed from the merger of Correct Care Solutions and Correctional Medical Group Companies. (FAC, ¶¶ 13–14.) The Court will therefore assume Wellpath stands in the shoes of California Medical Group Companies and will refer to these defendants as "Wellpath" and collectively to Wellpath and its individual employee defendants as "Wellpath Defendants."

1    Ex. 2 (County0408–0409).) When asked "Have you ever attempted suicide?", Ms. Snider

2    answered "YES." (*Id*.) In response to the question "Are you suicidal?" she answered "NO." (*Id*.)

3    Ms. Snider signed and dated that form. (*Id*.)

4        Shortly thereafter, between 1642 and 1710 hours on March 18, Defendant Amanpreet

5    Atwal, a Registered Nurse, performed an intake examination of Ms. Snider. (SUF #7; Doc. 127-3

6    at p. 000201, 211–18.) Nurse Atwal noted that a family member of Ms. Snider's brought

7    medications to the jail and that her pre-booking medication list included Prozac, eye drops, and

8    Dilaudid (an opioid) as needed for pain associated with hernia and breast surgery. (SUF #6.) In

9    response to the same series of questions administered by the booking officer, Ms. Snider again

10   reported no suicidal ideations, but changed her answer regarding prior suicide attempts to "NO."

11   (SUF #7.)[3] Nurse Atwal also took and recorded Ms. Snider's vital signs. (*See* Doc.127-3 at 206,

12   215.)

13       Nurse Atwal attempted to get records from Ms. Snider's psychiatrist Dr. Milin, but his

14   office was closed, so the records were unable to be obtained at the time of intake. (SUF #8.)[4] A

15   request for records was also sent to Walgreens to verify her prescriptions. (*Id*.) Nurse Atwal

16   referred Ms. Snider to nursing sick call and to mental health the next day based on Ms. Snider's

17

18   _____

19   [3] Plaintiffs object on authentication grounds to Defendants' reliance on a printout of the intake form purportedly filled out by Nurse Atwal. (Doc. 134-4, at 2.) Because this objection is boilerplate and Plaintiffs do not dispute the validity of the documents or suggest that the Defense would be unable to present the documents in an admissible

20   form at trial, this objection is overruled, as are the numerous other boilerplate authentication objections raised by Plaintiffs. *See Ma v. Target Corp.*, No. 17-cv-01625-AGJ-DE, 2018 WL 6265009, at *2 (C.D. Cal. July 30, 2018)

21   ("[The plaintiff] repeatedly objects on foundation and authentication grounds to evidence attached to a declaration by [the defendant's] attorney. But [the plaintiff] doesn't dispute the actual validity of the documents . . . or suggest that [the defendant] wouldn't be able to present the documents and testimony in an admissible manner at trial. These

22   objections are a waste.") (internal citations omitted).

23       Plaintiffs also object to this and many other citations to Ms. Snider's medical records on generic hearsay grounds. (*See generally* Doc. 134-4.) Defendants correctly point out that one or more hearsay exceptions likely apply to the various pieces of information relied upon. (Doc. 135 at 9–10.) For example, statements made by Ms. Snider to

24   Nurse Atwal about her medical and psychiatric history likely will be admissible under Federal Rule of Evidence 803(4) as statements made for medical diagnosis or treatment. To the extent the Court relies in this order on evidence

25   objected to on hearsay grounds, it does so because it finds the evidence could be presented in an admissible form at trial. *See Cherewick v. State Farm Fire & Cas.*, 578 F. Supp. 3d 1136, 1157 (S.D. Cal. 2022) ("[A]s long as a court

26   finds that hearsay evidence could be presented in an admissible form at trial (i.e., through testimony from a witness laying the foundation for an exception or because the Court finds the evidence to be non-hearsay), it may consider the

27   evidence when ruling on the motion for summary judgment.").
     [4] Plaintiffs repeatedly indicate that asserted facts are "disputed" simply because they object to the admissibility of the

28   evidence cited in support of the fact, without offering any contrary evidence. (*See* Doc. 134-3 at #8.) This is both improper and unhelpful.

Prozac prescription. (SUF #9.) Opiate withdrawal monitoring ("COWS")[5] was also ordered due to Ms. Snider's as-needed Dilaudid, which apparently could not be prescribed at the jail. (*Id*.)

At 1101 hours, Defendant Thanya Ryland, RN, performed COWS monitoring on Ms. Snider, reflecting a COWS score of 01. (SUF #10.) Nurse Ryland also recorded Ms. Snider's vital signs. (Doc. 127-3 at 206.)

At approximately 1206, Ms. Snider was also seen by Debbie Mandujano, RN. (SUF at #12; Doc. 127-3 at 205.) Ms. Snider reported to Nurse Mandujano that she was supposed to be on Prozac but thought her prescribed dose was too high. (SUF #12.) Nurse Mandujano noted the jail was awaiting Ms. Snider's records from Walgreens. (*Id*.) Ms. Snider denied suicidal ideations or that she wanted to hurt herself in any way. (SUF #13.) Ms. Snider requested counseling, and Nurse Mandujano scheduled her for an appointment with Terri Vince. (*Id*.) At 2053 hours, Defendant Shawn Autrey performed COWS monitoring, reflecting a score of 0. (SUF #11.)

Also on March 19, Defendant Alicia Dunwoody, the Health Services Administrator for Wellpath in the Merced County Jail, sent a letter to the Court regarding the Court's order for a "medical examination" of Ms. Snider. (SUF at #14.) Ms. Dunwoody reported to the Court that Ms. Snider had been booked on March 18 and "[a] medical intake was completed at that time where we obtained a complete history from the patient." (Doc. 127-3 at 313.) Ms. Dunwoody also reported that releases of information had been sent to facilities where Ms. Snider had previously received care; that Ms. Snider was started on COWS monitoring due to discontinuance of her as-needed opiate prescription; and that Ms. Snider was scheduled to be seen by the "mid-level provider" on March 21. (SUF ## 15, 17.)

The next morning, at 0955 hours, Defendant Jamie Burns, L.V.N. performed a COWS assessment on Ms. Snider, noting a score of 0. (SUF #18.) Nurse Burns also recorded Ms. Snider's vital signs. (Doc. 127-3 at 206.) Approximately two hours later, Ms. Snider participated

---

[5] COWS (Clinical Opiate Withdrawal Scale) monitoring is a numeric method used to rate common signs and symptoms of opiate withdrawal and monitor these symptoms over time. (*See* Doc. 127-4 at 38 (Ex. 2, p. 000037).) The scoring system identifies (0-4 points) as Level 0; (5-12 points) as Level 1-Mild symptoms; (13-24 points) as Level 2- Moderate symptoms; (25-36 points) as Level 3-Moderately severe symptoms; and (37-48) Severe withdrawal symptoms. (*Id*. at 90 (Ex. 2, p. 000089).)

.

1  in mental health group therapy. (SUF at #19.)

2      At 1050 hours, Ms. Snider was visited by Terri Vince for counseling. (SUF # 20; *see also*

3  Doc. 127-3 at 204.) Ms. Vince noted Ms. Snider stated she had been without her medications for

4  three days, and she was concerned that her mental health would suffer. (*Id*.) Ms. Snider denied

5  being a danger to herself or others. (*Id*.)

6      Additionally, on March 20, Dr. Milin responded to Wellpath's request for information.

7  (SUF #21.) He stated he wanted a new release form for updated records because Ms. Snider "has

8  paranoia about releasing her information." (*Id*.) It was noted the new release would be obtained

9  from Ms. Snider during the next day's sick call. (*Id*.) At 1640 hours on March 20, Defendant

10  Jessica Ramirez-Aguilar, RN, performed a COWS assessment on Ms. Snider, again reflecting a

11  score of 0. (SUF #22.) Nurse Ramirez-Aguilar also recorded Ms. Snider's vital signs. (Doc. 127-3

12  at 206.)

13      On March 21 at 0330 hours, Defendant Pao Chang performed a COWS assessment, again

14  returning a score of 0. (SUF # 26.) Defendant Chang also recorded Ms. Snider's vital signs. (Doc.

15  127-3 at 206.) Also on March 21, Ms. Snider was seen by Defendant Quinn-Fitzpatrick, a Nurse

16  Practitioner, for a sick call. (SUF # 24.) This visit was triggered by the referral made at Ms.

17  Snider's intake examination. (*Id*.) Nurse Quinn-Fitzpatrick reported Ms. Snider had a list of

18  "somatic complaints" and was only moderately cooperative during the examination. (*Id*.) Nurse

19  Quinn-Fitzpatrick ordered continued COWS monitoring and to obtain baseline lab studies. (*Id*.)

20  Ms. Snider's Prozac was re-started on this date. (SUF # 25.) Nurse Quinn-Fitzpatrick also

21  recorded Ms. Snider's vital signs. (Doc. 127-3 at 206.) At 1829 hours on March 21, Defendant

22  Autrey performed a COWS assessment, again returning a score of 0. (SUF # 26.)

23      On March 22 at 1109 hours Nurse Mandujano attempted to see Ms. Snider, but Ms. Snider

24  had been taken to court. (SUF # 27.) Also on March 22, 2019, Defendant Dylan Fulcher, RN,

25  performed a COWS assessment of Ms. Snider at 0300 hours. Defendant Shawn Autrey

26  subsequently performed another COWS assessment at 1820 hours. Again, both assessments

27  resulted in COWS scores of 0. (SUF at #27.) Both Fulcher and Autrey also recorded Ms. Snider's

28  vital signs. (Doc. 127-3 at 206.)

1    On March 23, at 0438 hours, COWS monitoring was again performed by Nurse Fulcher,

2    who noted Ms. Snider had normal vital signs and no symptoms of withdrawal, and that her

3    normal vitals and the absence of withdrawal symptoms had persisted for over 72 hours. (SUF

4    #28.) Again, Nurse Fulcher separately recorded Ms. Snider's vital signs. (Doc. 127-3 at 206.)

5    On March 23, at 1807 hours, Correctional Officer Castaneda called for custody assistance

6    after finding Ms. Snider hanging in her cell. (SUF #29.) Medical was called at 1809 hours along

7    with Riggs Ambulance. (*Id.*) CPR was initiated, but the Automatic External Defibrillator never

8    found a shockable rhythm. (*Id.*) The time of death was recorded as 1842. (*Id.*)

9    An autopsy of Ms. Snider was performed on March 25, 2019, by Dr. Mark Super. (SUF

10   #30.) He determined the cause of death was asphyxia by hanging. (*Id.*) He also noted there were

11   "hesitation marks" on Ms. Snider's arm. (*Id.*) According to Dr. Super, a "hesitation mark" is "a

12   standard term" used "in the field that implies this is an injury caused by the decedent on

13   themselves." (Deposition of Mark Super at p. 9.)[6]

14   According to Dr. Super, Ms. Snider's had "thin, faint remote scars" on the inside of her

15   left wrist, "which may be old hesitation marks measuring up to one centimeter long each." (Super

16   Depo. at p. 14 (reading from autopsy report).) She also had a newer hesitation mark,

17   approximately four centimeters long, located on the inside of her left elbow joint. (*Id.* at p. 6–10.)

18   Dr. Super described this as a "horizontal linear abrasion-superficial laceration" which meant that

19   "part of it is a scratch, but part of it actually went through the surface layer of skin, such that it

20   bled." (*Id.* at p. 8–10.) Though it was covered by an "amateur bandage" at the time of autopsy, it

21   is unclear when that bandage was applied or by whom. (*Id.* at p. 6.) According to Dr. Super, this

22   injury "was new," as "[t]here was no evidence of healing." (*Id.* at p. 12.) Dr. Super initially

23   testified that it "likely [ ] occurred at about the time that she died, up to several hours" prior.

24   (Super Depo. at p. 12.) He later conceded that time estimates for injuries like that "are not very

25   accurate." (*Id.* at p. 13.). The toxicology report from Ms. Snider's autopsy confirmed there were

26   therapeutic levels of Prozac in Ms. Snider's blood when she died. (SUF at #33.)

---

[6] Unless otherwise noted, the Court's page references are to the pages of the .pdf documents filed electronically with the Court. Where the Court is instead referencing a document's own, internal page numbering, it prefaces that numbering with ".p".

1          III.    LEGAL STANDARDS

2          Summary judgment is appropriate when there is "no genuine dispute as to any material

3    fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In addition,

4    Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there

5    is no genuine issue of material fact as to a particular claim or portion of that claim. *Id.*; *see also*

6    *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary

7    adjudication that will often fall short of a final determination, even of a single claim...") (internal

8    quotation marks, citation omitted).

9          The "purpose of summary judgment is to pierce the pleadings and to assess the proof in

10   order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith*

11   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted). Summary judgment should be entered

12   "after adequate time for discovery and upon motion, against a party who fails to make a showing

13   sufficient to establish the existence of an element essential to that party's case, and on which that

14   party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

15   The moving party bears the "initial responsibility" of demonstrating the absence of a genuine

16   issue of material fact. *Id.* at 323. An issue of fact is genuine only if there is sufficient evidence for

17   a reasonable fact finder to find for the non-moving party, and a fact is material if it "might affect

18   the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

19   248 (1986); *see also Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987). A

20   party demonstrates summary judgment is appropriate by "informing the district court of the basis

21   of its motion, and identifying those portions of 'the pleadings, depositions, answers to

22   interrogatories, and admissions on file, together with affidavits, if any,' which it believes

23   demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting

24   Fed. R. Civ. P. 56(c)).

25         If the moving party meets its initial burden, the burden then shifts to the opposing party to

26   present specific facts that show genuine issue of a material fact exists. Fed R. Civ. P. 56(e);

27   *Matsushita*, 475 U.S. at 586. An opposing party "must do more than simply show that there is

28   some metaphysical doubt as to the material facts." *Id.* at 587. The party must tender evidence of

7

specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586 n.11; Fed. R. Civ. P. 56(c). Further, the opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987). However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

## IV.   DISCUSSION

### A.   Fourteenth Amendment Deliberate Indifference to Medical Needs Claim

#### 1.   Applicable Legal Standard

Plaintiff's first cause of action alleges that Defendants were deliberately indifferent to Plaintiff's medical needs in violation of the Fourteenth Amendment. "[C]laims for violations of the right to adequate medical care 'brought by pretrial detainees against individual defendants under the Fourteenth Amendment' must be evaluated under an objective deliberate indifference standard." *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018) (emphasis added) (quoting *Castro v. Cnty. of Los Angeles*, 833F.3d 1060, 1070 (9th Cir. 2016)). In *Gordon*, the Ninth Circuit identified the following elements a pretrial detainee must prove to sustain a medical care claim against an individual defendant under the Due Process Clause of the Fourteenth Amendment:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125. "With respect to the third element, the defendant's conduct must be objectively unreasonable, a test that will necessarily turn on the facts and circumstances of each particular case.'" *Id*. (internal citation and quotation omitted).

8

2.      Standard of Care v. Deliberate Indifference

The "mere lack of due care by a state official does not deprive an individual of life, liberty, or property under the Fourteenth Amendment." *Gordon,* 888 F.3d at 1125. Thus, to prevail on a Fourteenth Amendment deliberate indifference claim, the plaintiff must "prove more than negligence but less than subjective intent—something akin to reckless disregard." *Id.*

As to all but Nurse Atwal, the Defense focuses its summary judgment arguments on whether the Wellpath Defendants breached the standard of care, making only passing references to whether Plaintiffs can also demonstrate reckless disregard. Defense experts Terry Fillman and Willam Gause have opined in their expert reports that all Wellpath Defendants met the standard of care in their treatment of Ms. Snider. (SUF # 34.) If Plaintiffs cannot demonstrate a dispute of fact as to that issue, their claims as to these Defendants fail because a breach is a necessary (though not sufficient) element of the deliberate indifference claims against them.

3.      Defendants Dylan Fulcher, Shawn Autrey, Pao Chang, Jessica Ramirez-Aguilar,
         Jamie Burns and Thanya Ryland

Defendants Dylan Fulcher, Shawn Autrey, Pao Chang, Jessica Ramirez-Aguilar, Jamie Burns and Thanya Ryland ("Wellpath Monitoring Defendants") maintain they are entitled to summary judgment on the Fourteenth Amendment claim because Plaintiffs' expert, "Dr. Kupers admitted he has no criticisms of [their] care of Ms. Snider, which consisted exclusively of COWS monitoring." (Doc. 127 at 11.) Defendants provide the following quote, which purports to be from Dr. Kupers' deposition:

> Q: Based on your review of the COWS monitoring, did you have any criticisms of the monitoring that was performed?
>
> A: Not of the COWS monitoring.
>
> Q: Are you going to be expressing any criticisms of the nurses who performed the individual COWS monitoring assessments in this case?
>
> A: Not because of their COWS assessment, no.
>
> Q: And why don't you have any criticisms of the nurses who performed the COWS assessment?
>
> A: I don't have enough information.

> Q: Do you know what the licensure was of these nurses, whether they were RNs or LVNs?
>
> A: No, I don't.
>
> Q: Other than looking at their forms, do you have any other information about what they did when they actually would conduct their COWS monitoring for Ms. Snider?
>
> A: No.
>
> Q: Do you feel qualified to even express an opinion about whether a nurse complied with the standard of care as it relates to COWS monitoring?
> A: I did not evaluate that.

(Doc. 127 at 17–18.)

Plaintiffs do not attempt to suggest that Dr. Kupers criticized any Defendants' implementation of COWS monitoring. (*See* Doc. 134 at 12.) Rather, Plaintiffs insist the Wellpath Monitoring Defendants did "far more than simple COWS monitoring." (*Id.*) In support of this assertion, Plaintiffs point to a log contained within Ms. Snider's medical records in which the Wellpath Monitoring Defendants recorded her vital signs on various occasions from March 19 to March 23. (Doc. 127-3 at 206).) The Court agrees with Plaintiffs that this log "demonstrate[s] that these Defendants took and recorded Ms. Snider's vital signs and performed overall evaluations of her health, including receiving purported complaints by Ms. Snider regarding her medications and mental healthcare." (Doc. 134 at 12.) For example, Nurse Ryland, who visited Ms. Snider on March 19, 2019, recorded Ms. Snider's blood pressure, pulse, respirations, and temperature, and noted:

> COWS level 0, Scoring 4. Patient c/o having multiple health problems including "active blood", "going blind if I don't get my eye drops and "breast abnormalities". States she drinks 1 cup of water QDAY. Pt is A/Oc4, NAD and appears well but well but visibly irritable and argumentative. Making statements r/t lack of medical staff helping her and not providing eye drops. Fluids encouraged. _ Next cheek due at 2140.

(Doc. 127-3 at 206.) It does appear, based on the present record, that each of the Wellpath Monitoring Defendants engaged in more than just COWS monitoring of Ms. Snider. The key question here is whether any of these Defendants breach the standard of care when doing so.

10

1    Plaintiffs point out that Dr. Kupers generally criticized the entire medical and mental

2 health care provided to Ms. Snider:

3           Q: Based on your review of the COWS monitoring, did you have any
            criticisms of the monitoring that was performed?
4
            A: Not of the COWS monitoring. **My criticism is about the entirety
5           of the medical and mental health assessment of Ms. Snider.**

6 (Deposition of Terry A. Kupers, M.D., at p. 14–15 (emphasis highlights text omitted from the

7 quote provided by the Defense above).) Plaintiffs argue that because the Wellpath Monitoring

8 Defendants recorded Ms. Snider's vital signs and "performed overall evaluations of her health

9 . . . each of these Defendants' actions in failing to intervene and provide Ms. Snider with any of

10 the specific suicide-prevention measures identified by Dr. Kupers in his expert report constitutes

11 deliberate indifference to her medical needs." (Doc. 134 at 12.) But this is conclusory. To survive

12 summary judgment, Plaintiffs must connect *each Defendant* to Plaintiffs' harm. *Bynum v. Correct*

13 *Care Sols*., LLC, No. 21-16254, 2023 WL 2134397, at *3 (9th Cir. Feb. 21, 2023) ("[A] plaintiff

14 must show that each defendant personally participated in the conduct alleged to have violated due

15 process) (citing *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002)). Dr. Kupers fails to direct

16 any specific critique at any of the Wellpath Monitoring Defendants.[7]

17    Nonetheless, the record supports one possible pathway to liability for some Wellpath

18 Monitoring Defendants. As mentioned, on this record, it is undisputed that Ms. Snider had several

19 hesitation marks on her wrist and/or arm from at least one prior suicide attempt. Plaintiffs argue

20 that "[n]one of the individual Defendants, despite carrying out physical examinations of Ms.

21 Snider on a regular basis, either noted these hesitation marks or referred Ms. Snider for specific

22 suicide-prevention treatment or measures." (Doc. 134 at 7.)

23    More specifically, Dr. Super noted in his autopsy report that Ms. Snider had "thin, faint

24 remote scars" on the inside of her left wrist, "which may be old hesitation marks measuring up to

25

26 _____

[7] Dr. Kupers acknowledges that those who performed COWS monitoring on Ms. Snider did not find any
"abnormalities," but nonetheless suggests they should have noticed her distress because "her blood pressure was well
27 over 100." (Kupers Depo at p. 12.) But it is not clear what blood pressure reading he is referring to, as those logged
by the Wellpath Monitoring Defendants show systolic blood pressure readings ranging from 96 to 118. (Doc. 127-3
28 at 000206.) If he is referencing a blood pressure reading taken by another Defendant, there is no evidence suggesting
any Wellpath Monitoring Defendant was aware of that information.

one centimeter long each." (Super Depo. at p. 14 (reading from autopsy report).) However, Dr. Super acknowledged these older marks "could be easily missed by a casual observer," (*id*. at p. 16.)[8] Even still, Dr. Kupers indicated that the older marks "should have been" discovered before Ms. Snider's autopsy. (Kupers Depo. at p. 21.) Dr. Kupers testified that "a comprehensive mental health evaluation would include looking for scars on the wrist." (Kupers Depo. at 58.) But Dr. Kupers identifies Nurse Mandujano, *who is not a defendant*, as having been responsible for that comprehensive evaluation. (*Id*. at 58.) There is simply no evidence to suggest that these "remote scars" were or should have been noticed by any of the Wellpath Monitoring Defendants.[9]

More problematic for the Defense was the presence of another, newer hesitation mark noted in the autopsy report. That mark was approximately four centimeters long and located on the inside of Ms. Snider's left elbow joint. (Super Depo. at p. 6–10.) Dr. Super described it as a "horizontal linear abrasion-superficial laceration" which meant that "part of it is a scratch, but part of it actually went through the surface layer of skin, such that it bled." (*Id*. at 8–10.) Though it was covered by an "amateur bandage" at the time of autopsy, it is unclear when that bandage was applied or by whom. (*Id*. at 6.) Dr. Super indicated that this recent mark could have been visible to an observer, assuming her arms were not covered by clothing. (*Id*. at p.8 (conceding that marks of this nature could be hidden under clothing).) As mentioned, (*see supra* note 9), the Court will assume Ms. Snider's wrists and elbow joints were visible to the Wellpath Monitoring Defendants.

However, it is unclear when Ms. Snider sustained this wound. Because that injury "was new" with "no evidence of healing," Dr. Super initially testified that it "likely [ ] occurred at about the time that she died, up to several hours" prior. (Super Depo. at p. 12.) He later conceded that time estimates for injuries like that "are not very accurate." (*Id*. at p. 13.). Though Dr.

---

[8] Plaintiffs assert that Dr. Super "testified that these hesitation marks could have been visible to anyone trained to look for signs of suicide." (Doc. 134 at 7.) Dr. Super testified that he looks for such marks during an autopsy. (Super Depo. at p. 16.)

[9] Dr. Super testified that Ms. Snider's sleeves were rolled up and pushed up when he examined her body. (Super Depo. at p. 13–14.) He did not know "who rolled [them] up and when they were rolled up." (*Id*.) On this record, the Court will presume for purposes of summary judgment that Ms. Snider's wrists were routinely visible in her prison garb.

12

1   Super's testimony doesn't define the timeframe with precision, nothing in the record suggests that

2   the hesitation mark was days old.[10] Even giving this timeline a wide berth considering the

3   summary judgment standard, the Court can identify no information that suggests the mark could

4   have been made more 24 hours before her death.[11] Assuming as much, this timeline overlaps with

5   visits by only two of the Wellpath Monitoring Defendants: Shawn Autrey and Dylan Fulcher. The

6   remaining Defendants in this group (Pao Chang, Jessica Ramirez-Aguilar, Jamie Burns and

7   Thanya Ryland) could not possibly have seen this unhealed wound. Given the absence of any

8   other evidence specifically linking Pao Chang, Jessica Ramirez-Aguilar, Jamie Burns and Thanya

9   Ryland to Ms. Snider's suicide, they are entitled to summary judgment.

10          As for Shawn Autrey and Dylan Fulcher, the Court finds that it is not impossible that a

11   finder of fact could conclude that (1) the wound had been present for 24 hours prior to Ms.

12   Snider's death; and (2) was visible to even a casual observer. If this is the case, then a finder of

13   fact could ultimately conclude that Defendants Autrey and Fulcher were deliberately indifferent

14   for failing to ensure Ms. Snider received more urgent attention and/or additional precautions were

15   taken to ensure her safety. The motion for summary judgment is **DENIED** as to Defendants

16   Autrey and Fulcher.

17          4.      Dr. Gianfranco Burdi

18          Wellpath Defendant Dr. Gianfranco Burdi provided telepsychiatry care for inmates at the

19   Merced County Jail during the relevant timeframe. (*See* Burdi Depo. at p. 32–33.) Defendants

20   argue Dr. Burdi cannot possibly be liable for deliberate indifference because "[h]e never saw [Ms.

21   Snider], he had no involvement with her treatment, and to the extent his name was in Ms.

22   Snider's medical records, it was in relation to a scheduled visit, which never occurred due to her

23   suicide." (Doc. 127 at 19.) In support of these factual assertions, the Defense cites all 332 pages

24

25   ───────────────

26   [10] Dr. Kupers assumed, inaccurately, that this more recent hesitation mark was a "healing sore" when he testified that it likely occurred "within the previous few days." (Kupers Depo. at p. 20.) Given Dr. Super's unrefuted testimony that there was "no evidence of healing," (Super Depo. at p. 12), Dr. Kuper's assumption was erroneous. Therefore, his opinion as to the timing of this mark is not obviously relevant.

27   [11] This assumption also happens to be consistent with the allegations in the FAC. (*See* Doc. 11, ¶ 1 ("Ms. Snider was not appropriately monitored by jail staff, who failed to notice physical evidence that Ms. Snider had, in fact, attempted suicide earlier on the same day.").)

28

1    of an exhibit consisting of Ms. Snider's medical records. (*Id.*, citing SUF #40.) Plaintiffs object to

2    this citation as "confusing or misleading" because the exhibit does not explicitly state that Dr.

3    Burdi had no hand in Ms. Snider's treatment and because Defendants do not specify which

4    page(s) they are referencing. (*See* Doc. 134-4 at 14–15.) The Court finds this several hundred-

5    page-citation to be appropriate under the circumstances, where the Defense is attempting to prove

6    a negative. *Cf. George v. Off. of Navajo*, No. CV-17-08200-PCT-DLR, 2018 WL 3536733, at *3

7    (D. Ariz. July 23, 2018) ("Although[the] citation covers the entire administrative record rather

8    than a specific portion of it, there is no other way to prove a negative."). The records consist of

9    Ms. Snider's medical records, which are central to this case and with which all parties are

10   undoubtedly familiar. Moreover, the Court had no difficulty searching the documents for Dr.

11   Burdi's name, which appears therein on a single page associated with Ms. Snider's prescription

12   for "FLUOXETINE (PROZAC) 20MG." (*See* Doc. 127-3 at p. 000239.) Dr. Burdi explained at

13   his deposition that his name likely was in Ms. Snider's records next to the prescription, even

14   though he did not himself prescribe it or provide Ms. Snider with any medical care, because staff

15   routinely continued a patient on a medication like Prozac once it had been verified to avoid

16   withdrawal until the patient could be seen by a provider. (Burdi Depo. at p. 75.) Plaintiffs offer no

17   affirmative evidence to suggest otherwise.

18       Defendants also cite page 36 of Dr. Kuper's Deposition. A relevant exchange starts on

19   page 35 and continues for several pages thereafter:

20       Q …One of the individually named defendants in this case is Dr.
         Gianfranco Burdi, who is a psychiatrist. Do you have any opinions
21       regarding his involvement or treatment of Ms. Snider? Or is it your
         understanding he had no involvement with her treatment and care?

22                                     ***

23

24       A He never saw her. He was supposed to see her on March 28th for
         a tele-psych visit, but of course she committed suicide before that.

25       Q I guess what I'm just trying to find out, Doctor, is will you
         expression any criticisms of Dr. Burdi in this case? Do you believe
26       he personally fell beneath standards of practice because he didn't see
         her prior to March 28th?

27

28       A I'm not sure. And here's the reason. Psychiatric coverage at the
         jail should be 24 hours. Typically in a small jail that will be on-call

14

coverage. But it is the responsibility of someone -- And I don't know if that's specifically Dr. Burdi, or if there's another psychiatrist who does that coverage -- so that at the end of the shift, when Ms. Atwal could not verify the Prozac prescription, a psychiatrist should have been notified and given instructions.

That psychiatrist could give instructions; they could do a phone order; they could ask that the medical physician see her. There are various things matter, is whether you're going to be telling the jury that Dr. Burdi fell beneath the standard of practice.

So, for example, in the hypothetical you just gave me, you've stated the opinion that at the end of the shift the psychiatrist should have been contacted to continue Ms. Snider's medication. Do you know whether Dr. Burdi was contacted?

A Huh. That's an interesting question. I don't know that.

Q And so I'm just simply trying to find out whether or not you're going to be telling the jury that Dr. Burdi, who was scheduled to see the patient on March 28th, fell beneath standards of practice in this case.

A Well, the way you just said that, it becomes sort of silly. He had -- He was scheduled -- He didn't make the appointment, but an appointment was made for him to see her on the 28th. He didn't see her. Does that fall beneath the in that first shift, and then there are various possibilities that psychiatrists could have pursued.

Typically what the psychiatrist will do is say, "Tell me about the case. What's going on? Let me talk to the medical physician, and let's get a prescription in place." That's typical of what happens in a jail that doesn't have a psychiatrist on the premise.

But I don't blame Dr. Burdi for that, unless there's something within the administrative structure that makes him in charge of the 24-hour care.

Q And I guess that's what I'm just trying to put the bill on here, is are you going to be telling the jury that Dr. Burdi did anything that fell beneath standards of practice in this case?

A I'm not aware of it. But if there's further evidence, I feel fine opining about it. I just told you what my opinion is.

Q And when you say "if there is further evidence," can you please help me understand what type of evidence you would need to opine that he fell beneath the standard of care, that Dr. Burdi fell beneath the standard of care?

A No, I can't.

Q Okay.

A It could be deposition evidence; it could be some kind of

discussion about who was on-call that night. I don't have that information.

Q What is the type of information, though, that you would need in order to formulate an opinion that Dr. Burdi fell beneath the standard of care?

A I am not working on an opinion that Dr. Burdi either satisfied the standard of care or fell beneath it. I haven't been asked that; I haven't investigated that. There are various ways to proceed. I can't even guess what it would be.

Q So then let me just clarify. Is it your understanding that you weren't being specifically asked in this case to determine whether or not Dr. Burdi complied with the standard of care?

MR. MARTIN: Objection. Calls for a legal conclusion.

Dr. Kupers, you can go ahead and answer, though.

THE WITNESS: I just don't have an answer besides what I've already said.

(Kupers Depo. at pp. 35–39.)

Dr. Burdi testified that he was the on-call psychiatrist for the jail facility at relevant times. (Burdi Depo., p. 123.) In this role, Dr. Burdi was on-call to approve the continuation of medications being taken by inmates and that medications like Prozac "would be continued, you know, no questions" apparently without even needing to talk to him. (*Id.*, p. 123–24.) As mentioned, the medical records indicate that pursuant to a prescription associated with Dr. Burdi, Prozac was ultimately provided to Ms. Snider starting on March 21, 2019 – several days after she entered the jail facility on March 18. (Doc. 127-3 at 240–241.)

Based on all this information, Plaintiffs argue that there is a question of fact as to whether Dr. Burdi was "in charge" of Ms. Snider's care as the on-call psychiatrist and deviated from the standard of care by delaying the continuation of the medication. (Doc. 134 at 13.) But even viewing the evidence in a light most favorable to Ms. Snider, there is a link missing in her theory of liability as to Dr. Burdi. Dr. Kupers was clear that he did not "blame" Dr. Burdi for the failure of staff to either contact him upon Ms. Snider's arrival at the jail or continue Prozac pursuant to Dr. Burdi's standing order unless "there's something within the administrative structure that makes him in charge of the 24-hour care." (Kupers Depo. at p. 38.) Dr. Burdi explained the

relatively narrow meaning of "on call" under the circumstances:

> The on-call physician is called basically to verify that the patient -- the inmate is incarcerated and he's on medications and that medication need to be approved. So that would be the nature of the being on-call, not -- not for any other reason.

(Burdi Depo at 123.) On this record, being "on call" to address concerns and approve prescriptions is not the same as being responsible for all aspects of Ms. Snider's care. Plaintiffs have failed to demonstrate there is a material dispute of fact as to Dr. Burdi's conduct. Therefore, the Defense motion for summary judgment as to the deliberate indifference claim against Dr. Burdi is **GRANTED**.

### 5. Defendant Dunwoody

Defendants contend that Ms. Dunwoody likewise cannot be liable under the Fourteenth Amendment because her "only involvement with Ms. Snider was to author a note to the criminal court on behalf of Wellpath informing the Court of Wellpath's compliance with the Court's Order for a medical examination of decedent in the Merced County Jail." (Doc. 127 at 19, citing SUF #17.)[12]

In response, Plaintiffs argue that the medical records indicate that Ms. Dunwoody, in her capacity as Director of Nursing for Wellpath, reviewed Ms. Snider's file in sufficient detail to represent to the criminal court that a "medical intake was completed" and that staff under her supervision "obtained a complete history from the patient." (Doc. 127-3 at 313.) Viewing the evidence in a light most favorable to Plaintiffs, Ms. Dunwoody's own representation to the state court suggests she reviewed Ms. Snider's file in detail – a review that presumably included examination of the conflicting medical pre-screen forms, one of which disclosed a history of suicide attempts and another that denied the same. (*Id.*, at 214, 317–318.)

As Dr. Kupers noted in his expert report,

> A suicidal inmate will often tell one or another member of the jail staff about risk factors, about her plan to commit suicide or about

---

[12] Again, this factual assertion is supported by a citation to the 332 pages of Ms. Snider's medical records and once again, Plaintiffs object. (Doc. 134-4.) Though lack of precise citations can be problematic in some circumstances, the Court again finds the citation appropriate under these circumstances, where the Defense is trying to demonstrate what Ms. Dunwoody *did not do*.

1

2

3

4

5

> other significant facts. That information has to be shared, and then any discrepancies between what the inmate tells different staff members must be considered in determining the seriousness of suicide risk. In Ms. Snider's case, she told Officer Swafford about a previous suicide attempt and responded "YES" to a number of risk factors. That information should have been known and relied upon by medical and mental health staff, including Ms. Atwal and Ms. Mandujano.

6  (Doc. 127-5 at 17.) Given this opinion, a finder of fact could conclude that Ms. Dunwoody was

7  aware of yet disregarded a serious risk to Ms. Snider and did not take reasonably available

8  measures to address the situation. The motion for summary judgment as to Ms. Dunwoody is

9  **DENIED**.

10         6.      Defendant Quinn-Fitzpatrick

11         Ms. Quinn-Fitzpatrick provided medical care to Ms. Snider during a single sick call on

12  March 21, 2019. (SUF # 41.) The Defense Expert, Mr. Gause, opined in his Rule 26 report that

13  Ms. Quinn-Fitzpatrick adhered to the standard of care:

14

15

16

17

18

> In my professional opinion, with 22 years as a correctional Nurse Practitioner and 47 years as a professional nurse, I see no breach of standards in NP Fitzpatrick's care of Ms. Snider. She provided care commensurate with common correctional standards. Her actions were complete and adhered to what any reasonable NP would do in similar circumstances. Her evaluation, conclusions and care were reasonable, timely and demonstrated concern for the patient's welfare.

19  (Doc. 127-4 at 79.) The Defense argues that Ms. Quinn-Fitzpatrick is entitled to summary

20  judgment because this opinion is uncontested. (Doc. 127 at 20.)

21         In response, Plaintiffs once again rely on Dr. Kupers' generic statement that his "criticism

22  is about the entirety of the medical and mental health assessment of Ms. Snider." (Kupers Depo.

23  at p. 14.) This conclusory opinion is, as Defendants maintain (Doc. 135 at 3), insufficient to stave

24  off summary judgment. *See Guangzhou Yucheng Trading Co. v. Dbest Prod., Inc*., 644 F. Supp.

25  3d 637, 665 (C.D. Cal. 2022) ("Because [plaintiff's expert] offers only conclusory assertions, this

26  is insufficient to defeat summary judgment on this point."). The motion for summary judgment is

27  **GRANTED** as to Defendant Quinn-Fitzpatrick.

28  ///

7.     Defendant Atwal

Wellpath Defendants do not dispute that Plaintiffs have set forth evidence sufficient to create a dispute of fact as to whether Nurse Atwal breached the standard of care during her intake examination of Plaintiff. (*See* Doc. 127 a 20.) Nurse Atwal instead frames her motion around the issue of causation, contending that Plaintiffs cannot create a dispute of fact as to whether Nurse Atwal's conduct caused Plaintiff's suicide. (*See* Doc. 127 a 20.) Wellpath Defendants focus on the fact that Nurse Atwal provided Ms. Snider with a referral to mental health for the day after her intake interview. (SUF #9.) They further assert that because Ms. Snider was provided "significant and higher-level" medical and mental health examinations between Nurse Atwal's intake exam of Ms. Snider and Ms. Snider's death, any causal chain between the intake examination and Ms. Snider's suicide was "dissolve[ed]." (Doc. 127 at 20.) On this point, Wellpath Defendants assert that Plaintiffs' expert, Dr. Kupers. "agrees that there is no nexus between Ms. Atwal's examination and decedent's suicide approximately six days later." (*Id*. (citing SUF #38).) This is not a fair representation of the record. Dr. Kupers made no such concession. To the contrary, he testified that "Ms. Snider was at high risk of suicide from the moment she stepped foot in that jail. The earlier that was detected and measures were put in place to keep her safe, the safer she would have been." (Kupers Depo. at p. 50.) While acknowledging "that she did not commit suicide between the 18th, when Ms. Atwal examined her, and the 19th when Ms. Mandujano examined her," Dr. Kupers did <u>not</u> absolve Nurse Atwal as to causation. Rather, he indicated that Nurse Atwal should have placed Ms. Snider on suicide precautions "when she first saw her" and that had Nurse Atwal done so it would have been "very unlikely [Ms. Snider] would have committed suicide on the 23rd." (*Id*.) The record therefore does not justify summary adjudication on the issue of causation.

In reply, Wellpath Defendants argue that the various intervening medical events that took place between the intake interview and Ms. Snider's death preclude a finding of "legal causation." (Doc. 135 at 5–6.) Defendants are correct that the causal link required in any § 1983 action consists of two elements: actual cause; and legal (or proximate) cause. *See generally Arnold v IBM Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981) (requiring but-for and proximate cause

1  for § 1983 suits). "Actual cause, sometimes referred to as cause-in-fact, or but-for causation, asks

2  this question: But for [defendant's] conduct, would [plaintiff] have suffered the alleged harm?"

3  *Vanzant v. Wilcox*, No. 1:15-CV-00118-BLW-CWD, 2018 WL 1468585, at *5 (D. Idaho Mar. 26,

4  2018). Proximate cause, asks "whether [defendant] should be legally responsible for the type of

5  harm [plaintiff] suffered." *Id*. In relation to proximate causation, the doctrine of superseding or

6  intervening causation applies in § 1983 actions. *See, e.g., Van Ort v. Estate of Stanewich*, 92 F.3d

7  831, 837 (9th Cir. 1996) (in § 1983 actions, the Ninth Circuit has looked to "[t]raditional tort law"

8  to define "intervening causes that break the chain of proximate causation"). A defendant's

9  conduct is not the proximate cause of the plaintiff's alleged injuries if another cause intervenes/

10  supersedes the liability for the subsequent events. *See id*. Proximate cause serves "to preclude

11  liability in situations where the causal link between conduct and result is so attenuated that the

12  consequence is more aptly described as mere fortuity." *Mendez v. Cnty. of Los Angeles*, 897 F.3d

13  1067, 1076 (9th Cir. 2018) (quoting *Paroline v. United States*, 572 U.S. 434, 445 (2014)).

14      "Causation is generally a question of fact for the jury, unless the proof is insufficient to

15  raise a reasonable inference that the act complained of was the proximate cause of the injury.'"

16  *Prosser v. Crystal Viking F/V*, 940 F.2d 1535 (9th Cir. 1991) (quoting *Lies v. Farrell Lines, Inc*.,

17  641 F.2d 765, 770 (9th Cir. 1981) (internal quotation marks omitted)). "[A]lthough the question

18  of proximate causation in a section 1983 action is sometimes for the court and sometimes for the

19  jury, the court decides whether reasonable disagreement on the issue is tenable." *Van Ort v.*

20  *Estate of Stanewich*, 92 F.3d 831, 837 (9th Cir. 1996) (quoting *Springer v. Seaman*, 821 F.2d 871,

21  876-77 (1st Cir. 1987)).

22      Here, Wellpath Defendants argue that:

23      > Ms Atwal triaged Ms. Snider into the mental health system of the
24      > Merced County Jail, whereupon she was seen by several mental
        > health specialists in the intervening days prior to Ms. Snider's
25      > suicide. Multiple subsequent evaluations and inquiries as to Ms.
        > Snider's suicidal ideation occurred in the interim by practitioners
26      > experienced and with expertise in mental health, unlike Ms. Atwal
        > who was a medical RN. Given none of these subsequent evaluations
27      > alluded to Ms. Snider's suicide, it is impossible that any conduct
        > antecedent by Ms. Atwal would have changed Ms. Snider's course
28      > in any way.

(Doc. 135 at 8–9.) This argument is not persuasive. First, it appears that this specific argument was not raised in the opening motions papers, which focused only on the assertion (rejected above) that Plaintiff's expert failed to attribute Ms. Snider's death to Nurse Atwal's conduct. (*See* Doc. 127 at 20–21; *see also Tinnin v. Sutter Valley Med. Found*., 647 F. Supp. 3d 864, 872 (E.D. Cal. 2022) (arguments raised for the first time in reply need not be considered by the Court). Second, the argument fails to view the factual record in a light most favorable to Plaintiffs. As mentioned, Ms. Snider underwent two screenings upon her arrival at the jail. The first was performed by a booking officer, the second by Nurse Atwal. Both these screenings asked Ms. Snider the following question followed by the option to circle "YES" or "NO": "Have you ever attempted suicide?" (*Id*. & Ex. 2 (Bates: County0408).) Ms. Snider answered that question "yes" during her first interview with the booking officer on March 18, 2019 at approximately 3:50 pm. (Doc. 127-3 at 317.) Nurse Atwal admitted to knowing that Ms. Snider answered that question "YES" when interviewed by the booking officer. (Atwal Depo. at 73–75.) During Nurse Atwal's intake interview of Ms. Snider, which took place at approximately 5:10 pm *that same day*, Ms. Snider answered that same question "NO". (Doc. 127-3 at 212-217.) Despite this contradiction, Nurse Atwal believed she was obligated to record the "NO" response in her medical intake form. (Atwal Depo at p. 75 ("I would chart whatever the inmate would tell me.").) Nurse Atwal referred Ms. Snider for further mental health treatment, though it is unclear exactly why she did so. (*Id*. at 74.[13]) However, Nurse Atwal appears to have taken no further direct steps to address the contradictory information about Ms. Sniders suicide history.

Dr. Kupers opined that Nurse Atwal should instead have "r[u]ng the bell" to "refer this to a higher level" because "[t]here's a piece of data there that needs to be investigated." (Kupers Depo at p. 91, 93.) Dr. Kupers further opined that Nurse Atwal should have, but did not, take steps to "keep [Ms. Snider] safe" from the risk of self-harm. (*Id*. at 94–95 ("[I]t's not the same to refer someone to Mental Health on the basis of next available Mental Health person to see her or

---

[13] Nurse Atwal explained that in instances where an inmate is not suicidal at the moment of the interview but has attempted suicide in the past, she would "make a mental health referral due to past attempted suicide." (Atwal Depo at p. 75.) At the same time, Nurse Atwal indicated that on her charting for Ms. Snider she "made a referral because she had PTSD." (*Id*.)

1   something, versus, 'I'm concerned that there's a danger here, so I'm going to keep her safe until

2   it's determined that the danger is either not there or past.' That's what she should have done, and

3   she didn't do that."). Based on this set of facts, the Court cannot agree with Defendants' assertion

4   that "it is impossible that any conduct antecedent by Ms. Atwal would have changed Ms. Snider's

5   course in any way." The motion for summary judgment/adjudication is **DENIED** as to Nurse

6   Atwal.

7   **B.      Fourteenth Amendment Substantive Due Process Claim**

8          Plaintiffs' third cause of action[14] is a Fourteenth Amendment Substantive Due Process

9   loss of companionship claim. (FAC, ¶¶ 107–109.) "Both parents and children of a decedent have

10  been found to have a constitutionally protected liberty interest in their familial relationship under

11  the Fourteenth Amendment." *Kim v. City of Santa Clara*, No. C 09-00025 RS, 2010 WL

12  2034774, at *6 (N.D. Cal. May 19, 2010) (*citing Curnow By and Through Curnow v. Ridgecrest

13  Police*, 952 F.2d 321, 325 (9th Cir. 1991)). This interest extends to the relationship between a

14  parent and an adult child. *See Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1106 (9th Cir.

15  2014).

16         The parties debate the exact substantive due process standard to apply to a loss of

17  companionship claim based on medical indifference. (*Compare* Doc. 127 at 21 (Defense focusing

18  on the "shocks the conscience" standard) *with* Doc. 134 at 16 (Plaintiffs discussing the distinct

19  "unwarranted state interference" standard)); *see also Ixta v. Cnty. of Ventura*, No. 2:22-CV-

20  02468-MCS-AFM, 2023 WL 2626370, at *7 (C.D. Cal. Feb. 21, 2023) (collecting cases and

21  concluding that the "unwarranted interference" standard applies outside the context of police

22  shootings). For purposes of this order, the Court will assume the seemingly more onerous "shocks

23  the conscious" standard applies. "Just as the deliberate indifference of prison officials to the

24  medical needs of prisoners may support Eighth Amendment liability, such indifference may also

25  'rise to the conscience-shocking level' required for a substantive due process violation." *See

26  Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) (quoting *Cnty

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [14] The second cause of action is a Monell claim against the "entity defendants." (Doc. 11, ¶¶ 102–106.) Wellpath
    does not challenge that claim in this motion. (Doc. 135 at 8.)

1  *of Sacramento v. Lewis*, 523 U.S. 833, 849–50 (1998)). "A prison official's deliberately

2  indifferent conduct will generally 'shock the conscience' so as long as the prison official had time

3  to deliberate before acting or failing to act in a deliberately indifferent manner." *Id.* (internal

4  citations omitted.)

5      Defendants' motion for summary judgment on this claim is premised on the same grounds

6  already discussed in the context of the deliberate indifference claim. As to Nurse Atwal, they

7  argue that Plaintiffs have failed to establish causation. (Doc. 127 at 22.) As to the other Wellpath

8  Defendants, they claim that Plaintiffs have failed to show a breach of the standard of care. (*Id.*)

9      As explained above, there is a dispute of fact as to whether Nurse Atwal caused Ms.

10  Snider's suicide. Therefore, she is not entitled to summary judgment on the substantive due

11  process claim.[15] The motion is **DENIED** as to this claim against Defendant Atwal.

12      As to Defendant Dunwoody, if the Plaintiffs' version of the facts is true, she stands in the

13  same position as Nurse Atwal. Having reviewed and disregarded the conflicting statements about

14  Ms. Snider's history of suicide, a finder of fact could conclude she was both deliberately

15  indifferent and that her conduct "shocked the conscious." The Court sees no reason to distinguish

16  her from Nurse Atwal at this stage of the case. The motion is **DENIED** as to the substantive due

17  process claim against Defendant Dunwoody.

18      As to Defendants Chang, Ramirez-Aguilar, Burns, Ryland, Burdi, and Quinn-Fitzpatrick,

19  Plaintiffs have failed to create a dispute of fact that any of them breached the standard of care.

20  Under the circumstances of this case, absent a breach of the standard of care, there can be no

21  finding that the conduct of these defendants either shocked the conscience or amounted to an

22  unwarranted state interference with a protected relationship. The motion is **GRANTED** as to the

23  substantive due process claim against these Defendants.

24      As to Defendants Autrey and Fulcher, if the Plaintiffs' version of the facts is true, they

25  could have observed Ms. Snider's four-centimeter, unhealed hesitation mark within 24 hours of

26

27  ───────────────────

[15] Almost as an aside, Defendants argue that Nurse Atwal's "thorough examination" of Ms. Snider "cannot be said to be 'conscience shocking'." (Doc. 127 at 22.) Yet they concede that Dr. Kupers contends that Nurse Atwal should

28  have assessed Ms. Snider to be an acute risk of suicide. (*Id.*) This is a quintessential dispute of fact – a fact that is material to the substantive due process analysis.

her death. If they should have seen it, then a finder of fact could conclude they were deliberately indifferent by failing to take action to protect Ms. Snider from further self-harm and that this conduct shocked the conscience. The motion is **DENIED** as to the substantive due process claim against Defendants Autrey and Fulcher.

### C.      California Wrongful Death Claim

The sixth cause of action advances a wrongful death and survival claim under California law. (FAC, ¶¶ 118–121.) The elements of a California wrongful death claim are: "(1) a wrongful act or neglect on the part of one or more persons that (2) causes (3) the death of another person." *Estate of Prasad v. County of Sutter*, 958 F. Supp. 2d 10 1101, 1118 (E.D. Cal. 2013) (quoting *Norgart v. Upjohn Co*., 21 Cal. 4th 383, 390 (1999) (quoting Cal. Code Civ. Pro. § 377.60)). Such a claim may be predicated on negligence or other tortious conduct. *Id*. Once again, Defendants advance the same arguments: that Nurse Atwal's conduct did not cause Ms. Snider's death and that the other Defendants did not breach the standard of care. The Court can discern no reason why the result should change as to this claim.

Defendants do not argue that Nurse Atwal was not negligent; they again focus on causation, insisting that "whether [Nurse Atwal's] intake examination caused Ms. Snider's later death is not disputed." (Doc. 127 at 25.) For the reasons already articulated, the Court disagrees. The motion is **DENIED** as to the wrongful death claim against Nurse Atwal.

As to Defendant Dunwoody, again, if the Plaintiffs' version of the facts is true, she reviewed and disregarded the conflicting statements about Ms. Snider's history of suicide. A finder of fact could conclude this breached the standard of care. Defendants do not make other arguments as to Ms. Dunwoody. The motion is **DENIED** as to the wrongful death claim against Defendant Dunwoody.

As to Defendants Chang, Ramirez-Aguilar, Burns, Ryland, Burdi, and Quinn-Fitzpatrick, Plaintiffs have failed to create a dispute of fact that they breached the standard of care, a necessary element of a wrongful death claim under the circumstances. The motion is **GRANTED** as to the wrongful death claim against these Defendants.

As to Defendants Autrey and Fulcher, if the Plaintiffs' version of the facts is true, they

could have observed Ms. Snider's four-centimeter, unhealed hesitation mark within 24 hours of her death. There is record evidence suggesting that doing nothing to prevent Ms. Snider from further harming herself after such an observation breached the standard of care. (*See* Kupers Depo. at p. 76. ("So while the COWS is coming to a zero conclusion, we have contrary evidence. Because the COWS is just a convention. It's just one way to monitor people. But it's very clear that Ms. Snider was having emotional difficulty; that she had hesitation marks that were done at the jail, the fresh hesitation marks. So she was contemplating self-harm. We don't know more details. She's not here to talk to us.").) The motion is **DENIED** as to the substantive due process claim against Defendants Autrey and Fulcher.

### D.      Bane Act Claim

The fifth cause of action alleges that the individual Defendants, including the individual Wellpath Defendants, "interfered with Ms. Snider's constitutional right to receive adequate mental health care while incarcerated through their deliberate indifference" in violation of California's Bane Act, Cal. Civ. Code § 52.1, which proscribes interference "by threats, intimidation, or coercion, or attempts to interfere by threats, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state." (*See* FAC, ¶¶ 116–17.) "The essence of a Bane Act claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Cornell v. City & Cnty. of San Francisco*, 17 Cal. App. 5th 766, 791–922, 225 (2017).

In addition to the arguments repeatedly discussed above, Defendants contend that this claim cannot survive because the Bane Act requires a showing of "coercion" separate from the underlying constitutional violation. (Doc. 127 at 26–27.) In support of this proposition, Defendants first cite *Shoyoye v. County of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012), in which a clerical computer error caused the defendant to be unlawfully detained for two weeks after he had been ordered released. *Id*. at 947. There, the state court of appeals concluded that the

plaintiff was required to demonstrate a form of coercion separate and distinct from that inherent in a wrongful detention. *Id*. at 959.

The Defense also cites *Lowe v. County of Butte*, No. 2:20-CV-01997-JAM-DMC, 2021 WL 1890386, at *9 (E.D. Cal. May 11, 2021), an Eighth Amendment deliberate indifference case. There, the court concluded that "because failure to respond to an inmate's medical needs does not necessarily involve threats, coercion, or intimidation," a plaintiff bringing such claims is required to separately demonstrate a threatening, coercive, or intimidating act. *Id*. As the court explained.

> In *Cornell*, the California Court of Appeal recognized that nothing in the text of the Bane Act "requires that the offending threat, intimidation or coercion be independent from the constitutional violation alleged." [17 Cal. App. 5th at 800.] That case involved a claim for false arrest after the plaintiff had been arrested without probable cause. [*Id*. at 777–76.] The court found "that the use of excessive force can be enough to satisfy the threat, intimidation or coercion element of Section 52.1." [*Id*. at 799.] It also held "the Bane Act requires a 'specific intent to violate the arrestee's right to freedom from unreasonable seizure.'" *Reese v. Cty. of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 801).

> "District courts in California have yet to reach a consensus as to whether a plaintiff bringing a Bane Act claim for deliberate indifference to serious medical needs must plead threats and coercion independent of the constitutional violation." *Lapachet v. Cal. Forensic Med. Grp. Inc.*, 313 F. Supp. 3d 1183, 1195 (E.D. Cal. 2018). This Court is ultimately more persuaded by Defendants' position that claims for deliberate indifference to serious medical needs must plead facts showing a threat, intimidation, or coercion. The court in *Cornell* found that the plaintiff did not have to demonstrate additional coercive or threatening facts beyond the false arrest claim because there is something inherently coercive about an arrest. *Cornell*, 225 Cal. Rptr. 3d at 382. Contrastingly, there is nothing inherently threatening, intimating, or coercive about failing to provide adequate medical care. While nothing in the text of the Bane Act "requires that the offending threat, intimidation or coercion be independent from the constitutional violation alleged", *id*. at 383, the text does require that a right has been "interfered with [. . .] by threats, intimidation, or coercion" or by an attempt to threaten, intimidate, or coerce. Cal. Civ. Code § 52.1(a)-(b).

*Lowe*, 2021 WL 1890386 at *9. *Lowe* has yet to be relied upon for this holding by any other court.

The opposite conclusion has gained greater momentum. In a decision issued in 2018, a judge in this district thoroughly explored the relevant authorities before rejecting the position

26

advocated by the Defense here. *See Scalia v. Cnty. of Kern*, 308 F. Supp. 3d 1064, 1079–84 (E.D. Cal. 2018). That published decision, which is lengthy and detailed, has been relied upon numerous times in more recent decisions. As the court in *Galley v. Cnty. of Sacramento*, No. 2:23-CV-00325 WBS AC, 2023 WL 4534205, at *5 (E.D. Cal. July 13, 2023), summarized: "[M]ultiple district courts have adopted the position that "a prisoner who successfully proves that prison officials acted or failed to act with deliberate indifference to his medical needs adequately states a claim for relief under the Bane Act.") (collecting cases); *see also Rojas v. California Dep't of Corr. & Rehab.*, No. 2:21-CV-01086 DAD AC, 2024 WL 584804, at *5 (E.D. Cal. Feb. 13, 2024), *report and recommendation adopted in part, rejected in part on other grounds*, 2024 WL 3467065 (E.D. Cal. July 19, 2024); *Ahn v. GEO Grp., Inc*., No. 1:22-CV-00586-CDB, 2024 WL 1257260, at *6 (E.D. Cal. Mar. 25, 2024); *Mollica v. Cnty. of Sacramento*, No. 2:19-CV-02017-KJM-DB, 2023 WL 3481145, at *14 (E.D. Cal. May 16, 2023); *Shoar v. Cnty. of Santa Clara*, No. C 22-00799 WHA, 2022 WL 10177673, at *2–3 (N.D. Cal. Oct. 17, 2022).

As the court in *Shoar* explained "[t]he significance of *Shoyoye* has been the subject of dispute . . . as some courts interpret it as standing only for the proposition that the threat or coercion cannot be a result of mere human error or negligence, but instead requires intentional conduct."  *Shoar*, 2022 WL 10177673 at * 2, citing *M.H. v. County of Alameda*, 90 F. Supp. 3d 889 (N.D. Cal. 2013)). *M.H*. reasoned that *Shoyoye*'s holding, which addressed an accidental clerical error leading to a constitutional deprivation, did not control in the context of a deliberate indifference to medical needs claim, because such claims necessarily require more than "mere negligence." 90 F. Supp. 3d at 889.[16] Relatedly, in *Page v. County of Madera*, 2017 WL 5998227, at *4 (E.D. Cal. Dec. 4, 2017), the court reasoned:

> [P]laintiffs bringing Bane Act claims for deliberate indifference to serious medical needs must only allege prison officials knowingly deprived [them] of a constitutional right or protection through acts that are inherently coercive and threatening, such as housing a prisoner in an inappropriate cell, failing to provide treatment plans or adequate mental health care, and failing to provide sufficient observation.

---

[16] In *Cornell*, a state court of appeal explicitly approved of M.H's reasoning, albeit in a footnote. *See Cornell*, 17 Cal. App. 5th at 802 n. 31.

1   *See also Shoar*, 2022 WL 10177673, at *3 (following *Page* because "Shoar was at first put in a

2   safety cell, but later transferred to a regular one, where he had access to a ligature[, and] was

3   [allegedly] inadequately supervised without appropriate suicide prevention precautions, such as

4   the 15-minute safety checks. In a prison detention context, these actions plausibly constitute

5   inherently coercive and threatening acts and thus satisfy the first prong.").

6       Though *Lowe*'s holding is not illogical in the abstract, the Court finds it more appropriate

7   to apply the developing majority rule under the circumstances of this case. There is evidence that

8   Ms. Snider was confined to her cell for 22 hours per day, a circumstance akin to solitary

9   confinement and which Plaintiffs' expert suggests increases the risk of suicide. (Kupers Depo. at

10  9–10.) Dr. Kupers further opines that "Ms. Snider, a prisoner at high risk of suicide," should not

11  have been confined in this manner "and should not have been left alone in a cell without rigorous

12  monitoring." (*Id.* at 17.) There is, therefore, at least some evidence that the prison environment

13  itself contributed to Ms. Snider's suicide. This is sufficient to create a dispute of fact as to

14  inherent coercion and therefore to overcome the Defendants' motion for summary judgment,

15  which focuses solely on the threat/intimidation/coercion issue.[17] With that issue resolved, there is

16  no reason to distinguish this claim from the federal deliberate indifference claim. Therefore, the

17  results are identical. The motion is **DENIED** as to the Bane Act claim against Defendants Atwal,

18  Dunwoody, Autrey, and Fulcher and **GRANTED** as to all other Wellpath Defendants.

19                      **V.      CONCLUSION AND ORDER**

20      For the reasons set forth above, the motion for summary judgment is **GRANTED IN**

21  **PART AND DENIED IN PART**. As to the fourteenth amendment deliberate indifference,

22  fourteenth amendment substantive due process, California wrongful death, and California Bane

23  Act claims, the motion is **DENIED** as to Defendants Atwal, Dunwoody, Autrey, and Fulcher and

24  **GRANTED** as to Defendants Chang, Ramirez-Aguilar, Burns, Ryland, Burdi, and Quinn-

25  Fitzpatrick.

26  _____

27  [17] Defendants separately argue that a Bane Act claimant must assert a constitutional violation distinct from that
    presented in his federal constitutional claim, citing *Mendez v. County of Alameda*, 2005 WL 3157516, *11 (N.D. Cal.
    2005). (Doc. 127 at 26.) But, as Plaintiffs point out (Doc. 134 at 10), *Mendez* merely held, unsurprisingly, that where

28  the federal claim is deficient and the Bane Act claim relies upon the federal constitutional violation as its foundation,
    the Bane Act claim also fails.

The existing pretrial conference date of August 12, 2024 and trial date of October 22, 2024 remain on calendar. The parties are again reminded that the undersigned generally requires a formal settlement conference take place before any civil case proceeds to trial. Should the parties jointly wish to schedule a settlement conference, they are directed to contact Courtroom Deputy Irma Munoz at imunoz@caed.uscourts.gov.

IT IS SO ORDERED.

Dated:   **July 24, 2024**

UNITED STATES DISTRICT JUDGE